Joseph S. Leventhal
Joseph.leventhal@dinsmore.com
DINSMORE & SHOHL LLP
655 West Broadway, Suite 840
San Diego, CA 92101
(619) 356-3518 (T) / (619) 400-0501 (F)

Richard D. Harris (*pro hac vice* forthcoming)
harrisr@gtlaw.com
James J. Lukas, Jr. (*pro hac vice* forthcoming)
lukasj@gtlaw.com
GREENBERG TRAURIG, LLP
77 West Wacker Drive, Suite 3100
Chicago, IL 60601
(312) 456-8400 (T) / (312) 456-8435 (F)

*Attorneys for Defendants and Counterclaim-Plaintiffs,*
*LG Electronics, Inc., LG Electronics U.S.A., Inc., and LG*
*Electronics Mobilecomm U.S.A., Inc.*

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WI-LAN, INC., WI-LAN USA, INC., and WI-LAN LABS, INC.,<br><br>　　　　　Plaintiffs,<br><br>v.<br><br>LG ELECTRONICS, INC., LG ELECTRONICS U.S.A., INC., and LG ELECTRONICS MOBILECOMM U.S.A., INC.,<br><br>　　　　　Defendants. | CASE NO. 18CV1577 AJB BGS<br><br>**DEFENDANTS LG ELECTRONICS, INC., LG ELECTRONICS U.S.A., INC., AND LG ELECTRONICS MOBILECOMM U.S.A., INC.'S ANSWER TO COMPLAINT, AFFIRMATIVE DEFENSES, AND COUNTERCLAIMS**<br><br>**DEMAND FOR JURY TRIAL** |

18cv1577

LG ELECTRONICS, INC., LG
ELECTRONICS U.S.A., INC., and LG
ELECTRONICS MOBILECOMM
U.S.A., INC.,

        Counterclaim-Plaintiffs,

v.

WI-LAN, INC., WI-LAN USA, INC.,
and WI-LAN LABS, INC.,

        Counterclaim-Defendants.

Defendants LG Electronics, Inc., LG Electronics U.S.A., Inc. and LG Electronics Mobilecomm U.S.A., Inc. (collectively, "LG") by and through their undersigned counsel of record and for its Answer to the Complaint of Plaintiffs Wi-LAN, Inc., Wi-LAN USA, Inc., and Wi-LAN Labs, Inc. (collectively, "Wi-LAN") herein states as follows:

## NATURE OF ACTION

1.     This is an action for infringement of U.S. Patent Nos. 8,787,924 ("the '924 Patent"), 8,867,351 ("the '351 Patent"), 9,226,320 ("the '320 Patent"), and 9,497,743 ("the '743 Patent").

**Answer:**     LG admits that the Complaint purports to state causes of action for infringement of the '924 Patent, the '351 Patent, the '320 Patent, and the '743 Patent against LG.  LG denies that any such claims are meritorious with respect to LG.  LG denies all of the remaining allegations of this Paragraph.

## THE PARTIES

2.     Plaintiff WI-LAN INC. is a corporation organized and existing under the laws of Canada, with a Canadian Corporation Number of 854057-8 and Business Number (BN) of 811594530RC0001, with its principal place of business at 303 Terry Fox Drive, Suite 300, Ottawa, ON, K2K 3J1, Canada.

**Answer:**     LG does not have sufficient information to admit or deny the allegations set forth in this Paragraph and, therefore, denies same.

3.     Plaintiff Wi-LAN USA, Inc. is a corporation organized and existing under the laws of Florida with its principal executive office at 303 Terry Fox Drive, Suite 300, Ottawa, ON, K2K 3J1, Canada, and a principal business office at 600 Anton Blvd., Suite 1350, Costa Mesa, CA, 92626.

**Answer:**     LG does not have sufficient information to admit or deny the allegations set forth in this Paragraph and, therefore, denies same.

4.     Plaintiff Wi-LAN Labs, Inc. is a corporation organized and existing under the laws of Delaware with its principal executive office at 303 Terry Fox Drive, Suite

300, Ottawa, ON, K2K 3J1, Canada, and a principal business office at 5962 La Place Court Suite 265, Carlsbad, CA 92008.

**Answer:** LG does not have sufficient information to admit or deny the allegations set forth in this Paragraph and, therefore, denies same.

5. LG Electronics, Inc. is incorporated under the laws of South Korea with its principal place of business at LG Twin Towers 20, Yeouido-dong, Yeongdeunspo-gu, Seoul 150-721, South Korea. Upon information and belief, LG Electronics, Inc. owns and controls, directly and/or indirectly, LG Electronics U.S.A., Inc. and LG Electronics Mobilecomm U.S.A., Inc.

**Answer:** Admitted that LG Electronics, Inc. is a South Korean corporation and has a principal place of business in Seoul, South Korea. Admitted that LG Electronics U.S.A., Inc. and LG Electronics Mobilecomm U.S.A., Inc. are wholly owned subsidiaries of LG Electronics, Inc. LG denies all of the remaining allegations of this Paragraph.

6. LG Electronics U.S.A., Inc. is a Delaware corporation with its principal place of business at 1000 Sylvan Ave, Englewood Cliffs, New Jersey. LG Electronics U.S.A., Inc. may be served via its registered agent, United States Corporation Company, 2711 Centerville Rd. Ste. 400, Wilmington, DE 19808.

**Answer:** Admitted that LG Electronics U.S.A., Inc. is a Delaware corporation and has a principal place of business in Englewood Cliffs, New Jersey. To the extent the remaining allegations of this Paragraph purport to state a legal conclusion, no response thereto is required. To the extent a response is deemed to be required, LG admits that LG Electronics U.S.A., Inc. may be served via its registered agent.

7. LG Electronics Mobilecomm U.S.A., Inc. is a California corporation with its principal place of business at 10225 Willow Creek Rd., San Diego, California 92131. LG Electronics Mobilecomm U.S.A., Inc. may be served via its registered agent, Corporation Service Company (Which will do Business in California as CSC - Lawyers Incorporating Service), 2710 Gateway Oaks Dr. Ste. 150N Sacramento, CA 95833.

**Answer:** Admitted that LG Electronics Mobilecomm U.S.A., Inc. is a

California corporation and has a principal place of business in San Diego, California.  To the extent the remaining allegations of this Paragraph purport to state a legal conclusion, no response thereto is required.  To the extent a response is deemed to be required, LG admits that LG Electronics Mobilecomm U.S.A., Inc. may be served via its registered agent.

## JURISDICTION AND VENUE

8.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a) because this action arises under the patent laws of the United States, 35 U.S.C. §§ 101 *et seq*.

**Answer:**     To the extent the allegations of this Paragraph purport to state a legal conclusion, no response thereto is required.  To the extent a response is deemed to be required, LG admits that 28 U.S.C. §§ 1331 and 1338(a) provide jurisdiction to this Court for cases arising under federal patent law.

9.     This Court has personal jurisdiction over LG as personal jurisdiction over LG in this action comports with due process.  LG has conducted and regularly conducts business within the United States and this judicial district.  LG has continuous and systematic contacts with California and this judicial district.  Furthermore, LG has purposefully availed itself of the privileges of conducting business in the United States and this judicial district.  LG has sought protection and benefit from the laws of the State of California by maintaining offices in California and this judicial district, by selling products with the expectation and/or knowledge that they will be purchased by consumers in this judicial district, and/or by offering advertisements targeted at consumers in this judicial district, and/or by having partners and customers in this judicial district.  In California and in this judicial district, LG regularly does or solicits business and engages in other persistent courses of conduct.  LG derives substantial revenue from services provided to individuals in California and in this judicial district.  Plaintiff's causes of action arise directly from LG's activities in this judicial district.  In particular, LG's research and development division is based in San Diego.  And LG's

San Diego-based division is the center of LG's 3GPP and standardization efforts.  LG has even sought to transfer other patent cases involving LTE technology to the Southern District of California.

**Answer:**    To the extent the allegations of this Paragraph purport to state a legal conclusion, no response thereto is required.  To the extent a response is deemed to be required, LG denies the allegations of this Paragraph, but states that it does not contest personal jurisdiction over LG.

10.    Joinder of Defendants is proper because Defendants are related parties who are either jointly and severally liable for infringement, or who make, use, sell, offer for sale, or import the same or similar accused products that practice the same 4G LTE standards.  Further, upon information and belief, Defendants use the same chip suppliers and chipsets in their infringing products, meaning the factual question of infringement will substantially overlap between Defendants.  Further, Plaintiffs anticipate that there will be substantial overlap during the discovery process.

**Answer:**    To the extent the allegations of this Paragraph purport to state a legal conclusion, no response thereto is required.  To the extent a response is deemed to be required, LG denies the allegations of this Paragraph.

11.    Venue is proper in this federal district pursuant to 28 U.S.C. §§ 1391(b)-(c) and 1400(b) in that one or all Defendants reside in this District, have done business in this District, have regular and established places of business in this District, have committed acts of infringement in this District, and continue to commit acts of infringement in this District, entitling Plaintiffs to relief.

**Answer:**    To the extent the allegations of this Paragraph purport to state a legal conclusion, no response thereto is required.  To the extent a response is deemed to be required, LG admits that 28 U.S.C. §§ 1391(b) and (c) and 1400(b) provide for venue in this District.  LG denies all of the remaining allegations of this Paragraph.

12.    No other venue is more convenient than the Southern District of California.  Plaintiff Wi-LAN Labs, Inc. resides in this district.  Two of the three patents in suit were

developed in this district (and the other was developed elsewhere in California).  Further, many of the inventors of the patents-in-suit, including Ken Stanwood, Yair Bourlas, Adam Newham, and Lei Wang currently reside in this district.  And Wi-LAN's current U.S. headquarters is also located in California (600 Anton Boulevard, Suite 1350, Costa Mesa, California 92626).  Also, important third-party suppliers for Defendants' infringing products reside in this district.

**Answer:**     To the extent the allegations of this Paragraph purport to state a legal conclusion, no response thereto is required.  To the extent a response is deemed to be required, LG states that it does not have sufficient information to admit or deny the allegations set forth in this Paragraph and, therefore, denies same.  LG also denies that any of its products are infringing.

## **BACKGROUND OF THE TECHNOLOGY**

13.     Wi-LAN Labs developed advanced 4G technologies and products for Wi-LAN and others in the wireless industry that enhance the capacity, quality of user experience, and connectivity of 4G (and next generation 5G) mobile devices and networks.

**Answer:**     LG does not have sufficient information to admit or deny the allegations set forth in this Paragraph and, therefore, denies same.

14.     Several of the 4G patents asserted in this action were developed by Wi-LAN's own Ken Stanwood, the former president of Wi-LAN Labs and current CTO at Wi-LAN, and his team.

**Answer:**     LG does not have sufficient information to admit or deny the allegations set forth in this Paragraph and, therefore, denies same.

15.     Mr. Stanwood has played a leadership role in the development of 4G technologies and standards for more than a decade, starting with the industry's first major 4G cellular initiative, referred to as WiMAX.  He served as Vice Chair of the IEEE 802.16 standards committee for WiMAX from 2003-2006 and as a principal contributor to the original IEEE 802.16 standard for 4G cellular networks and mobile devices.

**Answer:**   LG does not have sufficient information to admit or deny the allegations set forth in this Paragraph and, therefore, denies same.

16.   Mr. Stanwood has written extensively on 4G technologies, including coauthoring a popular textbook on the subject, and has been awarded 125 U.S. patents, with many more patent applications currently pending before the United States Patent Office and worldwide, many of which relate to 4G technologies.

**Answer:**   LG does not have sufficient information to admit or deny the allegations set forth in this Paragraph and, therefore, denies same.

17.   Like Ken Stanwood, Wi-LAN's founders, Michel Fattouche and Hatim Zaghloul, are widely recognized and acknowledged as wireless industry pioneers.  Their technologies, patents and writings have been cited in patents and publications written by thousands of engineers and scientists in the wireless industry.

**Answer**:   LG does not have sufficient information to admit or deny the allegations set forth in this Paragraph and, therefore, denies same.

18.   Wi-LAN's founders developed key cellular "data" technologies, including the W-OFDM air interface, to enable data to be exchanged at desktop speeds over a wireless channel, such as in Wi-Fi networks, or from mobile devices in 4G cellular networks.  Wi-LAN's technologies have made Wi-Fi and 4G in mobile devices possible.[1]

**Answer:**   LG does not have sufficient information to admit or deny the allegations set forth in this Paragraph (including footnote 1) and, therefore, denies same.

19.   The Wi-LAN success story is featured in major publications worldwide, including in such publications as Scientific American[2] and Time Magazine,[3] and in many

---

[1] *See, e.g., Ergen, Mustafa, Mobile Broadband: Including WiMAX and LTE*, John Wiley & Sons, 2009 at p. 110, Section 4.1 "Principles of OFDM: Introduction" (recognizing one of Wi-LAN's first patents, U.S. Patent No. 5,282,222, to W-OFDM as a major milestone in the development of Wi-Fi and 4G technologies, turning a single lane wireless communication channel into a multi-lane super highway, and enabling mobile devices to transmit and receive data at desktop speeds).

[2] The Future of Wireless, *Scientific American*, October 2000 at p. 57 ("To date, wireless multiplexing hasn't been exploited for cellular systems…. That may change soon…. Wi LAN holds a number of key patents for multiplexing technology known as wideband orthogonal frequency division multiplexing, or W-OFDM").

others.   Wi-LAN and its founders have also been the subject of numerous industry awards for their wireless innovations, and for their contribution to the growth in wireless data capability present in today's smartphones, tablets, and other mobile devices.

**Answer:**   LG does not have sufficient information to admit or deny the allegations set forth in this Paragraph (including footnotes 2 and 3) and, therefore, denies same.

20.   One of Wi-LAN's co-founders is featured in one of Canada's leading business publications as among the Top 100 Canadians of the 20th century for Wi-LAN's wireless innovations.[4]  And Wi-LAN's original wireless designs and first wireless mobile device have been displayed in the Canadian equivalent of the Smithsonian Institution.

**Answer**:   LG does not have sufficient information to admit or deny the allegations set forth in this Paragraph (including footnote 4) and, therefore, denies same.

21.   Enabling high-speed wireless data capability in mobile devices was no small task–it posed incredible challenges–something we take for granted today with desktop speeds now standard in 4G mobile devices.

**Answer**:   LG does not have sufficient information to admit or deny the allegations set forth in this Paragraph and, therefore, denies same.

22.   Over the years, Wi-LAN, Wi-LAN Labs, and their predecessors have invested hundreds of millions of dollars in developing, making and selling many of the world's first fixed and mobile devices capable of transmitting and receiving wireless data at desktop speeds.

**Answer:**   LG does not have sufficient information to admit or deny the allegations set forth in this Paragraph and, therefore, denies same.

---

[3] Wi-LAN Shows How to be Successful-and-Canadian-in the Global Economy, *Time Magazine*, April 3, 2000.

[4] Great Canadians, *Maclean's*, July 1, 2000 ("Riding the wave of invention ... Wi-LAN is one of those next generation companies.  Its technology may well become the base for what some call the coming wireless revolution: the ability to e-mail, surf the Net, adjust the lights in your home and order theater tickets from a cellphone or handheld computer.")

23.    Wi-LAN's products which had 4G data speeds include, among others, the I.WILL, BWS 300, LIBRA 3000, LIBRA 5800, LIBRA MX, and the LIBRA Mobilis.

**Answer**:    LG does not have sufficient information to admit or deny the allegations set forth in this Paragraph and, therefore, denies same.

24.    Wi-LAN was the first company in the world to build Wi-Fi and 4G data speeds into mobile devices, with speeds reaching up to 100 megabits per second (Mbps), and it did so a decade before 4G would become the standard in the wireless industry that it is today.

**Answer**:    LG does not have sufficient information to admit or deny the allegations set forth in this Paragraph and, therefore, denies same.

25.    A number of Wi-LAN's advanced 4G technologies have their origin in work started by Wi-LAN's Ken Stanwood and his team while at Ensemble Communications ("Ensemble"), a San Diego company that Mr. Stanwood helped grow (then, as Ensemble's Chief Technology Officer) to over 200 engineers, scientists, and support personnel.

**Answer**:    LG does not have sufficient information to admit or deny the allegations set forth in this Paragraph and, therefore, denies same.

26.    Others of Wi-LAN's advanced 4G technologies have their origin in work created at NextWave Communications, another San Diego company where Mr. Stanwood served as a Vice President.  And yet other technologies were first developed at SOMA network, a California-based company involved in 4G technologies.

**Answer**:    LG does not have sufficient information to admit or deny the allegations set forth in this Paragraph and, therefore, denies same.

27.    The advanced 4G technologies developed by Mr. Stanwood and his team were employed in the network stacks utilizing the 4G WiMAX cellular standard, and were subsequently adopted for use in the network stacks utilizing the 4G LTE cellular standard used in today's 4G mobile devices.

1   **Answer**:    LG does not have sufficient information to admit or deny the
2   allegations set forth in this Paragraph and, therefore, denies same.

3   28.    These advanced 4G technologies include:

4   (i) the bandwidth-on-demand and periodic bandwidth services built into 4G mobile
5   devices to enable apps installed on such devices to have the bandwidth they need, when
6   they need it, in real-time;

7   (ii) the quality-of-service functions built into 4G mobile devices to enable mobile
8   devices to prioritize the services that have the most pressing need for bandwidth; and

9   (iii) the handoff functionality built into 4G mobile devices to identify particular
10  devices and use pre-allocated codes to respond faster to requests from mobile devices.

11  **Answer**:    LG does not have sufficient information to admit or deny the
12  allegations set forth in this Paragraph and, therefore, denies same.

13  29.    The efforts of Mr. Stanwood and other Wi-LAN inventors in developing
14  these advanced 4G technologies have enabled 4G mobile devices to support a variety of
15  services popular among users of Defendants' 4G LTE mobile devices, such as voice,
16  conversational video, live streaming of video and music, real-time gaming, video and
17  photo sharing, email, and instant messaging, all in the palm of your hand ("4G Network
18  Services").

19  **Answer**:    LG does not have sufficient information to admit or deny the
20  allegations set forth in this Paragraph and, therefore, denies same.

21  30.    Wi-LAN's wireless technologies and patents, including its advanced 4G
22  technologies, have been licensed by nearly all companies in the wireless industry,
23  comprising more than 130 companies.

24  **Answer**:    LG does not have sufficient information to admit or deny the
25  allegations set forth in this Paragraph and, therefore, denies same.

26  31.    Defendants' infringement gives them an unfair advantage over their
27  competitors, many of whom have chosen to do the right thing and license their use of Wi-
28  LAN's wireless technologies and patents.  Many of Defendants' major competitors in the

mobile device industry, including Samsung, HTC, Nokia and BlackBerry have licensed Wi-LAN's wireless technologies and patents.

**Answer**:     To the extent the allegations of this Paragraph purport to state a legal conclusion, no response thereto is required.  To the extent a response is deemed to be required, LG states that it does not have sufficient information to admit or deny the allegation that LG's competitors have licensed Wi-LAN's wireless technologies and patents and, therefore, denies same.  LG denies the remaining allegations set forth in this Paragraph.

32.     Wi-LAN has made numerous efforts to license the unauthorized use of its wireless technologies by the Defendants, but Defendants have consistently refused to take a license, choosing to use Wi-LAN's 4G technologies without paying anything for that right.

**Answer**:     LG admits that Wi-LAN sought to license its wireless patent portfolio to LG.  LG denies the remaining allegations set forth in this Paragraph.

33.     Defendants have willfully chosen to not respect the intellectual property of Wi-LAN, including the four 4G patents asserted in this action directed to Wi-LAN's advanced 4G technologies, and it does so despite understanding the importance of intellectual property.

**Answer**:     Denied.

34.     Before initiating litigation, Wi-LAN made substantial efforts to license Defendants' use of Wi-LAN's advanced 4G technologies and patents in their 4G LTE mobile devices, expecting that Defendants would proceed in good faith.

**Answer**:     Denied.

35.     During the spring of 2016, Wi-LAN separately contacted both Defendants to engage in licensing the patents-in-suit relating to LTE and 4G wireless technology.  Both Defendants initially expressed interest.   But despite Wi-LAN's repeated efforts, Defendants failed to take a license.

**Answer**:   LG admits that Wi-LAN contacted LG in the spring of 2016 to renew its license to Wi-LAN's wireless patent portfolio, and that LG did not renew its license. LG denies the remaining allegations set forth in this Paragraph.

36.   Defendants' actions have forced Wi-LAN's hand, leaving it with no choice but to protect its intellectual property through litigation.

**Answer**:   Denied.

## DEFENDANTS' INFRINGING PRODUCTS

37.   LG directly or indirectly through subsidiaries or affiliated companies markets, distributes, manufactures, imports, sells, and/or offers for sale wireless communication products, such as products compliant with the 3rd Generation Partnership Project ("3GPP") 4G LTE standard, including but not limited to the LG G6, Pixel 2, Pixel 2 XL, LG G7, LG V30, LG X Venture, LG V20, LG Watch Urbane 2nd Edition LTE, LG Stylus 3, LG Stylo 2 V, LG Stylo 2 Plus, LG Stylo 3, LG Stylo 3 Plus, LG K3 2017, LG K4 2017, LG K8 2017, LG K10 2017, LG K8V, LG G Stylo, LG Stylo 2, LG Tribute HD, LG Aristo, LG G5, LG G4, LG G4c, LG G3, LG G3 S, LG G3 Beat, LG G3 Vigor, LG G2, LG K7, LG X Power, LG X Mach, LG X cam, LG X screen, LG Leon LTE, LG K10, LG B470, LG B471, LG Escape 3, LG Volt, LG Premier LTE, LG Treasure LTE, LG Classic, LG Rebel, LG Rebel 2, LG Fiesta, LG Grace, LG K20 Plus, LG Treasure, LG X style, LG Premier, LG K3, LG K8, LG K4, LG Optimus Zone 3, LG Optimus G Pro, LG K8 V, LG K8, LG Phoenix 3, LG Phoenix 2, LG Tribute 5, LG Wine 4, LG V10, LG Tribute 5, LG Spree, LG G Vista 2, LG X Charge, LG Risio 2, LG Risio, LG Terra, LG Exalt, LG Exalt II, LG Sunrise, LG G Flex 2, LG Destiny, LG Sunset, LG 441G, LG Access, LG Envoy III, LG 450, LG True, LG Revere 3, LG Extravert 2, LG XPression 2, LG G Flex, LG Cosmos 3, LG G Pad X II, LG G Pad X, LG G Pad F, LG G Pad, LG V30+, LG Q6, LG Fiesta 2 LTE, LG Wine LTE, and LG Stylo 3 Plus Titan, in the United States and in this district.  As some of these products, and additional LG LTE devices, are known by internal model numbers, codenames, or have alternate versions

and iterations, discovery will be necessary to finalize a list of devices that infringe the patents-in-suit.  LG's products support at least Release 8, et seq. of the 4G LTE standard.

**Answer**:      LG admits that LG Electronics, Inc. makes the above-listed products and LG Electronics Mobilecomm U.S.A., Inc. sells the above-listed products, but LG states that LG Electronics U.S.A., Inc. does not market, distribute, manufacture, import, sell, or offer for sale any of the above-listed products.  LG denies the remaining allegations set forth in this Paragraph.

Upon information and belief, LG's products also include software and associated hardware that prioritize the transmission of data generated by various applications that run on these LG products, and in doing such prioritization utilize the claimed inventions of the patents asserted in this action.

**Answer**:      Denied.

### INFRINGEMENT OF U.S. PATENT NO. 8,787,924

39.      On July 22, 2014, United States Patent No. 8,787,924 ("the '924 Patent") was duly and legally issued for inventions entitled "Methods and Systems for Transmission of Multiple Modulated Signals Over Wireless Networks."  WI-LAN INC. owns the '924 Patent and holds the right to sue and recover damages for infringement thereof.

**Answer**:      LG admits that the '924 Patent is titled "Methods and Systems for Transmission of Multiple Modulated Signals Over Wireless Networks."  LG admits that the face of the '924 Patent indicates that it was issued on July 22, 2014.  LG admits that the face of the '924 Patent indicates that Wi-LAN, Inc. is the applicant and assignee of the '924 Patent at least as of the issue date.  LG denies that the '924 Patent was duly and legally issued.  LG denies the remaining allegations set forth in this Paragraph, and notes that the '924 Patent was not attached to the Complaint.

40.      On information and belief, Defendants have directly infringed and continue to directly infringe numerous claims of the '924 Patent, including at least claims 1 and 17, by manufacturing, using, selling, offering to sell, and/or importing their respective

accused 4G LTE devices.  Defendants are liable for infringement of the '924 Patent pursuant to 35 U.S.C. § 271(a).

**Answer**:   Denied.

41.   For example, the LG accused 4G LTE devices comply with the 4G LTE standards, including the UL-SCH data transfer procedure specified by 3GPP TS 36.321 at section 5.4.  In particular, the accused 4G LTE devices first transmit a Scheduling Request (*i.e.*, "a one bit message to the base station to request an allocation of UL bandwidth in which to transmit a bandwidth request") and then subsequently transmit a Buffer Status Report (*i.e.*, a "bandwidth request indicative of an amount of pending UL data").  Thereafter, the accused devices dynamically allocate the assigned UL bandwidth amongst their respective "UL services based on a QoS parameter of a respective service."

**Answer**:   Denied.

42.   Defendants have been and are now indirectly infringing at least one claim of the '924 Patent in accordance with 35 U.S.C. § 271(b) in this district and elsewhere in the United States.  More specifically, Defendants have been and are now actively inducing direct infringement by other persons (*e.g.*, Defendants' customers who use, sell or offer for sale products that embody and/or otherwise practice one or more claims of the '924 Patent).

**Answer**:   Denied.

43.   By at least the filing of the complaint in Case No. 3:17-cv-00358- BEN-MDD on February 22, 2017, and by at least the filing of this complaint, Defendants had knowledge of the '924 Patent, and that their actions resulted in a direct infringement of the '924 Patent, and knew or were willfully blind that their actions would induce direct infringement by others and intended that their actions would induce direct infringement by others.

**Answer**:   To the extent the allegations of this Paragraph purport to state a legal conclusion, no response thereto is required.  To the extent a response is deemed to be required, LG admits that LG Electronics U.S.A., Inc. and LG Electronics Mobilecomm

U.S.A., Inc. were aware of the '924 Patent as of the date of service of Wi-LAN's Complaint in Case No. 3:17-cv-00358- BEN-MDD, but states that LG Electronics, Inc. was not aware of the '924 Patent as of the date of service of Wi-LAN's Complaint in Case No. 3:17-cv-00358- BEN-MDD.  LG further admits that LG Electronics, Inc. was aware of the '924 Patent at least as of the filing of this complaint.  LG denies all of the remaining allegations of this Paragraph.

44.   Defendants actively induce such infringement by, among other things, providing user manuals and other instruction material for their devices that induce their customers to use Defendants' devices in their normal and customary way to infringe the '924 Patent.  For example, LG's website provides instructions for using the LG devices on 4G LTE networks.  *See, e.g.*, http://www.lg.com/us/4g-lte-phones (noting that "LG 4G LTE phones feature forward-thinking designs and innovative technology" and emphasizing the "4G LTE phone Network," which permits the accused LG 4G LTE devices to "stay connected wherever you go on a super-fast LTE network, for seamless and reliable use.").  As does LG's user documentation for the accused devices.  *See, e.g.*, http://www.lg.com/us/support-mobile/lg-H910-Silver (encouraging customers to use the "Enhanced LTE Service").   Through its manufacture and sales of their devices, Defendants specifically intended for their customers to infringe the '924 Patent.  Further, Defendants were aware that these normal and customary activities would infringe the '924 Patent.  Defendants performed the acts that constitute induced infringement, and that would induce actual infringement, with knowledge of the '924 Patent and with the knowledge or willful blindness that the induced acts would constitute direct infringement.

**Answer**:   Denied.

45.   Accordingly, a reasonable inference is that Defendants specifically intend for others, such as their customers, to directly infringe one or more claims of the '924 Patent in the United States because Defendants had knowledge of the '924 Patent and actively induced others (*e.g.*, its customers) to directly infringe the '924 Patent by using, selling, or offering to sell Defendants' 4G LTE devices.

1    **Answer**:    Denied.

2        46.    Defendants have been and are now indirectly infringing at least one claim of

3    the '924 Patent in accordance with 35 U.S.C. § 271(c) in this district and elsewhere in the

4    United States.   More specifically, Defendants have been and are now providing non-

5    staple articles of commerce to others for use in an infringing system or method with

6    knowledge of the '924 Patent, and with knowledge that the use of their products resulted

7    in a direct infringement of the '924 Patent by their customers, and with knowledge that

8    these non-staple articles of commerce are used as a material part of the claimed invention

9    of the '924 Patent.

10    **Answer**:    Denied.

11        47.    Defendants' devices compliant with 4G LTE include components

12    comprising an application processor and a baseband processor specifically designed to

13    support communication and transmission of data over 4G LTE-compliant networks.

14    These components are mounted to a circuit board in Defendants' accused devices and,

15    absent these components, Defendants' devices compliant with 4G LTE would not

16    function in an acceptable manner to send or receive data over 4G LTE networks.   A

17    reasonable inference to be drawn from the facts set forth is that these components in

18    Defendants' devices are especially made or especially adapted to operate in the accused

19    devices to provide wireless communication, including the transmission of data in

20    accordance with the 4G LTE standard.   Further, a reasonable inference to be drawn from

21    the facts is that these components comprising an application processor and a baseband

22    processor are intended to support communication of data over a 4G LTE network and are

23    not staple articles or commodities of commerce, and that the use of the components is

24    required for operation of the devices to send or receive data over a 4G LTE-compliant

25    network.   Any other use would be unusual, far-fetched, illusory, occasional, aberrant, or

26    experimental.

27    **Answer**:    Denied.

28

48.   The components comprising an application processor and a baseband processor designed to support communication of data using 4G LTE in Defendants' devices are each a material part of the invention of the '924 Patent and are especially made for the infringing manufacture, sale, and use of Defendants' accused devices. Defendants' devices, including those components, are especially made or adapted to infringe the '924 Patent, and have no substantial non-infringing uses.

**Answer**:      Denied.

49.   The '924 Patent is valid and enforceable.

**Answer**:      Denied.

50.   Defendants' infringement of the '924 Patent has damaged Wi-LAN, and Defendants are liable to Wi-LAN in an amount to be determined at trial that compensates Wi-LAN for the infringement, which by law can be no less than a reasonable royalty.

**Answer**:      Denied.

51.   As a result of Defendants' infringement of the '924 Patent, Wi-LAN has suffered irreparable harm and will continue to suffer loss and injury unless Defendants are enjoined by this Court.

**Answer**:      Denied.

**INFRINGEMENT OF U.S. PATENT NO. 9,497,743**

52.   On November 15, 2016, United States Patent No. 9,497.743 ("the '743 Patent") was duly and legally issued for inventions entitled "Methods and Systems for Transmission of Multiple Modulated Signals Over Wireless Networks."  WI-LAN INC. owns the '743 Patent and holds the right to sue and recover damages for infringement thereof.

**Answer**:      LG admits that the '743 Patent is titled "Methods and Systems for Transmission of Multiple Modulated Signals Over Wireless Networks."  LG admits that the face of the '743 Patent indicates that it was issued on November 15, 2016.  LG admits that the face of the '743 Patent indicates that Wi-LAN, Inc. is the applicant and assignee of the '743 Patent at least as of the issue date.  LG denies that the '743 Patent was duly

and legally issued.  LG denies the remaining allegations set forth in this Paragraph, and notes that the '743 Patent was not attached to the Complaint.

53.     On information and belief, Defendants have directly infringed and continue to directly infringe numerous claims of the '743 Patent, including at least claims 1 and 6, by manufacturing, using, selling, offering to sell, and/or importing their respective accused 4G LTE devices.  Defendants are liable for infringement of the '743 Patent pursuant to 35 U.S.C. § 271(a).

**Answer**:     Denied.

54.     For example, the LG accused 4G LTE devices comply with the 4G LTE standards, including the UL-SCH data transfer procedure specified by 3GPP TS 36.321 at section 5.4.  In particular, the accused 4G LTE devices first transmit a Scheduling Request (*i.e.*, "an explicit message to the base station informing the base station that the cellular telephone has data awaiting transmission to the base station over the UL connection between the cellular telephone and the base station") and then subsequently transmit a Buffer Status Report (*i.e.*, a "information indicative of an amount of data awaiting transmission to the base station over the UL connection between the cellular telephone and the base station").

**Answer**:     Denied.

55.     Defendants have been and are now indirectly infringing at least one claim of the '743 Patent in accordance with 35 U.S.C. § 271(b) in this district and elsewhere in the United States.  More specifically, Defendants have been and are now actively inducing direct infringement by other persons (*e.g.*, Defendants' customers who use, sell or offer for sale products that embody and/or otherwise practice one or more claims of the '743 Patent).

**Answer**:     Denied.

56.     By at least the filing of the complaint in Case No. 3:17-cv-00358- BEN-MDD on February 22, 2017, and by at least the filing of this complaint, Defendants had knowledge of the '743 Patent, and that their actions resulted in a direct infringement of

the '743 Patent, and knew or were willfully blind that their actions would induce direct infringement by others and intended that their actions would induce direct infringement by others.

**Answer**:      To the extent the allegations of this Paragraph purport to state a legal conclusion, no response thereto is required.  To the extent a response is deemed to be required, LG admits that LG Electronics U.S.A., Inc. and LG Electronics Mobilecomm U.S.A., Inc. were aware of the '743 Patent as of the date of service of Wi-LAN's Complaint in Case No. 3:17-cv-00358- BEN-MDD, but states that LG Electronics, Inc. was not aware of the '743 Patent as of the date of service of Wi-LAN's Complaint in Case No. 3:17-cv-00358- BEN-MDD.  LG further admits that LG Electronics, Inc. was aware of the '743 Patent at least as of the filing of this complaint.  LG denies all of the remaining allegations of this Paragraph.

57.   Defendants actively induce such infringement by, among other things, providing user manuals and other instruction material for their devices that induce their customers to use Defendants' devices in their normal and customary way to infringe the '743 Patent.  For example, LG's website provides instructions for using the LG devices on 4G LTE networks.  *See, e.g.*, http://www.lg.com/us/4g-lte-phones (noting that "LG 4G LTE phones feature forward-thinking designs and innovative technology" and emphasizing the "4G LTE phone Network," which permits the accused LG 4G LTE devices to "stay connected wherever you go on a super-fast LTE network, for seamless and reliable use.").  As does LG's user documentation for the accused devices.  *See, e.g.*, http://www.lg.com/us/support-mobile/lg-H910-Silver (encouraging customers to use the "Enhanced LTE Service").   Through its manufacture and sales of their devices, Defendants specifically intended for their customers to infringe the '743 Patent.  Further, Defendants were aware that these normal and customary activities would infringe the '743 Patent. Defendants performed the acts that constitute induced infringement, and that would induce actual infringement, with knowledge of the '743 Patent and with the knowledge or willful blindness that the induced acts would constitute direct infringement.

1   **Answer**:     Denied.

2   58.     Accordingly, a reasonable inference is that Defendants specifically intend

3   for others, such as their customers, to directly infringe one or more claims of the '743

4   Patent in the United States because Defendants had knowledge of the '743 Patent and

5   actively induced others (*e.g.*, its customers) to directly infringe the '743 Patent by using,

6   selling, or offering to sell Defendants' 4G LTE devices.

7   **Answer**:     Denied.

8   59.     Defendants have been and are now indirectly infringing at least one claim of

9   the '743 Patent in accordance with 35 U.S.C. § 271(c) in this district and elsewhere in the

10  United States.   More specifically, Defendants have been and are now providing non-

11  staple articles of commerce to others for use in an infringing system or method with

12  knowledge of the '743 Patent, and with knowledge that the use of their products resulted

13  in a direct infringement of the '743 Patent by their customers, and with knowledge that

14  these non-staple articles of commerce are used as a material part of the claimed invention

15  of the '743 Patent.

16  **Answer**:     Denied.

17  60.     Defendants' devices compliant with 4G LTE include components

18  comprising an application processor and a baseband processor specifically designed to

19  support communication and transmission of data over 4G LTE-compliant networks.

20  These components are mounted to a circuit board in Defendants' accused devices and,

21  absent these components, Defendants' devices compliant with 4G LTE would not

22  function in an acceptable manner to send or receive data over 4G LTE networks.   A

23  reasonable inference to be drawn from the facts set forth is that these components in

24  Defendants' devices are especially made or especially adapted to operate in the accused

25  devices to provide wireless communication, including the transmission of data in

26  accordance with the 4G LTE standard.   Further, a reasonable inference to be drawn from

27  the facts is that these components comprising an application processor and a baseband

28  processor are intended to support communication of data over a 4G LTE network and are

not staple articles or commodities of commerce, and that the use of the components is required for operation of the devices to send or receive data over a 4G LTE-compliant network.  Any other use would be unusual, far-fetched, illusory, occasional, aberrant, or experimental.

**Answer**:      Denied.

61.    The components comprising an application processor and a baseband processor designed to support communication of data using 4G LTE in Defendants' devices are each a material part of the invention of the '743 Patent and are especially made for the infringing manufacture, sale, and use of Defendants' accused devices. Defendants' devices, including those components, are especially made or adapted to infringe the '743 Patent, and have no substantial non-infringing uses.

**Answer**:      Denied.

62.    The '743 Patent is valid and enforceable.

**Answer**:      Denied.

63.    Defendants' infringement of the '743 Patent has damaged Wi-LAN, and Defendants are liable to Wi-LAN in an amount to be determined at trial that compensates Wi-LAN for the infringement, which by law can be no less than a reasonable royalty.

**Answer**:      Denied.

64.    As a result of Defendants' infringement of the '743 Patent, Wi-LAN has suffered irreparable harm and will continue to suffer loss and injury unless Defendants are enjoined by this Court.

**Answer**:      Denied.

**INFRINGEMENT OF U.S. PATENT NO. 8,867,351**

65.    On October 21, 2014, United States Patent No. 8,867,351 ("the '351 Patent") was duly and legally issued for inventions entitled "Apparatus, System, and Method for the Transmission of Data with Different QoS Attributes."  WI-LAN INC. owns the '351 Patent and holds the right to sue and recover damages for infringement thereof.

**Answer**:     LG admits that the '351 Patent is titled "Apparatus, System, and Method for the Transmission of Data with Different QoS Attributes." LG admits that the face of the '351 Patent indicates that it was issued on October 21, 2014. LG admits that the face of the '351 Patent indicates that Wi-LAN, Inc. is the applicant and assignee of the '351 Patent at least as of the issue date. LG denies that the '351 Patent was duly and legally issued. LG denies the remaining allegations set forth in this Paragraph, and notes that the '351 Patent was not attached to the Complaint.

66.     On information and belief, Defendants have directly infringed and continue to directly infringe numerous claims of the '351 Patent, including at least claims 1 and 7, by manufacturing, using, selling, offering to sell, and/or importing their respective accused 4G LTE devices. Defendants are liable for infringement of the '351 Patent pursuant to 35 U.S.C. § 271(a).

**Answer**:     Denied.

67.     For example, the LG accused 4G LTE devices comply with the 4G LTE standards, including the UL-SCH data transfer procedure specified by 3GPP TS 36.321 at section 5.4 and, even more specifically, the Logical Channel Prioritization procedure specified at section 5.4.3.1. In particular, the accused 4G LTE devices transfer data on "logical channels." Prior to transfer, the MAC entity (*i.e.*, "link controller") queues data into "logical channel queues" that can have a "priority" and a prioritized bit rate (*i.e.*, "traffic shaping rate"). The accused 4G LTE devices then examine the available channels to determine which queues to assign to which channels, and attempt to fill the transmission capacity of the channels. In this way, highest priority transmissions will be made first.

**Answer**:     Denied.

68.     Defendants have been and are now indirectly infringing at least one claim of the '351 Patent in accordance with 35 U.S.C. § 271(b) in this district and elsewhere in the United States. More specifically, Defendants have been and are now actively inducing direct infringement by other persons (*e.g.*, Defendants' customers who use, sell or offer

for sale products that embody and/or otherwise practice one or more claims of the '351 Patent).

**Answer**:      Denied.

69.     By at least the filing of the complaint in Case No. 3:17-cv-00358- BEN-MDD on February 22, 2017, and by at least the filing of this complaint, Defendants had knowledge of the '351 Patent, and that their actions resulted in a direct infringement of the '351 Patent, and knew or were willfully blind that their actions would induce direct infringement by others and intended that their actions would induce direct infringement by others.

**Answer**:      To the extent the allegations of this Paragraph purport to state a legal conclusion, no response thereto is required.  To the extent a response is deemed to be required, LG admits that LG Electronics U.S.A., Inc. and LG Electronics Mobilecomm U.S.A., Inc. were aware of the '351 Patent as of the date of service of Wi-LAN's Complaint in Case No. 3:17-cv-00358- BEN-MDD, but states that LG Electronics, Inc. was not aware of the '351 Patent as of the date of service of Wi-LAN's Complaint in Case No. 3:17-cv-00358- BEN-MDD.  LG further admits that LG Electronics, Inc. was aware of the '351 Patent at least as of the filing of this complaint.  LG denies all of the remaining allegations of this Paragraph.

70.     Defendants actively induce such infringement by, among other things, providing user manuals and other instruction material for their devices that induce their customers to use Defendants' devices in their normal and customary way to infringe the '351 Patent.  For example, LG's website provides instructions for using the LG devices on 4G LTE networks.  See, *e.g.*, http://www.lg.com/us/4g-lte-phones (noting that "LG 4G LTE phones feature forward-thinking designs and innovative technology" and emphasizing the "4G LTE phone Network," which permits the accused LG 4G LTE devices to "stay connected wherever you go on a super-fast LTE network, for seamless and reliable use.").  As does LG's user documentation for the accused devices.  See, *e.g.*, http://wwwlg.com/us/support-mobile-lg-H910-Silver (encouraging customers to use the

"Enhanced LTE Service").   Through its manufacture and sales of their devices, Defendants specifically intended for their customers to infringe the '351 Patent.  Further, Defendants were aware that these normal and customary activities would infringe the '351 Patent. Defendants performed the acts that constitute induced infringement, and that would induce actual infringement, with knowledge of the '351 Patent and with the knowledge or willful blindness that the induced acts would constitute direct infringement.

**Answer**:   Denied.

71.   Accordingly, a reasonable inference is that Defendants specifically intend for others, such as their customers, to directly infringe one or more claims of the '351 Patent in the United States because Defendants had knowledge of the '351 Patent and actively induced others (*e.g.*, its customers) to directly infringe the '351 Patent by using, selling, or offering to sell Defendants' 4G LTE devices.

**Answer**:   Denied.

72.   Defendants have been and are now indirectly infringing at least one claim of the '351 Patent in accordance with 35 U.S.C. § 271(c) in this district and elsewhere in the United States.   More specifically, Defendants have been and are now providing non-staple articles of commerce to others for use in an infringing system or method with knowledge of the '351 Patent, and with knowledge that the use of their products resulted in a direct infringement of the '351 Patent by their customers, and with knowledge that these non-staple articles of commerce are used as a material part of the claimed invention of the '351 Patent.

**Answer**:   Denied.

73.   Defendants' devices compliant with 4G LTE include components comprising an application processor and a baseband processor specifically designed to support communication and transmission of data over 4G LTE-compliant networks. These components are mounted to a circuit board in Defendants' accused devices and, absent these components, Defendants' devices compliant with 4G LTE would not function in an acceptable manner to send or receive data over 4G LTE networks.  A

reasonable inference to be drawn from the facts set forth is that these components in Defendants' devices are especially made or especially adapted to operate in the accused devices to provide wireless communication, including the transmission of data in accordance with the 4G LTE standard.  Further, a reasonable inference to be drawn from the facts is that these components comprising an application processor and a baseband processor are intended to support communication of data over a 4G LTE network and are not staple articles or commodities of commerce, and that the use of the components is required for operation of the devices to send or receive data over a 4G LTE-compliant network.  Any other use would be unusual, far-fetched, illusory, occasional, aberrant, or experimental.

**Answer**:     Denied.

74.     The components comprising an application processor and a baseband processor designed to support communication of data using 4G LTE in Defendants' devices are each a material part of the invention of the '351 Patent and are especially made for the infringing manufacture, sale, and use of Defendants' accused devices. Defendants' devices, including those components, are especially made or adapted to infringe the '351 Patent, and have no substantial non-infringing uses.

**Answer**:     Denied.

75.     The '351 Patent is valid and enforceable.

**Answer**:     Denied.

76.     Defendants' infringement of the '351 Patent has damaged Wi-LAN, and Defendants are liable to Wi-LAN in an amount to be determined at trial that compensates Wi-LAN for the infringement, which by law can be no less than a reasonable royalty.

**Answer**:     Denied.

77.     As a result of Defendants' infringement of the '351 Patent, Wi-LAN has suffered irreparable harm and will continue to suffer loss and injury unless Defendants are enjoined by this Court.

**Answer**:     Denied.

## INFRINGEMENT OF U.S. PATENT NO. 9,226,320

78.   On December 29, 2015, United States Patent No. 9,226,320 ("the '320 Patent") was duly and legally issued for inventions entitled "Pre-Allocated Random Access Identifiers."  WI-LAN INC. owns the '320 Patent and holds the right to sue and recover damages for infringement thereof.

**Answer**:   LG admits that the '320 Patent is titled "Pre-Allocated Random Access Identifiers."  LG admits that the face of the '320 Patent indicates that it was issued on December 29, 2015.  LG admits that the face of the '320 Patent indicates that Wi-LAN, Inc. is the applicant and assignee of the '320 Patent at least as of the issue date.  LG denies that the '320 Patent was duly and legally issued.  LG denies the remaining allegations set forth in this Paragraph, and notes that the '320 Patent was not attached to the Complaint.

79.   On information and belief, Defendants LG have directly infringed and continue to directly infringe numerous claims of the '320 Patent, including at least claim 27, by manufacturing, using, selling, offering to sell, and/or importing their respective accused 4G LTE devices.  Defendants are liable for infringement of the '320 Patent pursuant to 35 U.S.C. § 271(a).

**Answer**:   Denied.

80.   For example, the LG accused 4G LTE devices comply with the 4G LTE standards, including the non-contention based random access procedure specified by 3GPP TS 36.300 at section 10.1.5.2.  In particular, during handover, the accused 4G LTE devices receive an information element (IE) message (RACH-ConfigDedicated) that explicitly signals the non-contention Random Access Preamble for use on the random access channel (*i.e.*, "an indication of a non-contention reserved access identifier") that uniquely identifies the mobile device, as well as System Information Blocks containing Random Access Channel related configuration information (*i.e.*, "information about a shared random access channel").   The accused 4G LTE devices then transmit the assigned non-contention Random Access preamble to the target base station.  Next, the

accused 4G LTE devices receive from the target base station a Random Access Response that conveys Timing Alignment information (*i.e.*, a feedback message comprising a timing adjustment"), including a timing advance command.  Finally, the accused 4G LTE devices adjust uplink transmission timing (*i.e.*, "adjust uplink transmission timing").

**Answer**:    Denied.

81.    Defendants have been and are now indirectly infringing at least one claim of the '320 Patent in accordance with 35 U.S.C. § 271(b) in this district and elsewhere in the United States.  More specifically, Defendants have been and are now actively inducing direct infringement by other persons (*e.g.*, Defendants' customers who use, sell or offer for sale products that embody and/or otherwise practice one or more claims of the '320 Patent).

**Answer**:    Denied.

82.    By at least the filing of the complaint in Case No. 3:17-cv-00358- BEN-MDD on February 22, 2017, and by at least the filing of this complaint, Defendants had knowledge of the '320 Patent, and that their actions resulted in a direct infringement of the '320 Patent, and knew or were willfully blind that their actions would induce direct infringement by others and intended that their actions would induce direct infringement by others.

**Answer**:    To the extent the allegations of this Paragraph purport to state a legal conclusion, no response thereto is required.  To the extent a response is deemed to be required, LG admits that LG Electronics U.S.A., Inc. and LG Electronics Mobilecomm U.S.A., Inc. were aware of the '320 Patent as of the date of service of Wi-LAN's Complaint in Case No. 3:17-cv-00358- BEN-MDD, but states that LG Electronics, Inc. was not aware of the '320 Patent as of the date of service of Wi-LAN's Complaint in Case No. 3:17-cv-00358- BEN-MDD.  LG further admits that LG Electronics, Inc. was aware of the '320 Patent at least as of the filing of this complaint.  LG denies all of the remaining allegations of this Paragraph.

83.   Defendants actively induce such infringement by, among other things, providing user manuals and other instruction material for their devices that induce their customers to use Defendants' devices in their normal and customary way to infringe the '320 Patent.  For example, LG's website provides instructions for using the LG devices on 4G LTE networks.  See, *e.g.*, http://www.lg.com/us/4g-lte-phones (noting that "LG 4G LTE phones feature forward-thinking designs and innovative technology" and emphasizing the "4G LTE phone Network," which permits the accused LG 4G LTE devices to "stay connected wherever you go on a super-fast LTE network, for seamless and reliable use.").  As does LG's user documentation for the accused devices.  See, *e.g.*, http://wwwlg.com/us/support-mobile-lg-H910-Silver (encouraging customers to use the "Enhanced LTE Service").   Through its manufacture and sales of their devices, Defendants specifically intended for their customers to infringe the '320 Patent.  Further, Defendants were aware that these normal and customary activities would infringe the '320 Patent.  Defendants performed the acts that constitute induced infringement, and that would induce actual infringement, with knowledge of the '320 Patent and with the knowledge or willful blindness that the induced acts would constitute direct infringement.

**Answer**:   Denied.

84.   Accordingly, a reasonable inference is that Defendants specifically intend for others, such as their customers, to directly infringe one or more claims of the '320 Patent in the United States because Defendants had knowledge of the '320 Patent and actively induced others (*e.g.*, its customers) to directly infringe the '320 Patent by using, selling, or offering to sell Defendants' 4G LTE devices.

**Answer**:   Denied.

85.   Defendants have been and are now indirectly infringing at least one claim of the '320 Patent in accordance with 35 U.S.C. § 271(c) in this district and elsewhere in the United States.   More specifically, Defendants have been and are now providing non-staple articles of commerce to others for use in an infringing system or method with knowledge of the '320 Patent, and with knowledge that the use of their products resulted

in a direct infringement of the '320 Patent by their customers, and with knowledge that these non-staple articles of commerce are used as a material part of the claimed invention of the '320 Patent.

**Answer**:     Denied.

86.     Defendants' devices compliant with 4G LTE include components comprising an application processor and a baseband processor specifically designed to support communication and transmission of data over 4G LTE-compliant networks. These components are mounted to a circuit board in Defendants' accused devices and, absent these components, Defendants' devices compliant with 4G LTE would not function in an acceptable manner to send or receive data over 4G LTE networks.   A reasonable inference to be drawn from the facts set forth is that these components in Defendants' devices are especially made or especially adapted to operate in the accused devices to provide wireless communication, including the transmission of data in accordance with the 4G LTE standard.  Further, a reasonable inference to be drawn from the facts is that these components comprising an application processor and a baseband processor are intended to support communication of data over a 4G LTE network and are not staple articles or commodities of commerce, and that the use of the components is required for operation of the devices to send or receive data over a 4G LTE-compliant network.  Any other use would be unusual, far-fetched, illusory, occasional, aberrant, or experimental.

**Answer**:     Denied.

87.     The components comprising an application processor and a baseband processor designed to support communication of data using 4G LTE in Defendants' devices are each a material part of the invention of the '320 Patent and are especially made for the infringing manufacture, sale, and use of Defendants' accused devices. Defendants' devices, including those components, are especially made or adapted to infringe the '320 Patent, and have no substantial non-infringing uses.

**Answer**:     Denied.

88.     The '320 Patent is valid and enforceable.

**Answer**:     Denied.

89.     Defendants' infringement of the '320 Patent has damaged Wi-LAN, and Defendants are liable to Wi-LAN in an amount to be determined at trial that compensates Wi-LAN for the infringement, which by law can be no less than a reasonable royalty.

**Answer**:     Denied.

90.     As a result of Defendants' infringement of the '320 Patent, Wi-LAN has suffered irreparable harm and will continue to suffer loss and injury unless Defendants are enjoined by this Court.

**Answer**:     Denied.

## WILLFUL INFRINGEMENT

91.     Prior to the filing of this complaint, Defendants knew or should have known that they infringed the patents-in-suit.  On April 7, 2016, Wi-LAN invited LG to renew its license to Wi-LAN's "wireless portfolio," including its patents covering "LTE."  LG knew or reasonably should have known based on its prior license that such patents in the "wireless portfolio" covering "LTE" included the three patents-in-suit.  Yet despite repeated requests from Wi-LAN on May 16, June 10, and June 27, 2016, LG declined to substantively engage in licensing negotiations with Wi-LAN or take a license.

**Answer**:     LG admits that Wi-LAN contacted LG in the spring of 2016 to renew its license to Wi-LAN's wireless patent portfolio, and that LG did not renew its license. LG denies the remaining allegations set forth in this Paragraph.

92.     Accordingly, LG has had knowledge, or reasonably should have had knowledge, of the patents-in-suit since at least April 7, 2016 and certainly by the filing of the complaint in Case No. 3:17-cv-00358-BEN-MDD on February 22, 2017, and by the filing of this complaint.  Despite such knowledge, Defendants have proceeded to infringe the patents-in-suit with full and complete knowledge of their applicability to their respective 4G LTE products without taking a license and without a good faith belief that the patents-in-suit are invalid and not infringed.  Defendants' infringement of the patents-

in-suit thus occurs with knowledge of infringement and/or objective recklessness and has been and continues to be willful and deliberate.  Thus, Defendants' infringement of the patents-in-suit is willful and deliberate, entitling Wi-LAN to increased damages under 35 U.S.C. § 284 and to attorneys' fees and costs incurred in prosecuting this action under 35 U.S.C. § 285.

**Answer**:    Denied.

## **PRAYER FOR RELIEF**

WHEREFORE, Wi-LAN prays for the following relief:

93.    A judgment in favor of Wi-LAN that Defendants have infringed and are infringing U.S. Patent Nos. 8,787,924; 8,867,351; 9,226,320; and 9,497,743.

**Answer**:    LG denies that Wi-LAN is entitled to any relief from LG, much less the relief set forth above, at least because the claims of the '924 Patent, the '351 Patent, the '320 Patent, and the '743 Patent are not valid or infringed, either directly or indirectly, by LG, and the '924 Patent, the '351 Patent, the '320 Patent, and the '743 Patent are not enforceable.  LG specifically denies all of the allegations in paragraph 93 of Wi-LAN's Prayer for Relief.

94.    An order permanently enjoining Defendants, their respective officers, agents, employees, and those acting in privity with it, from further direct and/or indirect infringement of U.S. Patent Nos. 8,787,924; 8,867,351; 9,226,320; and 9,497,743.

**Answer**:    LG denies that Wi-LAN is entitled to any relief from LG, much less the relief set forth above, at least because the claims of the '924 Patent, the '351 Patent, the '320 Patent, and the '743 Patent are not valid or infringed, either directly or indirectly, by LG, and the '924 Patent, the '351 Patent, the '320 Patent, and the '743 Patent are not enforceable.  LG specifically denies all of the allegations in paragraph 94 of Wi-LAN's Prayer for Relief.

95.    An award of damages to Wi-LAN arising out of Defendants' infringement of U.S. Patent Nos. 8,787,924; 8,867,351; 9,226,320; and 9,497,743, including enhanced

damages pursuant to 35 U.S.C. § 284, together with prejudgment and post-judgment interest, in an amount according to proof;

**Answer**:     LG denies that Wi-LAN is entitled to any relief from LG, much less the relief set forth above, at least because the claims of the '924 Patent, the '351 Patent, the '320 Patent, and the '743 Patent are not valid or infringed, either directly or indirectly, by LG, and the '924 Patent, the '351 Patent, the '320 Patent, and the '743 Patent are not enforceable.  LG specifically denies all of the allegations in paragraph 95 of Wi-LAN's Prayer for Relief.

96.     An award of an ongoing royalty for Defendants' post judgment infringement in an amount according to proof;

**Answer**:     LG denies that Wi-LAN is entitled to any relief from LG, much less the relief set forth above, at least because the claims of the '924 Patent, the '351 Patent, the '320 Patent, and the '743 Patent are not valid or infringed, either directly or indirectly, by LG, and the '924 Patent, the '351 Patent, the '320 Patent, and the '743 Patent are not enforceable.  LG specifically denies all of the allegations in paragraph 96 of Wi-LAN's Prayer for Relief.

97.     Declaring that Defendants' infringement is willful and that this is an exceptional case under 35 U.S.C. § 285 and awarding attorneys' fees and costs in this action.

**Answer**:     LG denies that Wi-LAN is entitled to any relief from LG, much less the relief set forth above, at least because the claims of the '924 Patent, the '351 Patent, the '320 Patent, and the '743 Patent are not valid or infringed, either directly or indirectly, by LG, and the '924 Patent, the '351 Patent, the '320 Patent, and the '743 Patent are not enforceable.  LG specifically denies all of the allegations in paragraph 97 of Wi-LAN's Prayer for Relief.

98.     Granting Wi-LAN its costs and further relief as the Court may deem just and proper.

**Answer**:   LG denies that Wi-LAN is entitled to any relief from LG, much less the relief set forth above, at least because the claims of the '924 Patent, the '351 Patent, the '320 Patent, and the '743 Patent are not valid or infringed, either directly or indirectly, by LG, and the '924 Patent, the '351 Patent, the '320 Patent, and the '743 Patent are not enforceable.  LG specifically denies all of the allegations in paragraph 98 of Wi-LAN's Prayer for Relief.

## WI-LAN'S DEMAND FOR JURY TRIAL

99.   Wi-LAN demands a trial by jury of any and all issues triable of right before a jury.

**Answer**:   LG admits that Wi-LAN requests a trial by jury.  LG denies any express or implied allegations of the Complaint not otherwise responded to in this Answer.

## GENERAL DENIAL

Except as explicitly admitted herein, LG denies each and every allegation contained in Wi-LAN's Complaint.

## LG'S AFFIRMATIVE DEFENSES

LG pleads the following affirmative defenses to the allegations in Wi-LAN's Complaint:

### First Affirmative Defense

### Non-Infringement

LG does not infringe, directly or indirectly, literally or under the doctrine of equivalents, any claims of the '924, '351, '320, and/or '743 Patents ("Patents-in-Suit").

### Second Affirmative Defense

### Invalidity Pursuant to 35 U.S.C. § 101

At least one or more of the claims of each of the Patents-in-Suit is invalid for failure to meet the statutory requirements set forth in 35 U.S.C. § 101, including but not limited to improper inventorship and non-patentable subject matter.

**Third Affirmative Defense**

**Invalidity Pursuant to 35 U.S.C. § 102**

At least one or more of the claims of each of the Patents-in-Suit is invalid for failure to meet the statutory requirements set forth in 35 U.S.C. § 102, in view of prior art.

**Fourth Affirmative Defense**

**Invalidity Pursuant to 35 U.S.C. § 103**

At least one or more of the claims of each of the Patents-in-Suit is invalid for failure to meet the statutory requirements set forth in 35 U.S.C. § 103, in view of prior art.

**Fifth Affirmative Defense**

**Invalidity Pursuant to 35 U.S.C. § 112**

Each of the Patents-in-Suit does not meet the requirements set forth in 35 U.S.C. § 112 and is invalid and void against LG, for either or both of the following reasons:

(a) The specifications of the Patents-in-Suit are incomplete, vague and indefinite and do not contain a written description of the alleged invention, and of the manner and process of making and using it, in such full, clear, concise and exact terms as to enable a person skilled in the art to which it pertains, to make and use the same; and

(b) The claims of the Patents-in-Suit are vague and indefinite and fail to particularly point out and distinctly claim the subject matter of the alleged invention.

**Sixth Affirmative Defense**

**Limitation on Damages Pursuant to 35 U.S.C. §§ 286 and/or 288**

Wi-LAN's claim for damages, if any, against LG is statutorily limited by 35 U.S.C. §§ 286 and/or 288.

**Seventh Affirmative Defense**

**Failure to Mark Pursuant to 35 U.S.C. § 287**

Any recovery by Wi-LAN is limited to any alleged infringement that occurred after the filing of the Complaint or after Wi-LAN provided actual notice of the Patents-in-Suit, as Wi-LAN, the prior owners of the Patents-in-Suit, and/or Wi-LAN's licensees have failed to mark any products made under the Patents-in-Suit in conformance with the requirements of 35 U.S.C. § 287.

### Eighth Affirmative Defense

### Limitation on Direct Infringement Claims

To the extent Wi-LAN's Complaint includes claims of direct infringement, such claims are barred because Wi-LAN's Complaint does not allege that any specific device, person, entity, and/or party directly infringes any asserted claim. To the extent Wi-LAN's Complaint includes claims of direct infringement of any method claims, such claims are barred because Wi-LAN does not allege that all steps of any claimed method are performed by a single entity or that all steps are attributable to a single entity that directs or controls the performance of others.

### Ninth Affirmative Defense

### Unclean Hands

Wi-LAN's claims are barred by the equitable doctrine of unclean hands.

### Tenth Affirmative Defense

### Prosecution History Estoppel and Prosecution Disclaimer

Wi-LAN's claims are barred in whole or in part under the doctrines of prosecution history estoppel and/or prosecution disclaimer.

### Eleventh Affirmative Defense

### Patent Misuse

Wi-LAN's claims are barred under the doctrine of patent misuse.

### Twelfth Affirmative Defense

### Waiver, Implied License, Estoppel, and Acquiescence

Wi-LAN's claims are barred by the doctrines of waiver, acquiescence, implied license, and/or equitable estoppel.

### Thirteenth Affirmative Defense

### Failure to State a Claim

Wi-LAN's Complaint fails to state a claim upon which relief can be granted.

### Fourteenth Affirmative Defense

### Lack of Standing

Wi-LAN lacks standing to assert the Patents-in-Suit.

### Fifteenth Affirmative Defense

### Limitation on Indirect Infringement Claims

To the extent Wi-LAN's Complaint includes claims of indirect infringement, such claims are barred because Wi-LAN's Complaint does not allege that LG: (i) had actual knowledge of the Patents-in-Suit; (ii) had actual knowledge of the alleged infringement of the Patents-in-Suit by any third-parties; and/or (iii) had any specific intent for any third parties to infringe the Patents-in-Suit.

### Sixteenth Affirmative Defense

### No Willful Infringement or Enhanced Damages

Wi-LAN is not entitled to a willful infringement finding and enhanced damages because it has failed to plead the requirements for willful infringement and enhanced damages. Further, Wi-LAN is not entitled to assert a charge of willful infringement and request enhanced damages because it cannot show LG's actual knowledge of the Patents-in-Suit prior to Wi-LAN's filing of the Complaint and/or LG's actual knowledge of the alleged infringement of the Patents-in-Suit, prior to Wi-LAN's filing of the Complaint. Any claim and recovery for willful infringement is limited to the period after which Wi-LAN can make such a showing.

### Seventeenth Affirmative Defense

### No Injunctive Relief

Neither preliminary nor permanent injunctive relief is available to Wi-LAN under the legal standards for injunctions because, among other things, Wi-LAN is not likely to succeed on the merits, Wi-LAN will not suffer irreparable harm, and LG is not practicing the alleged invention(s) disclosed in the Patents-in-Suit.  In addition, the balance of hardships and public interest do not favor an injunction in this case.

### Eighteenth Affirmative Defense

### License

Wi-LAN's claims are barred because LG, its suppliers, and/or its customers are licensed.

### Nineteenth Affirmative Defense

### Judicial Estoppel, Collateral Estoppel, and Law of the Case

Wi-LAN's claims are barred in whole or in part under the doctrines of judicial estoppel, collateral estoppel, and/or law of the case.

### Twentieth Affirmative Defense

### Unenforceability Based on Waiver, Estoppel, Implied License, Implied Waiver, and/or Unclean Hands for Failure to Disclose

As set forth with particularity in the Counterclaims set forth below, which LG hereby incorporates as if set forth herein verbatim, the Patents-in-Suit are unenforceable because of Wi-LAN's and/or Wi-LAN's predecessors' failure to disclose them to the applicable standards-setting organizations prior to the voting, approval, and/or publication dates of the applicable standards.

### Twenty-first Affirmative Defense

### Limitation on Damages Based on FRAND Obligations

As set forth with particularity in the Counterclaims set forth below, which LG hereby incorporates as if set forth herein verbatim, on information and belief, Wi-LAN has undertaken, in accordance with the relevant rules and intellectual property rights policies of applicable Standard Setting Organizations ("SSOs"), to grant licenses to some entities under each of the Patents-in-Suit on fair, reasonable, and

nondiscriminatory ("FRAND") terms and conditions.   Wi-LAN has not, however, offered LG reasonable and nondiscriminatory royalty terms and rates that are proportionate to royalty terms and rates offered to similarly situated companies.   As a beneficiary of the rules and intellectual property rights policies of the relevant SSOs, LG has the right to be granted license(s) to the Patents-in-Suit on FRAND terms and conditions.   Wi-LAN has failed to do so.   Wi-LAN's failure to comply with its FRAND obligations limit the damages, if any, available to Wi-LAN in this action.

### Twenty-second Affirmative Defense

### Limitation on Damages Based on License

Wi-LAN may not recover damages, if any, for any alleged infringement that occurred while LG was licensed to the Patents-in-Suit.   LG was licensed to the Patents-in-Suit from December 21, 2010, to December 31, 2016.   Accordingly, Wi-LAN may recover pre-filing damages (if any) only from January 1, 2017, until the filing of its Complaint.

### Twenty-third Affirmative Defense

### Limitation on Damages Pursuant to 28 U.S.C. § 1498

Wi-LAN's requested relief is barred, at least in part, by 28 U.S.C. § 1498 to the extent it claims infringement of devices used by, sold to, and/or designed for the United States.

### Twenty-fourth Affirmative Defense

### Exhaustion, Express and Implied License, First Sale, and Double Recovery

Wi-LAN's requested relief is barred or otherwise limited based on patent exhaustion, express or implied license, the "first sale" doctrine, and/or restrictions on double recovery of the Patents-in-Suit.

### Twenty-fifth Affirmative Defense

### Unenforceability Based on Inequitable Conduct

As set forth with particularity in the Counterclaims set forth below, the '351 Patent is unenforceable because Wi-LAN and/or Wi-LAN's predecessor(s) failed to comply with their duty of candor and good faith in dealing with the USPTO.

### **Reservation of Defenses**

Further responding, LG states that it currently has insufficient knowledge or information on which to form a belief as to whether it may have additional, as yet unstated, affirmative defenses available.   LG reserves the right to assert additional affirmative defenses in the event that discovery indicates it would be appropriate.

## DEFENDANTS LG ELECTRONICS, INC., LG ELECTRONICS U.S.A., INC., AND LG ELECTRONICS MOBILECOMM U.S.A., INC.'S COUNTERCLAIMS

For its Counterclaims against Wi-LAN, Inc., Wi-LAN USA, INC., and Wi-LAN Labs, Inc. (collectively, "Wi-LAN"), Counterclaim-Plaintiffs LG Electronics, Inc., LG Electronics U.S.A., Inc., and LG Electronics Mobilecomm U.S.A., Inc. (collectively, "LG") allege as follows:

### NATURE OF THE COUNTERCLAIMS

1. Counterclaim-Plaintiffs LG's Counterclaims are for declarations of non-infringement and invalidity of U.S. Patent Nos. 8,787,924 ("the '924 patent"), 8,867,351 ("the '351 patent"), 9,226,320 ("the '320 patent"), and 9,497,743 ("the '743 patent") (collectively, the "Patents-in-Suit"); a declaration of unenforceability of the '924 patent, the '320 patent, the '743 patent, and the '351 patent; a declaration that LG is entitled to license the Patents-in-Suit from Wi-LAN on fair, reasonable, and non-discriminatory terms and conditions; breach of contract; monopolization in violation of Section 2 of the Sherman Act; attempted monopolization in violation of Section 2 of the Sherman Act; and unfair business practices under Cal. Bus. & Prof. Code § 17200.

### THE PARTIES

2. Counterclaim-Plaintiff LG Electronics, Inc. is a South Korean corporation, with its principal place of business in Seoul, South Korea.

3. Counterclaim-Plaintiff LG Electronics U.S.A., Inc. is a Delaware corporation, with its principal place of business in Englewood Cliffs, New Jersey.

4. Counterclaim-Plaintiff LG Electronics Mobilecomm U.S.A., Inc. is a California corporation, with its principal place of business in San Diego, California.

5. On information and belief, Counterclaim-Defendant Wi-LAN, Inc. is a Canadian corporation, with its principal place of business in Ottawa, Ontario, Canada.

6. On information and belief, Counterclaim-Defendant Wi-LAN USA, Inc. is a Florida corporation, with a principal business office in Costa Mesa, California.

7.      On information and belief, Counterclaim-Defendant Wi-LAN Labs, Inc. is a Delaware corporation, with a principal business office in Carlsbad, California.

## JURISDICTION

8.      Counterclaim-Plaintiffs LG's Counterclaims are for declaratory relief relating to the Patents-in-Suit, among other counterclaims arising under federal law. Accordingly, this Court has subject matter jurisdiction over the Counterclaim-Plaintiffs' Counterclaims pursuant to 28 U.S.C. §§ 1331, 1338(a), 2201, and 2202, as well as the Patent Act, 35 U.S.C. § 1, *et seq.*

9.      This Court has supplemental subject matter jurisdiction over the Counterclaim-Plaintiffs' state law counterclaims pursuant to 28 U.S.C. §§ 1367 because Counterclaim-Plaintiffs' state law counterclaims are so related to claims and counterclaims in this action that are within the original jurisdiction of this Court such that they form part of the same case or controversy under Article III of the United States Constitution.

10.      Wi-LAN alleges that it owns all right, title and interest in, and has standing to sue for infringement of the Patents-in-Suit.

11.      Wi-LAN has submitted itself to this Court's jurisdiction by alleging, in the present lawsuit, that LG infringes the Patents-in-Suit.  Accordingly, an actual case or controversy between Counterclaim-Plaintiffs LG and Wi-LAN exists and is of such immediacy and reality to warrant the issuance of a declaratory judgment.

## COUNT I

## DECLARATORY JUDGMENT OF NON-INFRINGEMENT
## OF U.S. PATENT NO. 8,787,924

12.      Counterclaim-Plaintiffs LG incorporate and reallege the allegations set forth in Counterclaim Paragraphs 1-11, above, as if set forth fully herein.

13.      Counterclaim-Plaintiffs LG do not infringe and have not infringed, directly or indirectly, literally or pursuant to the doctrine of equivalents, any claim of the '924 patent.

14.     Counterclaim-Plaintiffs LG seek a declaratory judgment that they have not and do not infringe any claim of the '924 patent.

## COUNT II

## DECLARATORY JUDGMENT OF INVALIDITY

## OF U.S. PATENT NO. 8,787,924

15.     Counterclaim-Plaintiffs LG incorporate and reallege the allegations set forth in Counterclaim Paragraphs 1-14, above, as if set forth fully herein.

16.     The claims of the '924 patent are invalid for failure to meet the conditions of patentability or to otherwise comply with the requirements set forth in 35 U.S.C. §§ 101, 102, 103, and/or 112.

17.     Counterclaim-Plaintiffs LG seek a declaratory judgment that the claims of the '924 patent are invalid for failure to meet the conditions of patentability or to otherwise comply with the requirements set forth in 35 U.S.C. §§ 101, 102, 103, and/or 112.

## COUNT III

## DECLARATORY JUDGMENT OF NON-INFRINGEMENT

## OF U.S. PATENT NO. 8,867,351

18.     Counterclaim-Plaintiffs LG incorporate and reallege the allegations set forth in Counterclaim Paragraphs 1-17, above, as if set forth fully herein.

19.     Counterclaim-Plaintiffs LG do not infringe and have not infringed, directly or indirectly, literally or pursuant to the doctrine of equivalents, any claim of the '351 patent.

20.     Counterclaim-Plaintiffs LG seek a declaratory judgment that they have not and do not infringe any claim of the '351 patent.

## COUNT IV

## DECLARATORY JUDGMENT OF INVALIDITY

## OF U.S. PATENT NO. 8,867,351

21.    Counterclaim-Plaintiffs LG incorporate and reallege the allegations set forth in Counterclaim Paragraphs 1-20, above, as if set forth fully herein.

22.    The claims of the '351 patent are invalid for failure to meet the conditions of patentability or to otherwise comply with the requirements set forth in 35 U.S.C. §§ 101, 102, 103, and/or 112.

23.    Counterclaim-Plaintiffs LG seek a declaratory judgment that the claims of the '351 patent are invalid for failure to meet the conditions of patentability or to otherwise comply with the requirements set forth in 35 U.S.C. §§ 101, 102, 103, and/or 112.

## COUNT V

## DECLARATORY JUDGMENT OF NON-INFRINGEMENT

## OF U.S. PATENT NO. 9,226,320

24.    Counterclaim-Plaintiffs LG incorporate and reallege the allegations set forth in Counterclaim Paragraphs 1-23, above, as if set forth fully herein.

25.    Counterclaim-Plaintiffs LG do not infringe and have not infringed, directly or indirectly, literally or pursuant to the doctrine of equivalents, any claim of the '320 patent.

26.    Counterclaim-Plaintiffs LG seek a declaratory judgment that they have not and do not infringe any claim of the '320 patent.

## COUNT VI

## DECLARATORY JUDGMENT OF INVALIDITY

## OF U.S. PATENT NO. 9,226,320

27.    Counterclaim-Plaintiffs LG incorporate and reallege the allegations set forth in Counterclaim Paragraphs 1-26, above, as if set forth fully herein.

28.     The claims of the '320 patent are invalid for failure to meet the conditions of patentability or to otherwise comply with the requirements set forth in 35 U.S.C. §§ 101, 102, 103, and/or 112.

29.     Counterclaim-Plaintiffs LG seek a declaratory judgment that the claims of the '320 patent are invalid for failure to meet the conditions of patentability or to otherwise comply with the requirements set forth in 35 U.S.C. §§ 101, 102, 103, and/or 112.

**COUNT VII**

**DECLARATORY JUDGMENT OF NON-INFRINGEMENT**

**OF U.S. PATENT NO. 9,497,743**

30.     Counterclaim-Plaintiffs LG incorporate and reallege the allegations set forth in Counterclaim Paragraphs 1-29, above, as if set forth fully herein.

31.     Counterclaim-Plaintiffs LG do not infringe and have not infringed, directly or indirectly, literally or pursuant to the doctrine of equivalents, any claim of the '743 patent.

32.     Counterclaim-Plaintiffs LG seek a declaratory judgment that they have not and do not infringe any claim of the '743 patent.

**COUNT VIII**

**DECLARATORY JUDGMENT OF INVALIDITY**

**OF U.S. PATENT NO. 9,497,743**

33.     Counterclaim-Plaintiffs LG incorporate and reallege the allegations set forth in Counterclaim Paragraphs 1-32, above, as if set forth fully herein.

34.     The claims of the '743 patent are invalid for failure to meet the conditions of patentability or to otherwise comply with the requirements set forth in 35 U.S.C. §§ 101, 102, 103, and/or 112.

35.     Counterclaim-Plaintiffs LG seek a declaratory judgment that the claims of the '743 patent are invalid for failure to meet the conditions of patentability or to

otherwise comply with the requirements set forth in 35 U.S.C. §§ 101, 102, 103, and/or 112.

## COUNT IX

## DECLARATORY JUDGMENT OF UNENFORCEABILITY FOR FAILURE TO DISCLOSE TO STANDARD SETTING ORGANIZATIONS

36.     Counterclaim-Plaintiffs LG incorporate and reallege the allegations set forth in Counterclaim Paragraphs 1-35, above, as if set forth fully herein.

37.     Wi-LAN and/or Wi-LAN's predecessors-in-interest with respect to one or more of the Patents-in-Suit have engaged in standards-setting misconduct, including without limitation breach of the commitment to disclose standard-essential patents.

**Wi-LAN Alleges That the Patents-in-Suit are Essential to the 3GPP LTE and IEEE 802.16 Standards**

38.     Wi-LAN alleges, or has alleged, that the Patents-in-Suit are essential to, read on, and/or require the Third Generation Partnership Project ("3GPP") LTE standard—specifically, the 3GPP TS 36.300 and 36.321 standards—and the Institute of Electrical and Electronics Engineers ("IEEE") 802.16 standard.  Wi-LAN has also alleged that certain products that purportedly have wireless capability compliant with the 3GPP LTE and IEEE 802.16 standards infringe the Patents-in-Suit.

39.     More specifically, Wi-LAN also alleges, or has alleged, that the Patents-in-Suit are essential to, read on, and/or require the following 3GPP LTE standards:

- 3GPP TS 36.300 V8.12.0 (2010-03) Evolved Universal Terrestrial Radio Access (E-UTRA), "Overall description", Stage 2 (Release 8+);
- 3GPP TS 36.211 V8.9.0 (2009-12) Evolved Universal Terrestrial Radio Access (E-UTRA), "Physical Channels and Modulation" (Release 8+);
- 3GPP TS 23.203 V8.14.0 (2012-06) Technical Specification Group Servicesand System Aspects, "Policy and charging control architecture"; (Release 8+);
- 3GPP TS 36.331 V8.21.0 (2014-06), Evolved Universal Terrestrial Radio Access (E-UTRA), Radio Resource Control (RRC), Protocol specification (Release 8+);

- 3GPP TS 36.321 V8.12.0 (2012-03), Evolved Universal Terrestrial Radio Access (E-UTRA) Medium Access Control (MAC) protocol specification (Release 8+);

- 3GPP TS 36.302 V8.2.1 (2011-12) Evolved Universal Terrestrial Radio Access (E-UTRA), "Services provided by the physical layer" (Release 8+);

- 3GPP TS 36.213 V8.8.0 (2009-09) Evolved Universal Terrestrial Radio Access (E-UTRA), "Physical layer procedures" (Release 8+); and

- 3GPP TS 36.322 V8.8.0 (2010-06): Radio Link Control (RLC) protocol specification, (Release 8+).

40.     Wi-LAN has made the following representations regarding the Patents-in-Suit and the 3GPP LTE standard in this action and in Case No. 3:17-cv-00358- BEN-MDD:

- "Wi-LAN contends that products complying with the 3GPP LTE Standards (release 8+) infringe the patents-in-suit, as described in Wi-LAN's infringement contentions."  (Wi-LAN Objections and Responses to Defendants' First Set of Interrogatories ("Wi-LAN's Interrogatory Responses")  at Response No. 4 (at 15).)

- "Wi-LAN asserts that the following LG products infringe the Asserted Claims: wireless communication products, such as products compliant with the 3rd Generation Partnership Project ("3GPP") 4G LTE standard . . . ."  (Wi-LAN's Amended Disclosure of Asserted Claims and Infringement Contentions ("Wi-LAN's Infringement Contentions")

- "The accompanying theories, and accompanying charts, are based in part on specifications adopted by 3GPP in conjunction with 4G LTE, including . . . On information and belief, LG complies with these specifications in designing, testing, making, using, and selling its accused instrumentalities.  Further, LG designs its products such that any customer purchasing the product will necessarily comply with the relevant specifications while the product is in use by the customer."  (*Id*. at 3-4.)

- "Wi-LAN alleges that LG knowingly contributes to and induces infringement of the Asserted Claims by supplying the Accused Instrumentalities to customers for the purpose of, and with instructions for, their use in connection with cellular systems that comply with the 3GPP 4G LTE standard." (*Id*. at 4.)

- "Upon information and belief, employees at LG have knowledge relating to the design, development, testing, use, implementation, marketing and/or sales of LG's wireless communication products compliant with the 3GPP 4G LTE standard (Release 8+), which embody the invention(s) claimed by the '320 Patent." (Wi-LAN's Interrogatory Responses at Response No. 3 (at 14).)

- "LG had actual knowledge of its customers' infringement of the patents-in-suit because the patents-in-suit cover fundamental aspects of 4G LTE wireless devices (e.g., 'uploading' data and 'handover' from one base station to another) and LG knew that its customers used those fundamental aspects of LG's 4G LTE wireless device [sic]." (*Id*. at Response No. 5 (at 17).)

- "The widespread adoption of Wi-LAN's inventions into the LTE standards further shows the non-obviousness of the Asserted Claims." (*Id*. at Response No. 9 (at 24).)

- "Wi-LAN does not contend that any standard or sub-standard is required to practice any Asserted Claim.  However, each of the Asserted Claims are required to practice at least the following 3GPP LTE Standards as implemented by LG in the accused devices: . . . The Asserted Claims read on the aforementioned 3GPP LTE standards as set forth in Wi-LAN's Disclosure of Asserted Claims and Infringement Contentions at Exhibits 1-4, which are hereby incorporated by reference." (*Id.* at Response No. 11 (at 28).)

- "For example, the LG accused 4G LTE devices comply with the 4G LTE standards, including the non-contention based random access procedure specified by 3GPP TS 36.300 at section 10.1.5.2.   (Wi-LAN's Complaint ¶ 80 (discussing the '320 Patent); *see also id.* ¶¶ 83-86.)

41.   In addition, Wi-LAN has made the following representations regarding the Canadian counterpart to the '320 patent and the 3GPP LTE standards in a Canadian patent infringement action against LG:

- "The LTE Standards incorporate non-contention wireless device handover methods disclosed and claimed in the 159 Patent.  Later releases of the 3GPP standards, 3GPP Releases 9, 10, 11, 12, 13 and 14, also incorporate wireless device handover methods disclosed and claimed in the 159 Patent."   (Wi-LAN's Canadian Statement of Claim as amended November 2, 2017, ¶ 43.)

- "Any LG wireless device that carries out the non-contention handover methods incorporated in the LTE Standards and/or later 3GPP Releases 9, 10, 11, 12, 13 and/or 14 infringes the handover methods disclosed and claimed in the 159 Patent." (*Id.* ¶ 46.)

42.   Further, Wi-LAN has made the following representations regarding a European counterpart to the '320 patent and the 3GPP LTE standards in a European patent infringement action against LG:

- "The defendants' mobile stations are operated according to the LTE standard and are configured to apply the non-contention based random access procedure and thus realise the features of patent claim 4.  The test results in particular confirm that the attacked embodiment comply with the relevant features of the LTE standard."

43.   As further described below, Wi-LAN and its predecessors-in-interest, Ensemble Communications and Nextwave, also represented that the '924 patent, the '743 patent, and the '320 patent are essential to, read on, and/or require the IEEE 802.16 standard.

**The Patents-in-Suit, the Related Patents, and Wi-LAN's Predecessors-in-Interest**

44.   Wi-LAN has represented that it is the owner or assignee of the Patents-in-Suit.

45.     The '924 patent is a continuation of U.S. App. No. 12/645,937 (filed December 23, 2009, now U.S. Patent No. 8,315,640), which is a continuation of U.S. App. No. 11/170,392 (filed June 29, 2005, now U.S. Patent No. 8,189,514), which is a continuation of U.S. App. No. 09/859,561 ("the '561 application") (filed May 16, 2001, now U.S. Patent No. 6,956,834 ("the '834 patent")), which is a continuation of U.S. App. No. 09/316,518 ("the '518 application") (filed May 21, 1999, now U.S. Patent No. 6,925,068 ("the '068 patent")) (collectively, "the '924 patent priority patents and applications").

46.     As continuation patents and applications, the '924 patent and the '924 patent priority patents and applications all have similar specifications that purportedly do not contain any new matter.

47.     The '743 patent is a continuation of U.S. App. No. 14/523,573 (filed on October 24, 2014, now U.S. Patent No. 9,414,368) and U.S. App. No. 14/523,755 (filed on October 24, 2014, now U.S. Patent No. 9,420,573), which are a continuation of U.S. App. No. 14/338,103 (filed on July 22, 2014), which is a continuation of U.S. App. No. 14/170,271 (filed on January 31, 2014), which is a divisional of U.S. App. No. 14/139,159 (filed December 23, 2013, now U.S. Patent No. 8,929,905), which is a divisional of U.S. App. No. 13/089,075 (filed April 18, 2011, now U.S. Patent No. 8,654,664), which is a divisional of U.S. App. No. 12/645,937 (filed December 23, 2009, now U.S. Patent No. 8,315,640), which is a continuation of U.S. App. No. 11/170,392 (filed June 29, 2005, now U.S. Patent No. 8,189,514), which is a continuation of the '561 application (filed May 16, 2001, now the '834 patent), said U.S. App. No. 14/338,103 is also a continuation of U.S. App. No. 13/649,986 (filed October 11, 2012, now the '924 patent), which is a continuation of U.S. App. No. 12/645,937 (filed December 23, 2009, now U.S. Patent No. 8,315,640), which is a continuation of U.S. App. No. 11/170,392 (filed June 29, 2005, now U.S. Patent No. 8,189,514), which is a continuation of the '518 application (filed May 21, 1999, now the '068 patent) (collectively, "the '743 patent priority patents and applications").

48. The '924 patent and the '743 patent both claim priority to the '518 application. The '924 and '743 patents also claim priority to, and are continuations of, the '561 application, which shares the same specification as the '924 and '743 patents.

49. James Mollenauer, Israel Jay Klein, Sheldon Gilbert, and Wi-LAN's Kenneth Stanwood are listed as inventors on the face of the '924 and '743 patents, as well as on the face of the '518 and '561 applications.

50. The '518 and '561 applications were previously assigned to Ensemble Communications, Inc. ("Ensemble"). Ensemble assigned its interest to the '518 and '561 applications to Wi-LAN on May 25, 2004. Accordingly, Ensemble is a predecessor-in-interest of Wi-LAN with respect to the '924 and '743 patents.

51. The '351 patent is a continuation of U.S. App. No. 14/102,120 (filed on December 10, 2013), which is a continuation of U.S. App. No. 13/468,925 (filed May 10, 2012, now U.S. Patent No. 8,630,238), which is a continuation of U.S. App. No. 12/028,365 ("the '365 application") (filed February 8, 2008, now U.S. Patent No. 8,184,661), which is a continuation of U.S. App. No. 10/521,581 (filed as App. No. PCT/CA03/01043 on July 11, 2003, now U.S. Patent No. 7,333,435) ("the '435 patent") (collectively, "the '351 patent priority patents and applications").

52. As continuation patents and applications, the '351 patent and the '351 patent priority patents and applications all have similar specifications that purportedly do not contain any new matter.

53. Anthony Gerkis is listed as the sole inventor on the face of the '351 patent.

54. The '365 application and the '435 patent were originally assigned to SOMA Networks, Inc. ("SOMA"). SOMA assigned its interest in the '365 application and the '435 patent to Turtlebones Inc. ("Turtlebones") on November 10, 2010. Turtlebones assigned its interest in the '365 application and the '435 patent to Wi-LAN on the very same day (*i.e.*, November 10, 2010). Accordingly, SOMA and Turtlebones are predecessors-in-interest of Wi-LAN with respect to the '351 patent.

55.     The '320 patent is a continuation of U.S. App. No. 13/957,173 (filed August 1, 2013), which is a continuation of U.S. App. No. 13/565,405 (filed August 2, 2012, now U.S. Patent No. 8,532,052), which is a continuation of U.S. App. No. 11/469,794 ("the '794 application") (filed September 1, 2006, now U.S. Patent No. 8,259,688) (collectively, "the '320 patent priority patents and applications").

56.     As continuation patents and applications, the '320 patent and the '320 patent priority patents and applications all have similar specifications that purportedly do not contain any new matter.

57.     The '794 application was previously assigned to Nextwave Broadband, Inc. ("Nextwave"). Nextwave assigned its interest in the '794 application to Wi-LAN on July 16, 2009. Accordingly, Nextwave is a predecessor-in-interest of Wi-LAN with respect to the '320 patent.

58.     Yair Bourlas, Adam Newham, Lei Wang, and Srikanth Gummadi are listed as inventors on the face of the '320 patent, as well as on the '794 application.

59.     Yair Bourlas, Adam Newham, Lei Wang, and Srikanth Gummadi were employees or representatives of Nextwave.

60.     Nextwave is a wholly-owned subsidiary of Nextwave Wireless, Inc. ("Nextwave Wireless").

61.     On or about May 14, 2007, Nextwave Wireless acquired IPWireless Inc. ("IPWireless"). Like Nextwave, IPWireless is a wholly-owned subsidiary of Nextwave Wireless. On information and belief, IPWireless and its representatives and employees acted at the direction of, and on behalf of, Nextwave and/or Nextwave Wireless at least as of the time IPWireless was acquired by Nextwave Wireless.

**Wi-LAN and Wi-LAN's Predecessors-in-Interest Nextwave and Ensemble Were Members of 3GPP, ETSI, and/or ATIS**

62.     During all relevant times herein, Wi-LAN and Wi-LAN's predecessors-in-interest Nextwave and Ensemble were members of the following Standard Setting Organizations ("SSO") and Industry Partnership Projects ("Industry Partnerships"):

3GPP, European Telecommunications Standards Institute ("ETSI"), and/or Alliance for Telecommunications Industry Solutions ("ATIS").

63.     During all or part of the time period it owned the '794 application, Nextwave was a member of 3GPP, ETSI, and ATIS.

64.     During all or part of the time period Nextwave owned the '794 application, IPWireless was a member of 3GPP and ETSI.

65.     During all or part of the time period it owned the '518 and '561 applications, Ensemble was a member of 3GPP and ETSI.

66.     During all or part of the time period it has owned the Patents-in-Suit and any priority patents and applications leading thereto, Wi-LAN has been a member of ETSI.

67.     On information and belief, during all or part of the time period it has owned the Patents-in-Suit and any priority patents and applications leading thereto, Wi-LAN has been a member of ATIS.

68.     During all relevant times herein, LG was also a member of 3GPP, ETSI, and ATIS.

69.     SSOs collaborate with their members to create and establish global specifications for cellular telephone transmission technologies.

70.     SSOs also collaborate with other SSOs on Industry Partnerships to create and establish similar global specifications for these technologies.  In the cellular industry, 3GPP is a well-known example of such an Industry Partnership.  The SSOs that comprise Industry Partnerships are also known as Organizational Partners.

71.     As SSOs, ETSI and ATIS are both Organizational Partners of 3GPP.  In order for Nextwave and Ensemble to be individual members of 3GPP, they must also be members of one of the Organizational Partners of 3GPP.  During all or part of the time period it owned the '794 application, Nextwave was an individual member of 3GPP.  During all or part of the time period Nextwave owned the '794 application, IPWireless was an individual member of 3GPP.  During all or part of the time period it owned the '518 and '561 applications, Ensemble was an individual member of 3GPP.

## The 3GPP, ETSI, and ATIS IPR Rules and Policies

72.    3GPP, ETSI, and ATIS have written policies and disclosure requirements relating to the Intellectual Property Rights ("IPR") of their members.

73.    3GPP's IPR policy states that its Individual Members are bound by the IPR policy of their respective Organizational Partner.  3GPP's IPR policy further provides that "Individual Members should declare at the earliest opportunity any IPRs which they believe essential or potentially essential to any work ongoing within" the partnership project.   "Declarations should be made by Individual Members to their respective Organizational Partners."

74.    The ETSI IPR policy states, in part, "each MEMBER shall use its reasonable endeavors, in particular during the development of a STANDARD or TECHNICAL SPECIFICATION where it participates, to inform ETSI of ESSENTIAL IPRs in a timely fashion. In particular, a MEMBER submitting a technical proposal for a STANDARD or TECHNICAL SPECIFICATION shall, on a bona fide basis, draw the attention of ETSI to any of that MEMBER's IPR which might be ESSENTIAL if that proposal is adopted."  The ETSI IPR policy defines "IPR" as "any intellectual property right conferred by statute law including applications therefor."  The ETSI IPR policy defines "ESSENTIAL" as "it is not possible on technical (but not commercial) grounds … to make, sell, lease, otherwise dispose of, repair, use or operate EQUIPMENT or METHODS which comply with a STANDARD without infringing that IPR."

75.    The ATIS IPR policy states, in part, "[i]f reference to a patented invention shall be made in a standard, guideline, or other ATIS deliverable, disclosure of the patented invention should be encouraged at the earliest possible time in the development of the standard, guideline, or other ATIS deliverable."

76.    As individual members of 3GPP, Nextwave, IPWireless, and Ensemble were required to comply with 3GPP's IPR policy.

77.    As members of ETSI, Wi-LAN and its predecessors-in-interest Nextwave and Ensemble were required to comply with ETSI's IPR policy.

78.     As a member of ETSI, IPWireless was required to comply with ETSI's IPR policy.

79.     As a member of ATIS, Wi-LAN's predecessor-in-interest Nextwave was required to comply with ATIS's IPR policy.

80.     As members of 3GPP, ETSI, and/or ATIS, IPWireless, Wi-LAN, and its predecessors-in-interest Ensemble and Nextwave were obligated to declare any patents and patent applications that they believed to be essential, or potentially essential, to the standardization efforts underway at 3GPP, ETSI, and ATIS, including the development of the 3GPP LTE and IEEE 802.16 standards.

81.     On information and belief, the members and other participants of 3GPP and 3GPP's Organizational Partners, including ATIS and ETSI, did understand, at all times mentioned herein, including all times during the development and standards-setting of the 3GPP standards mentioned herein, and would have understood the IPR policies of 3GPP and 3GPP's Organizational Partners, including ATIS and ETSI, as: 1) imposing a duty, in a timely fashion, to investigate all IPR, including patents and patent applications, owned by the member, participant, and relevant third parties; and 2) as imposing a duty, in a timely fashion, to disclose all known IPR, including patents and patent applications, that is essential or potentially essential to standards of 3GPP and 3GPP's Organizational Partners, including ATIS and ETSI.  On information and belief, those members and other participants also did understand and would have understood that, in the event that certain IPR is essential or potentially essential to implementing a standard or proposed standard of 3GPP and/or 3GPP's Organizational Partners, including ATIS and ETSI, and a license to that IPR is not available on fair, reasonable, and non-discriminatory ("FRAND") terms, the 3GPP and 3GPP's Organizational Partners, including ATIS and ETSI, would modify the standard or otherwise refuse to implement the standard.

**Wi-LAN's, Nextwave's, IPWireless's, and Ensemble's Participation in SSOs and Industry Partnerships**

82. IPWireless, Wi-LAN, Wi-LAN's predecessors-in-interest Ensemble and Nextwave, and their representatives participated in the standards-setting process at 3GPP, ETSI, and/or ATIS.

83. 3GPP is composed of specification groups responsible for drafting and amending technical specifications associated with 3GPP.

84. 3GPP specification group TSG Radio Access Network ("TSG RAN") was responsible for drafting 3GPP Technical Specifications ("TS") 36.300 and 36.321. Wi-LAN has alleged that certain LG products purportedly having wireless capability compliant with the TS 36.300 and 36.321 standards infringe the Patents-in-Suit. Accordingly, IPWireless, Wi-LAN, and Wi-LAN's predecessors-in-interest Ensemble and Nextwave were obligated to disclose the Patents-in-Suit, their underlying applications, and any related patents and applications in accordance with the 3GPP, ETSI, and ATIS rules and policies.

85. On information and belief, Nextwave and its representatives actively participated in numerous meetings of 3GPP, including through submissions, statements, communications, agreements, proposals, omissions, and/or other interactions. On information and belief, these submissions, statements, communications, agreements, proposals, omissions, and/or other interactions of Nextwave to/with 3GPP, or parts thereof, were incorporated into 3GPP's TS 36.300 and 36.321 standards, at least as they are characterized by Wi-LAN's infringement claims (which LG expressly denies).

86. The following Nextwave employees and representatives attended TSG RAN meetings on behalf of Nextwave: Martin Beale, Nicholas Anderson, Alan Jones, Chandrika Worrall, and Philip Young.

87. Nextwave's Martin Beale attended a TSG RAN meeting on behalf of Nextwave on May 29 to June 1, 2007.

88. Nextwave's Nicholas Anderson attended TSG RAN meetings on behalf of Nextwave on September 11-14, 2007; November 27-30, 2007; March 4-7, 2008; May 27-30, 2008; and September 9-12, 2008.

89. Nextwave's Alan Jones attended a TSG RAN meeting on behalf of Nextwave on December 2-5, 2008.

90. Nextwave's Chandrika Worrall attended TSG RAN meetings on behalf of Nextwave on June 25-29, 2007; August 20-24, 2007; and September 29 to October 3, 2008.

91. Nextwave's Philip Young attended TSG RAN meetings on behalf of Nextwave on August 18-22, 2008; and September 29 to October 3, 2008.

92. On information and belief, IPWireless and its representatives actively participated in numerous meetings of 3GPP, including through submissions, statements, communications, agreements, proposals, omissions, and/or other interactions. On information and belief, these submissions, statements, communications, agreements, proposals, omissions, and/or other interactions of IPWireless to/with 3GPP, or parts thereof, were incorporated into 3GPP's TS 36.300 and 36.321 standards, at least as they are characterized by Wi-LAN's infringement claims (which LG expressly denies). On information and belief, at all relevant times hereto IPWireless was acting on behalf of, and at the direction of, Nextwave and/or Nextwave Wireless.

93. The following IPWireless employees and representatives attended TSG RAN meetings on behalf of IPWireless: Derek Richards and Chandrika Worrall.

94. IPWireless's Derek Richards attended TSG RAN meetings on behalf of IPWireless, Nextwave, and/or Nextwave Wireless on June 25-29, 2007; August 20-24, 2007; September 11-14, 2007; and October 8-12, 2007.

95. IPWireless's Chandrika Worrall attended a TSG RAN meeting on behalf of IPWireless, Nextwave, and/or Nextwave Wireless on May 7-11, 2007.

96. On information and belief, Ensemble, Wi-LAN, and/or their representatives actively participated in 3GPP meetings, including through submissions, statements, communications, agreements, proposals, omissions, and/or other interactions. On information and belief, these submissions, statements, communications, agreements, proposals, omissions, and/or other interactions of Ensemble and/or Wi-LAN to/with

3GPP, or parts thereof, were incorporated into 3GPP's TS 36.300 and 36.321 standards, at least as they are characterized by Wi-LAN's infringement claims (which LG expressly denies).

97.     Wi-LAN's Kenneth Stanwood—who is listed as an inventor on the face of the '924 and '743 patents and is a former employee of Ensemble—participated in drafting and revising the TS 36.300 and 36.321 standards when he attended a TSG RAN meeting on November 27-30, 2007.

98.     During TSG RAN meetings attendees were informed that 3GPP Individual Members have the obligation under the IPR policies of their respective Organizational Partners to inform their respective Organizational Partners of essential IPRs of which they become aware.

99.     On information and belief, IPWireless, Wi-LAN, Wi-LAN's predecessors-in-interest Ensemble and Nextwave, and their representatives participated in specification groups responsible for drafting and amending technical specifications associated with 3GPP, including some or all of the following specifications:

- 3GPP TS 36.300 V8.12.0 (2010-03) Evolved Universal Terrestrial Radio Access (E-UTRA), "Overall description", Stage 2 (Release 8+);
- 3GPP TS 36.211 V8.9.0 (2009-12) Evolved Universal Terrestrial Radio Access (E-UTRA), "Physical Channels and Modulation" (Release 8+);
- 3GPP TS 23.203 V8.14.0 (2012-06) Technical Specification Group Services and System Aspects, "Policy and charging control architecture"; (Release 8+);
- 3GPP TS 36.331 V8.21.0 (2014-06), Evolved Universal Terrestrial Radio Access (E-UTRA), Radio Resource Control (RRC), Protocol specification (Release 8+);
- 3GPP TS 36.321 V8.12.0 (2012-03), Evolved Universal Terrestrial Radio Access (E-UTRA) Medium Access Control (MAC) protocol specification (Release 8+);
- 3GPP TS 36.302 V8.2.1 (2011-12) Evolved Universal Terrestrial Radio Access (E-UTRA), "Services provided by the physical layer" (Release 8+);
- 3GPP TS 36.213 V8.8.0 (2009-09) Evolved Universal Terrestrial Radio Access

(E-UTRA), "Physical layer procedures" (Release 8+); and

- 3GPP TS 36.322 V8.8.0 (2010-06): Radio Link Control (RLC) protocol specification, (Release 8+).

**Wi-LAN, Nextwave, IPWireless, and Ensemble Failed to Disclose the '924 Patent, the '743 Patent, the '320 Patent, and Related Patents and Applications to SSOs and Industry Partnerships**

100.    IPWireless, Wi-LAN, and Wi-LAN's predecessors-in-interest Ensemble and Nextwave intentionally and knowingly failed to disclose the '924 patent, the '743 patent, the '320 patent, and any patents and applications related to those patents to 3GPP, ETSI, and ATIS, including as alleged below.

101.    The TS 36.300 specification was first published or released on October 27, 2006, and has been revised periodically since then.  The TS 36.321 specification was first published or released on September 24, 2007, and has been revised periodically since then.  The TS 36.211 specification was first published or released on October 10, 2006, and has been revised periodically since then.  The TS 23.203 specification was first published or released on September 16, 2005, and has been revised periodically since then.  The TS 36.331 specification was first published or released on December 11, 2007, and has been revised periodically since then.  The TS 36.302 specification was first published or released on September 24, 2007, and has been revised periodically since then.  The TS 36.213 specification was first published or released on October 16, 2006, and has been revised periodically since then.  The TS 36.322 specification was first published or released on September 24, 2007, and has been revised periodically since then.

102.    The '794 application, the parent application of the '320 patent, was filed on September 1, 2006, before the TS 36.300 and TS 36.321 standards were first published or released.

103.    The '518 application, the parent application of the '924 and '743 patents, was filed on May 21, 1999, many years before the TS 36.300 and TS 36.321 standards

were first published or released.   Likewise, the '561 application, another parent application of the '924 and '743 patents, was filed on May 16, 2001, years before the TS 36.300 and TS 36.321 standards were first published or released.

104.   Nextwave knew or should have known of essential or potentially essential IPRs, including the '794 application, among others, because, *inter alia*, Nextwave had a duty to investigate its IPRs, and Nextwave's representatives attended and/or participated in numerous 3GPP meetings.  Wi-LAN knew or should have known of these patents and patent applications at least when Wi-LAN acquired any of its purported interest in the Patents-in-Suit from Nextwave, because Wi-LAN purports to be Nextwave's successor-in-interest and Nextwave was required to inform Wi-LAN of its IPR disclosure obligations.  Upon its alleged acquisition of rights to the Patents-in-Suit from Nextwave, Wi-LAN became co-obligated to perform the duties to timely investigate and timely disclose its essential or potentially essential IPRs to 3GPP.

105.   IPWireless knew or should have known of essential or potentially essential IPRs, including the '794 application, among others, because, *inter alia*, IPWireless had a duty to investigate its IPRs, IPWireless's representatives attended and/or participated in numerous 3GPP meetings, IPWireless and Nextwave are both wholly-owned subsidiaries of Nextwave Wireless, and IPWireless and its representatives acted on behalf of, and at the direction of, Nextwave and/or Nextwave Wireless at least as of IPWireless's acquisition by Nextwave Wireless.   Upon its acquisition by Nextwave Wireless, IPWireless became co-obligated to perform the duties to timely investigate and timely disclose its, Nextwave's, and Nextwave Wireless's essential or potentially essential IPRs to 3GPP.

106.  Ensemble and Wi-LAN knew or should have known of essential or potentially essential IPRs, including the '518 and '561 applications, among others, because, *inter alia*, Ensemble and Wi-LAN had a duty to investigate its IPRs, and Ensemble and/or Wi-LAN's representatives, including Kenneth Stanwood—one of the inventors of the '924 patent and '732 patent—attended and/or participated in 3GPP

meetings.  Wi-LAN knew or should have known of these patents and patent applications at least when Wi-LAN acquired any of its purported interest in the Patents-in-Suit from Ensemble, because Wi-LAN purports to be Ensemble's successor-in-interest, and Ensemble was required to inform Wi-LAN of its IPR disclosure obligations.  Upon its alleged acquisition of rights to the Patents-in-Suit from Ensemble, Wi-LAN became co-obligated to perform the duties to timely investigate and timely disclose its essential or potentially essential IPRs to 3GPP.

107.   Nextwave, Nextwave Wireless, IPWireless, and Wi-LAN all failed to disclose the '320 patent and the '320 patent priority patents and applications to 3GPP or any of the relevant Organizational Partners (*i.e.*, ETSI and ATIS) or any other Organizational Partner.

108.   Nextwave and IPWireless representatives intentionally and knowingly failed to disclose the '320 patent and any of the '320 patent priority patents and applications as essential, or potentially essential, to the specifications being drafted and revised by TSG RAN, including TS 36.300 and TS 36.321.

109.   The foregoing failure to disclose the '320 patent and any of the '320 patent priority patents and applications was made in bad faith with the intent to deceive and induce reliance.

110.   Nextwave and IPWireless had a duty to disclose the '320 patent and the '320 patent priority patents and applications essential to standards drafted and revised by TSG RAN as a result of their membership in ETSI, ATIS, and/or 3GPP, including their obligations to disclose essential IPRs under the IPR policies of ETSI, ATIS, and 3GPP.

111.   Nextwave's and IPWireless's failure to disclose led to the adoption and propagation of 3GPP standards without consideration of the '320 patent or any of the '320 patent priority patents and applications.

112.   Wi-LAN and Ensemble disclosed the '518 and '561 applications to ETSI as essential to the HiperMAN (TS 102 177 and TS 102 178) standard, but never disclosed the '518 or '561 applications to ETSI as being essential to any 3GPP standard.  Other

than the above disclosures to ETSI, neither Wi-LAN, nor Ensemble, nor any of their representatives ever disclosed the '924 patent, the '743 patent, or any of the '924 patent and '743 patent priority patents and applications to ETSI, ATIS, or 3GPP.

113. Wi-LAN, Ensemble, and their representatives intentionally and knowingly failed to disclose the '924 patent, the '743 patent, and the '924 patent and '743 patent priority patents and applications as essential, or potentially essential, to the specifications being drafted and revised by TSG RAN, including TS 36.300 and TS 36.321.

114. The foregoing failure to disclose the '924 and '743 patents, and any of the '924 patent and '743 patent priority patents and applications was made in bad faith with the intent to deceive and induce reliance.

115. Wi-LAN, Ensemble, and/or Mr. Stanwood had a duty to disclose the '924 and '743 patents, and the '924 patent and '743 patent priority patents and applications essential to standards drafted and revised by TSG RAN as a result of Wi-LAN's and Ensemble's membership in ETSI, Ensemble's membership in 3GPP, because Mr. Stanwood was listed as an inventor on the '924 and '743 patents and the '924 patent and '743 patent priority patents and applications, and because of Mr. Stanwood's participation in 3GPP meetings.

116. Wi-LAN, Ensemble, and/or Mr. Stanwood's failure to disclose led to the adoption and propagation of 3GPP standards without consideration of the '924 and '743 patents, or any of the '924 patent and '743 patent priority patents and applications.

117. As a consequence of IPWireless's, Wi-LAN's, Wi-LAN's predecessors-in-interest Nextwave's and Ensemble's, and/or Mr. Stanwood's failure to disclose, ETSI members, ATIS members, 3GPP members, their successors, and customers throughout the supply chain, including LG and relevant third parties, thereafter designed, manufactured, and marketed products meant to comply with the relevant 3GPP standards, thereby reasonably and justifiably relying on IPWireless's, Wi-LAN's, and Wi-LAN's predecessors-in-interest Nextwave and Ensemble's promises to abide by ETSI, ATIS and/or 3GPP IPR policies, to their detriment.

118.   The foregoing actions and conduct have caused damage and continue to cause damage to LG and relevant third parties.

**Wi-LAN Also Asserts That the '924 Patent, the '743 Patent, the '320 Patent, and Related Patents and Applications are Essential to the IEEE 802.16 Standard**

119.   Wi-LAN asserts that the '924 patent, the '743 patent, the '320 patent, and their related patents and applications are essential to the IEEE 802.16 standard.

120.   Wi-LAN has previously asserted that the '068 patent and the '834 patent—two of the parent patents to the '924 and '743 patents—are essential to the IEEE 802.16 standard.

121.   The '924 and '743 patents list submissions to the IEEE 802.16 Broadband Wireless Access Working Group on the face of the patents.

122.   The '924 and '743 patents share the same specification as the '561 application, which was included in letters of assurance submitted by both Ensemble and Wi-LAN to IEEE as reciting potentially essential claims to the IEEE 802.16 standard.

123.   On June 23, 2004, Wi-LAN issued a press release stating that it had acquired a patent portfolio from Ensemble and that the "purchase of Ensemble's 802.16 related portfolio has enhanced Wi-LAN's Intellectual Property (IP) portfolio considerably. These patents are critical to design and implementation of the Media Access Control (MAC) layer of the WiMAX standard."

124.   On July 13, 2004, Wi-LAN issued a press release stating that "Patents Acquired from Ensemble Communications are Believed to be Essential for Implementation of WiMAX Certified Equipment. . . . Wi-LAN's letter of assurance states that it is prepared to grant a license for the patents and patent applications to an unrestricted number of applicants on a worldwide, non-discriminatory basis on reasonable terms and conditions.  Wi-LAN believes the infringement of these patents is unavoidable in any implementation of the IEEE 802.16 WirelessMAN Standard."

125.   The '320 patent states "[t]he descriptions contained herein generally focus on Orthogonal Frequency Division Multiple Access (OFDMA) wireless communication

systems, and particularly are directed towards IEEE 802.16 wireless communication systems."

**Wi-LAN, Wi-LAN's Predecessors-in-Interest Ensemble and Nextwave, and Their Representatives Were Members of the IEEE**

126.   The IEEE is a professional association and leading developer of technical standards.   IEEE members include engineers, scientists, and allied professionals whose technical interests relate to electrical and computer sciences, engineering, and related disciplines.   Members may participate in the standards-setting process in working groups and/or subgroups called task groups.

127.   Wi-LAN, Wi-LAN's predecessors-in-interest Ensemble and Nextwave, and their representatives were or are members of the IEEE, as discussed in detail below.

128.   During all relevant times herein, LG was also a member of the IEEE.

**The IEEE's Rules and Policies**

129.   The IEEE instituted policies and rules regarding the disclosure and licensing of patents, in part to protect against unscrupulous conduct by any member who seeks to benefit from, or to manipulate to its advantage, the IEEE's standard-setting process, and to enable the IEEE and its members to develop standards free from potentially blocking patents.

130.   The IEEE's rules and policies require fairness and candor with respect to intellectual property.   By way of example only, the IEEE requires its members to submit letters of assurance ("LOAs") including either a general disclaimer to the effect that the patentee will not enforce any of its present or future patents the use of which would be required to implement the proposed IEEE standard against any person or entity using the patents to comply with the standard, or a statement that a license will be made available to all applicants without compensation or under reasonable rates, with reasonable terms and conditions that are demonstrably free of any unfair discrimination.   For example, the IEEE's 802.16 Patent Policy and Procedures states "IEEE standards may include the known use of patent(s), including patent applications, if there is technical justification in

the opinion of the standards-developing committee and provided the IEEE receives assurance from the patent holder that it will license applicants under reasonable terms and conditions for the purpose of implementing the standard."

131.   Additionally, the IEEE's Standards Board Bylaws state that the assurance "shall be a letter that is in the form of either a) A general disclaimer to the effect that the patentee will not enforce any of its present or future patent(s) whose use would be required to implement the proposed IEEE standard against any person or entity using the patent(s) to comply with the standard or b) A statement that a license will be made available to all applicants without compensation or under reasonable rates, with reasonable terms and conditions that are demonstrably free of any unfair discrimination."

132.   The IEEE 802.16 Patent Policy and Procedures further states: "Early disclosure to the Working Group of patent information that might be relevant to the standard is essential to reduce the possibility for delays in the development process and increase the likelihood that the draft publication will be approved for publication.  Please notify the Chair as early as possible, in written or electronic form, of any patents (granted or under application) that may cover technology that is under consideration by or has been approved by IEEE 802.16."

133.   As a result of their membership and/or participation in the IEEE, Wi-LAN, Wi-LAN's predecessors-in-interest Ensemble and Nextwave, and their representatives agreed, both explicitly and implicitly, that they would abide by the rules and policies of the IEEE.

**Jay Klein's, Kenneth Stanwood's, James Mollenauer's, and Ensemble's Participation in the IEEE Standard-Setting Process**

134.   The IEEE formed the 802.16 working group in 1999.  The 802.16 working group is further divided into the MAC and PHY task groups.  Three of the four named inventors on the '924 and '743 patents—Jay Klein, Kenneth Stanwood, and James Mollenauer—participated in the standard-setting process for 802.16.   Moreover, Jay

Klein and Kenneth Stanwood appeared as representatives for Ensemble, a predecessor-in-interest of Wi-LAN.

135.   Jay Klein, Kenneth Stanwood, and James Mollenauer are all listed as inventors on the face of the '518 application, the parent application of the '924 and '743 patents.  The '518 application was filed on May 21, 1999.

136.   On or about July 6, 1999, the first official meeting of the 802.16 working group was held in Montreal, Canada.

137.   Jay Klein and James Mollenauer attended the July 1999 802.16 meeting in Montreal.

138.   On or about August 4, 1999, the second meeting of the 802.16 working group was held in Denver, Colorado.

139.   James Mollenauer attended the August 1999 802.16 meeting in Denver.

140.   On or about September 13, 1999, the third meeting of the 802.16 working group was held in Boulder, Colorado.

141.   Jay Klein and James Mollenauer attended the September 1999 802.16 meeting in Boulder.

142.   On or about November 8, 1999, the fourth meeting of the 802.16 working group was held in Kauai, Hawaii.

143.   Jay Klein and James Mollenauer attended the November 1999 802.16 meeting in Hawaii.

144.   On or about January 10, 2000, the fifth meeting of the 802.16 working group was held in Richardson, Texas.

145.   Jay Klein and James Mollenauer attended the January 2000 802.16 meeting in Richardson.

146.   On or about March 6, 2000, the sixth meeting of the 802.16 working group was held in Albuquerque, New Mexico.

147.   Jay Klein and James Mollenauer attended the March 2000 802.16 meeting in Albuquerque.

148.   On or about May 1, 2000, the seventh meeting of the 802.16 working group was held in Gaithersburg, Maryland.

149.   Kenneth Stanwood, Jay Klein, and James Mollenauer attended the May 2000 802.16 meeting in Gaithersburg.

150.   On or about July 10, 2000, the eighth meeting of the 802.16 working group was held in La Jolla, California.

151.   Kenneth Stanwood, Jay Klein, and James Mollenauer attended the July 2000 802.16 meeting in La Jolla.

152.   At each of the above 802.16 working group meetings, the Chairman of the 802.16 working group explained the IEEE Patent Policy and specifically asked for notification from members as to any patents and/or applications applicable to standards or draft standards.

153.   Kenneth Stanwood, Jay Klein, and James Mollenauer were heavily involved in the development of the 802.16 standard.  For example, Jay Klein was named chairman of the 802.16 PHY task group, and James Mollenauer and Kenneth Stanwood were named to the 802.16 MAC task group editorial team.  Additionally, Kenneth Stanwood served as Vice Chair of the IEEE 802.16 standards committee for WiMAX from 2003-2006, and as a principal contributor to the original IEEE 802.16 standard for 4G cellular networks and mobile devices.

154.   Several proposals authored by Kenneth Stanwood, Jay Klein, and/or James Mollenauer were submitted to the 802.16 MAC task group for consideration.  Each of the proposals submitted states that the "contributor is familiar with the IEEE 802.16 Patent Policy and Procedures."

155.   The "An Efficient Media Access Control Protocol for Broadband Wireless Access Systems" proposal submitted before the fourth 802.16 meeting by Jay Klein and James Mollenauer, and the "MAC Proposal for IEEE 802.16.1" proposal submitted before the fifth 802.16 meeting by Jay Klein, James Mollenauer, and Kenneth Stanwood, are both listed on the faces of the '924 and '743 patents.

156.   Several proposals authored by Jay Klein were submitted to the 802.16 PHY task group for consideration.  Each of the proposals submitted states that the "contributor is familiar with the IEEE 802.16 Patent Policy and Procedures."

157.   During the eighth 802.16 working group meeting, Kenneth Stanwood, Jay Klein, and James Mollenauer, among others, submitted a proposal called "Media Access Control Layer Proposal for the 802.16 Air Interface Specification" to the 802.16 MAC task group.  The proposal states that the "contributor is familiar with the IEEE 802.16 Patent Policy and Procedures," and reproduces the relevant IEEE 802.16 Patent Policy and Procedures.

158.   During the eighth 802.16 working group meeting, the 802.16 MAC task group voted in favor of pursuing the Stanwood et al. proposal, and decided not to pursue other proposals.

**Jay Klein, Kenneth Stanwood, James Mollenauer, and Ensemble Failed to Disclose the '924 Patent, the '743 Patent, and Related Patents and Applications to the IEEE**

159.   Jay Klein, Kenneth Stanwood, James Mollenauer, and/or Wi-LAN's predecessor-in-interest Ensemble intentionally and knowingly failed to disclose the '924 patent, the '743 patent, and patents and applications related to those patents to the IEEE, as alleged below.

160.   On March 29, 2004, Ensemble submitted a LOA to the IEEE identifying the '518 and '561 applications as essential to the 802.16 standard.

161.   On July 12, 2004, Wi-LAN submitted a LOA to the IEEE identifying the '518 and '561 applications as essential to the 802.16 standard.

162.   The '518 and '561 applications were never disclosed to the IEEE before March 29, 2004—nearly five years after the '518 application was filed with the PTO, and nearly four years after the 802.16 MAC task group adopted the proposal submitted by Kenneth Stanwood, Jay Klein, and James Mollenauer.

163.   The '924 patent, the '743 patent, and the '924 patent and '743 patent priority patents and application (excluding the '518 and '561 applications) were never disclosed to the IEEE.

164.   The IEEE 802.16 working group never considered the '518 application when it adopted the proposal submitted by Kenneth Stanwood, Jay Klein, and James Mollenauer.

165.   Kenneth Stanwood, Jay Klein, James Mollenauer, and Wi-LAN's predecessor-in-interest Ensemble intentionally and knowingly failed to disclose the '924 patent, the '743 patent, and patents and applications related to those patents—including the '518 application that eventually led to the '924 patent and the '743 patent—to the IEEE 802.16 working group.

166.   Kenneth Stanwood, Jay Klein, James Mollenauer, and Wi-LAN's predecessor-in-interest Ensemble had a duty to disclose facts regarding their alleged intellectual property, including as a result of their representations and commitments to the IEEE.

167.   The foregoing failure to disclose was made in bad faith with the intent to deceive and to induce reliance.

168.   The IEEE, its members, their successors, and customers throughout the supply chain who rely on 802.16 activities, including LG and relevant third parties, reasonably and justifiably relied on the foregoing failure to disclose in adopting 802.16 standards and by investing substantial resources designing, developing, and marketing products accused of alleged infringement in this action.

169.   The foregoing actions and conduct have caused damage and continue to cause damage to LG and relevant third parties.

**Yair Bourlas's, Lei Wang's, Srikanth Gummadi's, and Nextwave's Participation in the IEEE Standard-Setting Process**

170.   Three of the four named inventors on the '320 patent—Yair Bourlas, Lei Wang, and Srikanth Gummadi—participated in the standard-setting process for 802.16.

Yair Bourlas, Lei Wang, and Srikanth Gummadi appeared as representatives for Nextwave, a predecessor-in-interest of Wi-LAN.

171.   Yair Bourlas, Lei Wang, and Srikanth Gummadi are all listed as inventors on the face of the '794 application, the parent application of the '320 patent.  The '794 application was filed on September 1, 2006.

172.   On or about January 12, 2009, the 59th meeting of the 802.16 working group was held in La Jolla, California.  Lei Wang and Nextwave hosted the meeting.

173.   On or about May 4, 2009, the 61st meeting of the 802.16 working group was held in Cairo, Egypt.

174.   At each of the above 802.16 working group meetings, the Chairman of the 802.16 working group explained the IEEE Patent Policy and specifically asked for notification from members as to any patents and/or applications applicable to standards or draft standards.

175.   The IEEE 802.16-2009 standard was approved at the May 2009 meeting in Cairo.

176.   The face of the IEEE 802.16-2009 standard states that Lei Wang "participated in the Working Group Letter Ballot in which the draft of this standard was prepared and finalized for IEEE Ballot"

177.   The face of the IEEE 802.16-2000 standard states that Yair Bourlas "voted on this standard."

178.   Yair Bourlas, Lei Wang, and Srikanth Gummadi were involved in the setting and development of the 802.16-2009 standard.  For example, several proposals authored by Yair Bourlas, Lei Wang, and/or Srikanth Gummadi were submitted to the 802.16 working group for consideration.  Each of the proposals submitted states that the "contributor is familiar with the IEEE 802.16 Patent Policy and Procedures."

179.   On information and belief, one or more of the proposals authored by Yair Bourlas, Lei Wang, and/or Srikanth Gummadi were incorporated into the IEEE 802.16-2009 standard.

**Yair Bourlas, Lei Wang, Srikanth Gummadi, and Nextwave Failed to Disclose the '320 Patent and Related Patents and Applications to the IEEE**

180.   Yair Bourlas, Lei Wang, Srikanth Gummadi, and/or Wi-LAN's predecessor-in-interest Nextwave intentionally and knowingly failed to disclose the '320 patent and the '320 patent priority patents and applications to the IEEE, as alleged below.

181.   The '320 patent, and the '320 patent priority patents and applications (including the '794 application) were never disclosed to the IEEE, despite the fact that the '794 application was filed several years before the IEEE 802.16-2009 standard was approved.

182.   The IEEE 802.16 working group never considered the '794 application when it adopted the 802.16-2009 standard.

183.   Yair Bourlas, Lei Wang, Srikanth Gummadi, and Wi-LAN's predecessor-in-interest Nextwave intentionally and knowingly failed to disclose the '320 patent and the '320 patent priority patents and applications—including the '794 application that eventually led to the '320 patent—to the IEEE 802.16 working group.

184.   Yair Bourlas, Lei Wang, Srikanth Gummadi, and Wi-LAN's predecessor-in-interest Nextwave had a duty to disclose facts regarding their alleged intellectual property, including as a result of their representations and commitments to the IEEE.

185.   The foregoing failure to disclose was made in bad faith with the intent to deceive and to induce reliance.

186.   The IEEE, its members, their successors, and customers throughout the supply chain who rely on 802.16 activities, including LG and relevant third parties, reasonably and justifiably relied on the foregoing failure to disclose in adopting 802.16 standards and by investing substantial resources designing, developing, and marketing products accused of alleged infringement in this action.

187.   The foregoing actions and conduct have caused damage and continue to cause damage to LG and relevant third parties.

188.   IPWireless, Wi-LAN, Wi-LAN's predecessors-in-interest Ensemble, Nextwave, and SOMA, and/or one or more of the inventors of the Patents-in-Suit, were or are a member of a SSO involved with the setting of a standard (or standards) that Wi-LAN asserts, or has asserted, is necessarily covered by one or more claims of the Patents-in-Suit.  IPWireless, Wi-LAN, Wi-LAN's predecessors-in-interest Ensemble, Nextwave, and SOMA, and/or one or more of the inventors of the Patents-in-Suit participated in the setting of such standard (or standards).  Despite this participation, the Patents-in-Suit, and the patents and applications that led to the Patents-in-Suit, including any priority patents and/or applications, were never disclosed to the applicable SSOs.  Accordingly, the standards that Wi-LAN asserts, or has asserted, are necessarily covered by one or more claims of the Patents-in-Suit were set without consideration of the Patents-in-Suit, or the patents and applications that led to the Patents-in-Suit.  IPWireless, Wi-LAN, Wi-LAN's predecessors-in-interest Ensemble, Nextwave, and SOMA, and/or one or more of the inventors of the Patents-in-Suit knowingly and in bad faith failed to disclose the Patents-in-Suit and the patents and applications that led to the Patents-in-Suit with the intent to deceive and to induce reliance.  The foregoing actions and conduct have caused damage and continue to cause damage to LG and relevant third parties.

189.   As a result of the conduct described above, the '924 patent, the '743 patent, and the '320 patent are unenforceable against LG on the grounds of estoppel, fraud, waiver, implied waiver, unclean hands, patent exhaustion, implied license, and/or other equitable defenses.

## COUNT X

## DECLARATORY JUDGMENT OF UNENFORCEABILITY

## OF U.S. PATENT NO. 8,867,351

190.   Counterclaim-Plaintiffs LG incorporate and reallege the allegations set forth in Counterclaim Paragraphs 1-189, above, as if set forth fully herein.

191.   An intentional concealment of prior art that is material to the patentability of the inventions claimed in a patent, an affirmative misrepresentation

of a material fact, the submission of false material information, and/or the failure to disclose material information, coupled with an intent to deceive the United States Patent & Trademark Office ("PTO"), constitutes inequitable conduct before the PTO.

192.   The '351 patent is unenforceable because one or more persons involved in the prosecution of the '351 patent's parent patent, U.S. Patent No. 7,333,435 (the "'435 patent"), deliberately withheld and/or failed to disclose one or more known material prior art references from the PTO, and made material omissions to the PTO during prosecution of the '435 patent.  The '351 patent is also unenforceable because one or more persons involved in the prosecution of the '435 patent deliberately failed to file an information disclosure statement or IDS to list one or more known material prior art references.  The single most reasonable inference that a reasonable factfinder can draw from each of these acts is that the deliberate withholding of and/or failure to disclose these material references and the material omissions were done or made with the specific intent to deceive the PTO.

193.   The '351 patent is unenforceable under the doctrine of infectious unenforceability because the '351 patent claims priority and/or is related to the '435 patent.  At a minimum, to the extent that Wi-LAN asserts that the '351 patent is related to and/or entitled to the priority filing date of the '435 patent, any inequitable conduct that renders the '435 patent unenforceable also renders the '351 patent unenforceable via infectious unenforceability and/or unclean hands.

194.   During prosecution of the '435 patent, SOMA Networks, Inc. ("SOMA"),[5] Anthony Gerkis (the "Named Inventor"), SOMA's counsel, including the law firm of Katten Muchin Rosenman LLP, and attorney Bauer (collectively, "Counsel"), and anyone else responsible for prosecuting the '435 patent (and related patents and applications), knew or should have known that all patent applicants and their counsel are under a duty to act with good faith and candor before the PTO and are required by 37 C.F.R. § 1.56 to disclose material information to the PTO.

---

[5] SOMA is the predecessor-in-interest to the '351 patent.

195. Counsel who prosecuted the '435 patent on behalf of SOMA and the Named Inventor are registered patent attorneys who knew or should have known of their duty of good faith and candor before the PTO and the requirement of 37 C.F.R. § 1.56 to disclose material information to the PTO.

### International Application No. PCT/CA2003/001043

196. On July 11, 2003, the Named Inventor and SOMA filed International App. No. PCT/CA2003/001043 (the "PCT App."), entitled "Apparatus, System and Method for the Transmission of Data with Different QoS Attributes."

197. On February 18, 2004, an International Search Report was issued in connection with the PCT App. (the "Search Report").

198. The Search Report lists as an "X" reference U.S. Patent Pub. No. 2002/032788 to Emanuel ("Emanuel").

199. According to the European Patent Office ("EPO") and the Search Report, an "X" reference is a "document of particular relevance; the claimed invention cannot be considered novel or cannot be considered to involve an inventive step when the document is taken alone."

200. According to the Search Report, Emanuel was considered relevant to claims 1, 9, 11, and 14-18 of the PCT App.

201. The Search Report also lists the European and other foreign counterparts of Emanuel.

202. The PCT App. published as International Pub. No. WO 2004/008698 on January 22, 2004.

### Prosecution of European Patent App. No. 03763537.2

203. The PCT App. entered into the regional phase at the EPO as European Patent App. No. 03763537.2 (the "'537 app.").

204. The originally-filed claims of the '537 app. were identical to the originally-filed claims of the PCT App. Original Claim 1 of the '537 app. is reproduced below:

A method of transmitting at least two data flows over a telecommunications link, wherein each data flow can have a different set of quality of service attributes defined for it, comprising the steps of:

(i) receiving a packet for transmission over said link;

(ii) examining said packet to determine an appropriate set of quality of service attributes required for it;

(iii) placing said examined packet into one of a plurality of logical channel queues, said one logical channel queue having defined therefor quality of service attributes corresponding to the determined quality of service attributes required for said packet;

(iv) determining a data transmission capacity for said link and selecting one of said plurality of logical channel queues which holds data to be transmitted with the highest priority for transmission and packaging and transmitting as much data from said logical channel queue as can be packaged to fit within said determined transmission capacity of said channel; and

(v) repeating steps (i) through (iii) and step (iv) as necessary.

205.   On October 30, 2006, the EPO issued an examination report (the "First Examination Report") rejecting the '537 app. as lacking novelty.  Specifically, the EPO stated that Claims 1, 11, and 14-18 of the '537 app. lack novelty in view of Emanuel, and detailed how Emanuel discloses every limitation of Claims 1, 11, and 14-18 of the '537 app.

206.   On August 28, 2007, the Named Inventor, SOMA, and their European counsel submitted a response to the EPO's October 30, 2006, rejection.  Rather than attempting to argue around the rejection of Claims 1, 11, and 14-18 in view of Emanuel, the Named Inventor, SOMA, and their European counsel acquiesced to the EPO's rejection and filed amendments to the claims.  By way of example, amended Claim 1 of the '537 app. is shown below with added language underlined and deleted language struckthrough:

A method of transmitting a plurality of at least two data flows from a base station (44) to at least one of a plurality of subscriber stations (48) over a telecommunications radio link (40), wherein each data flow can have a

~~different set of quality of service attributes defined for it,~~ comprising the steps of:

(i) at a network interface port (104), receiving a packet from one of said data flows for transmission to one of said plurality of subscriber stations over said radio link;

(ii) in a data classifier (112), examining said received packet to determine an appropriate set of quality of service attributes required for said received packet ~~it~~;

(iii) in said data classifier, placing said examined packet into one of a plurality of logical channel queues ($LC_O$ to $LC_i$) defined for said one subscriber station, each logical channel queue comprising a queue of packets to be transmitted and each entry in a queue holding one packet, said one logical channel queue having defined therefor quality of service attributes corresponding to the determined set of quality of service attributes required for said examined packet;

(iv) at a radio link controller (140), determining ~~a~~ the available data transmission capacity for said radio link and selecting one of said ~~plurality of~~ logical channel queues ~~which~~ that holds a packet ~~data~~ to be transmitted ~~with~~ that has the highest priority for transmission and ~~packaging and~~ transmitting said packet over said radio link ~~as much data from said logical channel queue as can be packaged to fit within said determined transmission capacity of said channel~~; and

(v) repeating steps (i) through (iii) and step (iv) as necessary~~.~~,

characterized in that:

each data flow can have a different set of quality of service attributes defined for its packets;

each subscriber station ($48_x$) has assigned to it a separate network interface port ($104_x$) and a separate data classifier ($112_x$) and defined for it a separate plurality of logical channel queues, so that steps (i) through (iii) are repeated separately for each subscriber station;

said radio link is structured into at least one channel (148, 156) and each said channel can have a different amount of data transmission capacity; and

each logical channel queue ($LC_i$) is assigned to at least one channel and in step (iv) the determined data transmission capacity is determined separately for each channel and a packet from one of the logical channel queues assigned to a channel is selected for transmission on that channel.

207.   On September 26, 2008, the EPO issued a communication stating that it intended to grant a European patent on the '537 app.

208.   The '537 app. was eventually abandoned due to failure to pay the requisite fees.

### Prosecution of Canadian Patent App. No. 2,393,373

209.   The PCT App. claims priority to Canadian Patent App. No. 2,393,373 (the "'373 app."), entitled "Apparatus, System and Method for the Transmission of Data with Different QoS Attributes," which was filed by the Named Inventor and SOMA on July 15, 2002.

210.   The originally-filed claims of the '373 app. were identical to the originally-filed claims of the PCT App.

211.   On March 30, 2009, the Canadian Patent Office ("CPO") issued an examination report (the "Second Examination Report") rejecting the '373 app. as lacking novelty.   Specifically, the CPO stated that independent Claims 1 and 14 of the '373 app. lack novelty in view of Emanuel, and detailed how Emanuel discloses every limitation of Claims 1 and 14 of the '373 app.   The CPO also stated that dependent Claims 2-13 and 15-19 were obvious in view of Emanuel and the "common knowledge in the art."

212.   The '373 app. was eventually abandoned for failure to respond to the CPO's examination report.

### Prosecution of U.S. Patent No. 7,333,435

213.   On January 18, 2005, the Named Inventor, SOMA, and Counsel submitted the PCT App. to the PTO for the purpose of entering the National stage under 35 U.S.C. §371.   The PTO designated the application U.S. Patent App. No. 10/521,581 (the "'581 app.").

214.   The originally-filed claims of the '581 app. were identical to the originally-filed claims of the PCT App.

215.   Also on January 18, 2005, the Named Inventor, SOMA, and Counsel submitted to the PTO a copy of the priority '373 app. and PCT App., along with a copy of the Search Report.

216.   Also on January 18, 2005, the Named Inventor signed a declaration in connection with the '581 app. in which he attested to his awareness of his duty of good faith and candor before the PTO and the requirement of 37 C.F.R. § 1.56 to disclose material information to the PTO.   The Named Inventor also declared that he believed himself to be "the original and first inventor of the subject matter which is claimed and for which a patent is sought."   The Named Inventor further declared that he "reviewed and underst[ood] the contents of the above identified specification, including the claims, as amended by any amendment specifically referred to above." The Named Inventor additionally declared that the '581 app. claims priority to the PCT App. and the '373 app.

217.   On July 19, 2005, the PTO mailed a notice of acceptance of application under 35 U.S.C. 371 and 37 CFR 1.495 (Form PCT/DO/EO/903) which indicated that: (i) the Search Report is included in the national stage file; and (ii) copies of the references listed in the Search Report are not included in the national stage file.

218.   The Examiner issued a Notice of Allowance for the '581 app. on September 25, 2007.  All claims of the '581 app. were allowed as originally filed.

219.   Also on September 25, 2007, the Examiner issued a Notice of References Cited.   The Notice of References Cited did not list Emanuel or any of Emanuel's foreign counterparts.   Additionally, the Notice of References Cited did not list any of the other references cited in the Search Report or any of their foreign counterparts.

220.   An information disclosure form or IDS was never filed in connection with the prosecution of the '581 app. by the Named Inventor, SOMA, and Counsel.

221.   Copies of the references listed in the Search Report were never provided to the PTO by the Named Inventor, SOMA, and Counsel.

222.   Copies of the references listed in the Search Report were never included in the national stage file.

223.   At no point in time during the prosecution of the '581 app. did the examiner indicate that he considered any of the references listed in the Search Report.

224.   The examiner never considered the Search Report, any of the references cited in the Search Report (including Emanuel), any of the European, U.S., and other foreign counterparts of each of the references cited in the Search Report, the First Examination Report, and/or the Second Examination Report.

225.   Copies of the references cited in the Search Report (including Emanuel), any of the European, U.S., and other foreign counterparts of each of the references cited in the Search Report, the First Examination Report, and/or the Second Examination Report were never provided to the examiner during prosecution of the '581 app. by the Named Inventor, SOMA, and Counsel.

226.   On February 19, 2008, the '581 app. issued as the '435 patent.  The '435 patent was originally assigned to SOMA.

227.   On or about June 13, 2010, SOMA assigned the '435 patent to Turtlebones, Inc.  On or about November 10, 2010, Turtlebones, Inc. assigned the '435 patent to Wi-LAN.

228.   The Named Inventor, SOMA, Counsel, Turtlebones, Inc., and Wi-LAN never sought reissuance pursuant to 35 U.S.C. § 251 or reexamination pursuant to 35 U.S.C. §§ 301–07 of the '435 patent to disclose to the PTO the Search Report, the references listed in the Search Report (including Emanuel), any of the European, U.S., and other foreign counterparts of each of the references listed in the Search Report, the First Examination Report, and/or the Second Examination Report and to file an information disclosure statement listing those items.

### Prosecution of U.S. Patent No. 8,184,661

229.   On February 8, 2008, the Named Inventor, SOMA, and Counsel filed U.S. Patent App. No. 12/028,365 (the "'365 app.").

230.   On May 6, 2008, Counsel submitted to the PTO an IDS in connection with the prosecution of the '365 app. disclosing, for the first time, the references cited in the Search Report, including Emanuel.  This IDS was submitted nearly three months after the '435 patent had issued.

231.   On September 29, 2009, the Examiner issued an Office Action rejecting Claims 1-19 of the '365 app. based on non-statutory obviousness-type double patenting based on Claims 1-19 of the '435 patent.  On April 8, 2011, the applicant responded by filing a terminal disclaimer.  The Examiner subsequently allowed the '365 app., and the '365 app. issued as U.S. Patent No. 8,184,661 (the "'661 patent") on May 22, 2012.

**Prosecution of U.S. Patent No. 8,630,238**

232.   On May 10, 2012, the Named Inventor, Wi-LAN, and Wi-LAN's counsel filed U.S. Patent App. No. 13/468,925 (the "'925 app.").  The '925 app. claims priority to the '435 patent and the '365 app.

233.   On August 14, 2012, Wi-LAN's counsel submitted to the PTO an IDS in connection with the prosecution of the '925 app. disclosing the references cited in the Search Report, including Emanuel.

234.   On May 31, 2013, the Examiner issued an Office Action objecting to Claims 2-8 and 10-17, and rejecting Claims 1 and 9 of the '925 app. based on non-statutory obviousness-type double patenting based on Claims 1 and 8 of the '661 patent.   On August 29, 2013, the applicant responded by cancelling Claims 1-17.  The Examiner subsequently allowed the '925 app. on September 20, 2013, and the '925 app. issued as U.S. Patent No. 8,630,238 (the "'238 patent") on January 14, 2014.

**Prosecution of U.S. Patent No. 8,817,805**

235.   On December 10, 2013, the Named Inventor, Wi-LAN, and Wi-LAN's counsel filed U.S. Patent App. No. 14/102,120 (the "'120 app.").  The '120 app. claims priority to the '435 patent, the '661 patent, and the '925 app.

236.   On December 13, 2013, Wi-LAN's counsel submitted to the PTO an IDS in connection with the prosecution of the '120 app. disclosing the references cited in the Search Report, including Emanuel.

237.   In a March 14, 2014, interview, the applicant agreed to submit a terminal disclaimer to overcome a non-statutory obviousness-type double patenting rejection in view of the '661 patent.  On May 15, 2014, the Examiner allowed the '120 app., and the '120 app. issued as U.S. Patent No. 8,817,805 (the "'805 patent") on August 26, 2014. Notably, the claims of the '120 app. were never rejected in view of Emanuel.

### Prosecution of U.S. Patent No. 8,867,351

238.   On May 30, 2014, the Named Inventor, Wi-LAN, and Wi-LAN's counsel filed U.S. Patent App. No. 14/292,380 (the "'380 app.").  The '380 app. claims priority to the '435 patent, the '661 patent, the '238 patent, and the '120 app.

239.   On August 5, 2014, Wi-LAN's counsel submitted to the PTO an IDS in connection with the prosecution of the '380 app. disclosing the references cited in the Search Report, including Emanuel.

240.   On August 1, 2014, the Examiner issued an Office Action rejecting Claims 1-3 and 5 of the '380 app. based on non-statutory obviousness-type double patenting in view of the '120 app.  On August 5, 2014, the applicant responded by filing a terminal disclaimer.  The Examiner subsequently allowed the '380 app. on August 27, 2014, and the '380 app. issued as the '351 patent on October 21, 2014.

**Inequitable Conduct Based on the Failure to Disclose the Search Report, Emanuel, Emanuel's Foreign Counterparts, the First Examination Report, and the Second Examination Report and a Failure to File an Information Disclosure Statement Listing Those Items**

241.   The Named Inventor, SOMA, and Counsel actually knew of, but did not disclose, the Search Report, Emanuel, the patent family members of Emanuel, the First Examination Report, and the Second Examination Report during the prosecution of the '435 patent.

242.   The Named Inventor, SOMA, and Counsel actually knew of, but did not file an information disclosure statement or IDS listing according to the requirements of 37 CFR 1.97 or 1.98: the Search Report, Emanuel, the patent family members of Emanuel that were also listed in the Search Report, the First Examination Report, and the Second Examination Report during the prosecution of the '435 patent.

243.   The Named Inventor, SOMA, and Counsel had knowledge of the Search Report, Emanuel, the patent family members of Emanuel that were also listed in the Search Report, the First Examination Report, and the Second Examination Report during the prosecution of the '435 patent because the Named Inventor is the named inventor on the PCT App. and the '373 app., and SOMA is listed as the applicant on the PCT App. and the '373 app.   In addition, the Named Inventor, SOMA, and Counsel had knowledge of the Search Report, Emanuel, the patent family members of Emanuel that were also listed in the Search Report, the First Examination Report, and the Second Examination Report because the PCT App. and the '373 app. (with the attached Search Report) were submitted to the PTO when the application for the '435 patent was filed.

244.   The Named Inventor, SOMA, and Counsel knew that copies of the references listed in the Search Report were not provided to the PTO because the PTO's July 19, 2005, notice of acceptance of application under 35 U.S.C. 371 and 37 CFR 1.495 (Form PCT/DO/EO/903) indicated that they were not.

245.   The Named Inventor, SOMA, and Counsel deliberately withheld the Search Report, Emanuel, the patent family members of Emanuel that were also listed in the Search Report, the First Examination Report, and the Second Examination Report from the PTO during prosecution of the '435 patent in view of their previous knowledge of those references.

246.   The Named Inventor, SOMA, and Counsel deliberately failed to file an information disclosure statement listing the Search Report, Emanuel, the patent family members of Emanuel that were also listed in the Search Report, the First Examination

Report, and the Second Examination Report from the PTO during prosecution of the '435 patent in view of their previous knowledge of those references.

247.   The information included in the Search Report, Emanuel, the patent family members of Emanuel that were also listed in the Search Report, the First Examination Report, and the Second Examination Report was "but-for" material to the examination of the application that led to the '435 patent because the PTO would not have allowed one or more claims of the '435 patent had it been aware of those references.

248.   The Search Report, Emanuel, the patent family members of Emanuel that were also listed in the Search Report, the First Examination Report, and the Second Examination Report are "but-for" material to patentability at least because the Named Inventor and/or SOMA failed to argue around, acquiesced to, and made substantive changes to the claims of the '537 app. and the '373 app. in response to the rejections contained in the First Examination Report and the Second Examination Report, respectively—which were based on Emanuel.  These actions demonstrate the materiality of Emanuel (and Emanuel's foreign counterparts) to the patentability of the '435 patent and/or the fact that they are not cumulative to the prior art of record.

249.   The Search Report, Emanuel, and the patent family members of Emanuel that were also listed in the Search Report are also "but-for" material to patentability because Emanuel was listed as a "X" reference on the Search Report.

250.   The Search Report, Emanuel, and the patent family members of Emanuel that were also listed in the Search Report are also "but-for" material to patentability because Emanuel was subsequently identified in IDSs by The Named Inventor, SOMA, Counsel, Turtlebones, Inc., and/or Wi-LAN during prosecution of every later-issued patent in the same family as the '435 patent.

251.   The Examiner would have used the Search Report, Emanuel, the patent family members of Emanuel that were also listed in the Search Report, the First Examination Report, and/or the Second Examination Report to reject all of the

independent claims of the '435 patent pursuant to 35 U.S.C. §§ 102 and/or 103, and the '435 patent would not have issued as a result.

252.   The Named Inventor, SOMA, and Counsel withheld the Search Report, Emanuel, the patent family members of Emanuel that were also listed in the Search Report, the First Examination Report, and the Second Examination Report during prosecution of the '435 patent with the intent to deceive the PTO.  The Named Inventor, SOMA, and Counsel intentionally chose not to disclose those references during prosecution of the '435 patent despite having knowledge of those references and knowledge of their relevance to each and every independent claim of the '435 patent (and any claims that depend from those independent claims).

253.   The Named Inventor, SOMA, and Counsel failed to file an information disclosure statement listing the Search Report, Emanuel, the patent family members of Emanuel that were also listed in the Search Report, the First Examination Report, and the Second Examination Report during prosecution of the '435 patent with the intent to deceive the PTO.  The Named Inventor, SOMA, and Counsel intentionally chose not to file an information disclosure statement listing those references during prosecution of the '435 patent despite having knowledge of those references and knowledge of their relevance to each and every independent claim of the '435 patent (and any claims that depend from those independent claims).

254.   In view of the above, (1) the Named Inventor, SOMA, and Counsel knew of the Search Report, Emanuel, the patent family members of Emanuel that were also listed in the Search Report, the First Examination Report, and the Second Examination Report during prosecution of the '435 patent; (2) the Search Report, Emanuel, the patent family members of Emanuel that were also listed in the Search Report, the First Examination Report, and the Second Examination Report were but-for material to the patentability of one or more claims of the '435 patent; and (3) the Named Inventor, SOMA, and Counsel withheld those references from the PTO with a specific intent to deceive the PTO.

255.   The single most reasonable inference that a reasonable factfinder can draw from each of these acts of the Named Inventor, SOMA, and Counsel is that they deliberately withheld, failed to disclose, and/or failed to file an information disclosure statement listing, material references, and that each of these acts or omissions were done or made with the specific intent to deceive the PTO.

**Infectious Unenforceability of U.S. Patent No. 8,867,351**

256.   A breach of the duty of candor early in the prosecution of a patent application renders unenforceable all patent claims eventually issuing from the same *or a related application.  See, e.g., Fox Indus., Inc. v. Structural Preservation Sys., Inc.*, 922 F.2d 801, 804 (Fed. Cir. 1990).

257.   There is an immediate and necessary relation between the '351 patent and SOMA's, the Named Inventor's, and Counsel's inequitable conduct used to procure the '435 patent.

258.   The '435 and '351 patents share the same title ("Apparatus, System and Method for the Transmission of Data With Different QoS Attributes").  The '435 and '351 patents have similar specifications, and relate to similar subject matters.  The '351 patent is a continuation of the '435 patent.  Indeed, the '435 patent is the parent patent for the entire string of patents that the '351 patent claims priority to.

259.   Each successive continuation application in the chain of patents from the '435 patent to the '351 patent incorporates the teachings of the previous patents of the chain into its specification by reference.

260.   For the same reasons set forth above with particularity with respect to the '435 patent, the '351 patent is unenforceable in view of the inequitable conduct that occurred during prosecution of the related '435 patent.

**COUNT XI**

**DECLARATORY JUDGMENT THAT LG IS ENTITLED TO LICENSE THE PATENTS-IN-SUIT FROM WI-LAN ON FRAND/RAND TERMS AND CONDITIONS**

261.   Counterclaim-Plaintiffs LG incorporate and reallege the allegations set forth in Counterclaim Paragraphs 1-260, above, as if set forth fully herein.

262.   On information and belief, Wi-LAN has undertaken, in accordance with the relevant rules and IPR polices of applicable SSOs, to grant licenses to some entities under each of the Patents-in-Suit on reasonable and non-discriminatory ("RAND") or fair, reasonable, and non-discriminatory ("FRAND") terms and conditions.   These RAND/FRAND obligations are found in IPR policies adopted by ETSI, including but not limited to Clause 6.1 of the ETSI IPR policy, and the IEEE Standards Board Bylaws.

263.   The IEEE Standards Board Bylaws require IEEE members to submit letters of assurance ("LOAs") including either a general disclaimer to the effect that the patentee will not enforce any of its present or future patents the use of which would be required to implement an IEEE standard against any person or entity using the patents to comply with the standard, or a statement that a license will be made available to all applicants without compensation or under reasonable rates, with reasonable terms and conditions that are demonstrably free of any unfair discrimination.

264.   Additionally, the IEEE Standards Board Bylaws state that the assurance "shall be a letter that is in the form of either a) A general disclaimer to the effect that the patentee will not enforce any of its present or future patent(s) whose use would be required to implement the proposed IEEE standard against any person or entity using the patent(s) to comply with the standard or b) A statement that a license will be made available to all applicants without compensation or under reasonable rates, with reasonable terms and conditions that are demonstrably free of any unfair discrimination."

265.   Clause 6.1 of the ETSI IPR policy states that "When an ESSENTIAL IPR relating to a particular STANDARD or TECHNICAL SPECIFICATION is brought to the attention of ETSI, the Director-General of ETSI shall immediately request the owner to give within three months an irrevocable undertaking in writing that it is prepared to grant irrevocable licenses on fair, reasonable and non-discriminatory ('FRAND') terms and conditions under such IPR."   The ETSI IPR policy further states that "FRAND

licensing undertakings made pursuant to Clause 6 shall be interpreted as encumbrances that bind all successors-in-interest," and that "[a]n undertaking pursuant to Clause 6.1 with regard to a specified member of a PATENT FAMILY shall apply to all existing and future ESSENTIAL IPRs of that PATENT FAMILY."  The ETSI IPR policy defines "PATENT FAMILY" as "all documents having at least one priority in common."

266.   On information and belief, Wi-LAN and its predecessors-in-interest have asserted, or are asserting, that some or all of the Patents-in-Suit are essential to the IEEE 802.16 standard, as discussed above.

267.   On July 12, 2004, Wi-LAN submitted an LOA to the IEEE signed by Wi-LAN's General Counsel Lynel A. Barrow stating "that it intends to license under reasonable rates, with reasonable terms and conditions that are demonstrably free of any unfair discrimination" any patents issuing from the '518 application and the '561 application.

268.   On April 1, 2011, Wi-LAN submitted an LOA to the IEEE signed by Wi-LAN's Vice President Patents and Counsel Curtis Dodd stating that it "will grant a license under reasonable rates to an unrestricted number of applicants on a worldwide basis with reasonable terms and conditions that are demonstrably free of unfair discrimination" to "any and all claims determined to be essential to the [802.16-2009 standard] that [Wi-LAN] may own now or in the future" (*i.e.*, some or all of the Patents-in-Suit).

269.   On February 17, 2005, Wi-LAN submitted an IPR declaration to ETSI signed by Wi-LAN's President & COO Dr. Sayed-Amr El-Hamamsy stating that Wi-LAN is "prepared to grant irrevocable licenses … on terms and conditions which are in accordance with Clause 6.1 of the ETSI IPR Policy" to any patents issuing from the '518 application and the '561 application.

270.   On September 26, 2003, Ensemble submitted an IPR declaration to ETSI signed by Ensemble's Executive Vice President of Engineering Sheldon Gilbert stating that Ensemble is "prepared to grant irrevocable licenses under the IPRs on terms and

conditions which are in accordance with current Clause 6.1 of the ETSI IPR Policy" to any patents issuing from the '518 application and the '561 application.

271.   On March 29, 2004, Ensemble submitted an IPR declaration to the IEEE signed by Ensemble's Executive Vice President Sheldon Gilbert stating "that it intends to license under reasonable rates, with reasonable terms and conditions that are demonstrably free of any unfair discrimination" to any patents issuing from the '518 application and the '561 application.

272.   On July 13, 2007, Nextwave submitted a blanket LOA to the IEEE signed by Nextwave's Senior Counsel for Intellectual Property Dennis A. Duchene stating that it will "grant a license under reasonable rates to an unrestricted number of applicants on a worldwide basis with reasonable terms and conditions that are demonstrably free of unfair discrimination" for all patent claims essential to the IEEE 802.16 standard (*i.e.*, some or all of the Patents-in-Suit).

273.   On or about April 14, 2008, Nextwave (among others) publicly committed to licensing its LTE-related IP on FRAND terms.

274.   Despite Wi-LAN's and Wi-LAN's predecessors-in-interest's commitments to grant licenses to some or all of the Patents-in-Suit on FRAND/RAND terms and conditions, Wi-LAN has not offered to LG reasonable and non-discriminatory royalty terms and rates that are proportionate to royalty terms and rates offered to similarly situated companies.  As a third party beneficiary of the rules and IPR policies of the relevant SSOs, LG has the right to be granted license(s) to the Patents-in-Suit on FRAND/RAND terms and conditions.

275.   Wi-LAN has failed to comply with its FRAND/RAND obligations under the relevant rules and IPR policies of the relevant SSOs with respect to LG (which is claiming the benefit thereof) by refusing to offer a license (or licenses) on FRAND/RAND terms.

276.   As a result of the acts described in the foregoing paragraphs, there exists a substantial controversy of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

277.   In the event that one or more claims of the Patents-in-Suit are found valid and infringed, a judicial declaration that LG is entitled to license the Patents-in-Suit under FRAND/RAND terms and conditions is necessary and appropriate.

**COUNT XII**

**<u>BREACH OF CONTRACT</u>**

278.   Counterclaim-Plaintiffs LG incorporate and reallege the allegations set forth in Counterclaim Paragraphs 1-277, above, as if set forth fully herein.

279.   For consideration, including IEEE and ETSI membership and participation, Wi-LAN entered into express and/or implied contracts with the IEEE and ETSI's members, or alternatively, with the IEEE and ETSI, to which IEEE and ETSI members and others are third-party beneficiaries, in which Wi-LAN agreed, among other things, to abide by the IEEE and ETSI's policies and rules.  The IEEE and ETSI rules and policies, whether formal or informal, including all stipulations, requirements and representations in any form, constitute a contract between Wi-LAN and the IEEE and ETSI's members, or alternatively between Wi-LAN and the IEEE and ETSI, to which IEEE and ETSI members and others are third-party beneficiaries.

280.   In accordance with the foregoing, the IEEE and ETSI's rules and policies require its members to submit LOAs including statements that a license will be made available to all applicants under reasonable rates, with reasonable terms and conditions that are demonstrably free of any unfair discrimination.

281.   Furthermore, Wi-LAN's representations and other conduct, including the LOAs offering licenses on fair, reasonable and non-discriminatory terms that Wi-LAN submitted to the IEEE and ETSI, created express and/or implied contracts with the IEEE, ETIS, and their members, or alternatively between Wi-LAN and the IEEE and ETSI, to which IEEE and ETSI members and others are third-party beneficiaries.

282.   Wi-LAN breached its contractual obligations, including by failing to offer licenses for the Patents-in-Suit on fair, reasonable and non-discriminatory terms, by seeking to enjoin LG from making and selling 802.16 and/or 3GPP LTE compliant products, failing to disclose certain of the Patents-in-Suit, and through misrepresentations and/or omissions regarding its patents and/or patent applications.

283.   LG has incurred damages, and will be further damaged in the future due to Wi-LAN's breach of its contractual obligations.

## COUNT XIII

## MONOPOLIZATION IN VIOLATION OF SECTION 2 OF THE SHERMAN ACT

284.   Counterclaim-Plaintiffs LG incorporate and reallege the allegations set forth in Counterclaim Paragraphs 1-283, above, as if set forth fully herein.

285.   For years, continuing through to today, Wi-LAN has made objectively baseless claims that products having components designed based upon any one of a number of technical standards (including the IEEE 802.16 standard and the 3GPP LTE standard) necessarily infringe the patents that Wi-LAN asserts in this action.   Those claims are false—Wi-LAN's asserted patents are *not* infringed by products having components designed based upon the IEEE 802.16 standard or the 3GPP LTE standard, necessarily or otherwise.   Nevertheless, Wi-LAN is and has been engaged in a long-standing campaign to improperly assert its patents, including patents that it knows and has known for some time to be invalid and/or unenforceable, in an attempt to extract licensing revenues to which Wi-LAN knows it is not entitled and to obtain additional patents that have also become part of Wi-LAN's improper campaign.

286.   The Patents-in-Suit are unenforceable as a result of fraudulent misrepresentations and/or omissions to various SSOs and the PTO.   Wi-LAN has nevertheless improperly asserted those patents against LG and others.   Wi-LAN's assertions of those patents were and are objectively baseless, including because Wi-LAN was and is in possession of information confirming that those patents are invalid and unenforceable.   Through Wi-LAN's improper assertions of its patents, it has obtained not

only licensing revenue to which it is not entitled, but also additional patents that it uses as part of its improper licensing campaign.

287. Wi-LAN's misconduct has forced the many targets of its improper assertions to either stand and fight Wi-LAN's objectively baseless claims, at great expense, or else give in to those improper claims and either leave the market or pay Wi-LAN substantial license fees to which it is not entitled. As a result, Wi-LAN's unlawful conduct alleged herein has caused and continues to cause harm to legitimate competition, as alleged more fully below, including by improperly increasing barriers to entry such that potential competitors who would or might have produced products designed based upon the accused standards have been dissuaded from doing so and/or making investments in such activities, by forcing unnecessary defense expenditures by competitors or potential competitors who are unwilling to surrender to Wi-LAN's extortionate scheme to extract licensing revenue for patents that Wi-LAN has asserted in bad faith despite knowing them to be invalid and unenforceable, by facilitating Wi-LAN's demand for and extraction of improper license payments when Wi-LAN is not entitled to any such license payments including because its Patents-in-Suit do not cover products designed based upon the accused standards, by causing increased prices to consumers for products designed based upon the accused standards as a result of unnecessary defense expenditures and/or exorbitant licensing fees for those who accede to Wi-LAN's improper demands, and by decreasing or eliminating competition from alternative technologies that would or might have had increased viability but for Wi-LAN's unlawful conduct. Unless Wi-LAN's continuing campaign of unlawful conduct is put to a stop, these harmful effects will continue unabated.

288. Wi-LAN also engages and continues to engage in a long-running scheme of prosecuting patent applications in the wireless technology area before the Patent and Trademark Office and/or committing fraud before that office to attempt to have such patents read on or cover previously standardized standards such as the IEEE 802.16 standard or the 3GPP LTE standard, all in furtherance of Wi-LAN's antitrust scheme.

289.   Wi-LAN also engages and continues to engage in a long-running scheme of asserting certain patents in the wireless technology area that it contends are standard-essential but then refusing to offer a license on FRAND or RAND terms and tying any license to a license to its entire wireless portfolio, all in furtherance of Wi-LAN's antitrust scheme.

290.   Wi-LAN also engages and continues to engage in a long-running scheme of demanding and obtaining licenses for the Patents-in-Suit on above-FRAND/RAND royalty rates, all in furtherance of Wi-LAN's antitrust scheme.

291.   Wi-LAN also engages and continues to engage in a long-running scheme of licensing a party on patents in the wireless technology area and extracting unwarranted licensing revenues, only to then sue that party on licensed products and licensed patents during the term of the license, all in furtherance of Wi-LAN's antitrust scheme.   On information and belief, Wi-LAN has engaged in these activities in multiple situations and with respect to multiple parties.

292.   Wi-LAN also engages and continues to engage in a long-running scheme of asserting and contending that a party infringes certain patents in the wireless technology area, only to then execute covenants not to sue when that party initiates a declaratory action, all in furtherance of Wi-LAN's antitrust scheme.   On information and belief, Wi-LAN has engaged in these activities in multiple situations and with respect to multiple parties.

**Wi-LAN's Improper Claims of Market Power**

293.   Wi-LAN's unlawful conduct has had, and will continue to have, a substantial anticompetitive effect on the relevant Wireless Technologies Markets (defined below).

294.   In developing the IEEE 802.16 standard and the 3GPP LTE standard, participants sought to select the most appropriate technologies to provide each individual function within the standards.   Standard-setting participants, such as LG, evaluated whether to incorporate particular proposed functionalities and whether to include viable

alternative competing technologies into the standards. They made these decisions based on technical and commercial merit and intellectual property considerations, including whether the proposed technology was covered by disclosed IPR and, if so, whether the party claiming to hold patents covering that technology had committed to make it available on FRAND or RAND terms.

295. The IEEE 802.16 standard and the 3GPP LTE standard consist of many different technologies performing a variety of functions. The technologies that perform each of these functions are essential inputs into the manufacture of products and services that comply with the standards.

296. Because the IEEE 802.16 standard and the 3GPP LTE standard specify sets of distinct technologies to perform the various functions within the standards, once the standards were adopted, for those functions included in the standard, there were (by definition) no substitutes for the standardized technologies that perform each function.

297. Technical standards, such as the IEEE 802.16 standard and the 3GPP LTE standard, can, in the right circumstances, facilitate the adoption and advancement of technology as well as the development and commercialization of products that can interoperate with one another. Technical standards also can lower costs by increasing product manufacturing volume and increase price competition by eliminating "switching costs" for consumers who desire to switch from products manufactured by one company to those manufactured by another. Once a standard has been adopted and a sufficiently large number of products designed based upon that standard have been deployed in a sufficiently widespread fashion for a sufficient amount of time, companies that have structured their businesses to produce products having components designed based on technical standards, such as the IEEE 802.16 standard and the 3GPP LTE standard, can in some circumstances become "locked in" to the technologies included in the standards if, because of costs, sales schedules, and/or other considerations, it is no longer practical or possible to develop or switch to other technologies at that point due to the widespread, long standing adoption of the standard, or if customers for their products have no

practical choice at that point other than to purchase products having components designed based upon the standard due to the widespread, long standing adoption of the standard.

298.   When a technical standard mandates use of a particular technology in order to implement the standard, it is possible that a patent may be held or obtained covering that technology.  Once a standard has been adopted and a sufficiently large number of products designed based upon that standard have been deployed in a sufficiently widespread fashion for a sufficiently long period of time, at that point there may no longer be readily substitutable alternatives to a particular technology the use of which is mandated by the standard.  Accordingly, when a sufficiently large number of products designed based upon a standard have been deployed in a sufficiently widespread fashion for a sufficiently long period of time, the owner of a patent whose claims cover technology mandated by the standard can at that point gain market power in the market for that particular technology that is unrelated to any inherent value of the subject matter claimed in its patent and is instead derived merely from the fact that use of the claimed subject matter was previously mandated by a standard which has now been incorporated into a sufficiently large number of products.  If left unconstrained, the owner of such a patent may, after such "lock-in" occurs, demand supracompetitive monopoly rents for the use of the technology covered by its patent claims, knowing that it would be less costly for product designers to pay the excessive royalties or capitulate to unreasonable terms rather than incur the cost of switching or face a risk of injunction.  This dynamic is often called "patent hold-up."

299.   While viable alternative technologies may exist prior to the adoption and widespread deployment of a standard, once a standard that requires use of a patented technology has been adopted and a sufficiently large number of products designed based upon that standard have been deployed in a sufficiently widespread fashion for a sufficiently long period of time, previously viable alternatives to that patented technology may no longer be as feasible and/or available to those who wish to implement the

standard.  Further, even if there were an alternative standard, the costs and disruption associated with switching it typically prohibitively expensive.  Thus, the inclusion in a standard of a requirement that a particular patented technology be used to implement the standard may, if a standard has been deployed widely enough for a long enough period of time, confer on the patent owner market power in the market for technologies that perform the functionalities covered by the patent's claims.  Such market power is unlawful under Section 2 of the Sherman Act, 15 U.S.C. § 2, when it is acquired and/or maintained through anticompetitive, exclusionary conduct.

300.  Wi-LAN states in its Complaint that: "Wi-LAN's wireless technologies and patents, including its advanced 4G technologies, have been licensed by nearly all companies in the wireless industry, comprising more than 130 companies.  Defendants' infringement gives them an unfair advantage over their competitors, many of whom have chosen to do the right thing and license their use of Wi-LAN's wireless technologies and patents.  Many of Defendants' major competitors in the mobile device industry, including Samsung, HTC, Nokia and BlackBerry have licensed Wi-LAN's wireless technologies and patents.  Wi-LAN has made numerous efforts to license the unauthorized use of its wireless technologies by the Defendants, but Defendants have consistently refused to take a license, choosing to use Wi-LAN's 4G technologies without paying anything for that right."  (Complaint, Dkt. No. 1, ¶¶ 30-32.)  In other words, Wi-LAN claims that it holds a dominant position in the relevant technology markets, and that any company that wishes to carry on business in the economic market for the supply of mobile telephone handsets has no choice but to seek and obtain a license under Wi-LAN's portfolio of allegedly standard-essential patents (including the Patents-in-Suit).

301.  In press releases and on its website, Wi-LAN has also represented that it holds a dominant position in the relevant technology markets, and that any company that wishes to carry on business in the economic market for the supply of mobile telephone handsets has no choice but to seek and obtain a license under Wi-LAN's portfolio of allegedly standard-essential patents (including the Patents-in-Suit).

302.   Wi-LAN advertises on its website that its wireless portfolio covers the "wireless communication [market]" and includes 3G Wireless Communication, 4G Wireless Communication, Wireless infrastructure, and Wireless Antenna.

303.   Here, Wi-LAN has claimed that the alleged inventions of the Patents-in-Suit were incorporated or adopted into the IEEE 802.16 standard and the 3GPP LTE standard. (*See, e.g.,* Complaint, Dkt. No. 1, ¶ 27 ("The advanced 4G technologies developed by Mr. Stanwood and his team were employed in the network stacks utilizing the 4G WiMAX cellular standard, and were subsequently adopted for use in the network stacks utilizing the 4G LTE cellular standard used in today's 4G mobile devices."); Wi-LAN Objections and Responses to Defendants' First Set of Interrogatories at Response No. 9 (at 24) ("The widespread adoption of Wi-LAN's inventions into the LTE standards further shows the non-obviousness of the Asserted Claims.").)

304.   Wi-LAN has also claimed, in this litigation and elsewhere, that each of the Patents-in-Suit is essential to practicing technologies that are used for certain functions of the IEEE 802.16 standard and the 3GPP LTE standard.   (*See, e.g.,* Wi-LAN Objections and Responses to Defendants' First Set of Interrogatories at Response No. 4 (at 15) ("Wi-LAN contends that products complying with the 3GPP LTE Standards (release 8+) infringe the patents-in-suit, as described in Wi-LAN's infringement contentions."); *id.* at Response No. 11 (at 28) ("[E]ach of the Asserted Claims are required to practice at least the following 3GPP LTE Standards as implemented by LG in the accused devices…").)

305.   The technologies that Wi-LAN has identified with respect to each of the Patents-in-Suit are as follows: the '924 and '743 patents relate to the bandwidth-on-demand and periodic bandwidth services built into mobile devices to enable apps installed on such devices to have the bandwidth they need, when they need it, in real-time ("Bandwidth Allocation Technology"); the '351 patent relates to the quality-of-service functions built into mobile devices to enable mobile devices to prioritize the services that have the most pressing need for bandwidth ("QoS Technology"); and the '320 patent relates to the handoff functionality built into mobile devices to identify particular devices

and use pre-allocated codes to respond faster to requests from mobile devices ("Handover Technology").  (*See* Complaint, Dkt. No. 1, ¶ 28.)

306.   The relevant markets in which to assess the anticompetitive effects of Wi-LAN's conduct, therefore, are the various markets for technologies that—before the IEEE 802.16 standard and the 3GPP LTE standard were implemented—were competing to perform each of the various functions covered by each of Wi-LAN's purported essential patents for the IEEE 802.16 standard and the 3GPP LTE standard (collectively, the relevant "Wireless Technologies Markets").  The functionality for the IEEE 802.16 standard and the 3GPP LTE standard provided by each relevant Wireless Technology, therefore, comprises its own relevant market for antitrust purposes.  In particular, the technology identified in the '924 and '743 patents and their reasonable substitutes comprise the Bandwidth Allocation Technology Market.  The technology identified in the '351 patent and its reasonable substitutes comprise the QoS Technology Market.  The technology identified in the '320 patent and its reasonable substitutes comprise the Handover Technology Market.  Before standardization, the sellers in these Wireless Technologies Markets were the companies supplying technologies capable of performing the relevant functions incorporated in the IEEE 802.16 and the 3GPP LTE standards.  After standardization, however, the holder of patents covering the technology that performs a given function holds a monopoly in the relevant Wireless Technology Market.  That is because, post-standardization, formerly viable alternative technologies are no longer viable because of the lock-in effect discussed above.

307.   The IEEE 802.16 and the 3GPP LTE standards are employed throughout the world, and alternative technologies competing to be incorporated into the IEEE 802.16 and the 3GPP LTE standards were offered by suppliers from around the world.  Accordingly, the geographic scope of each of the relevant Wireless Technologies Markets described above is worldwide.

308.   If Wi-LAN in fact has patents covering technologies that have been incorporated into the relevant standards, it has the power to raise prices and exclude

competition with respect to each of the technologies covered by its patents and incorporated in the relevant standards.  Further, Wi-LAN acquired that power as a result of its misconduct before the PTO and in connection with the standard-setting process, including untimely disclosure of its IPR and/or false FRAND or RAND commitments. Barriers to entry into these markets are high because, among other reasons, the post-standardization lock-in effect means that other technologies are no longer viable substitutes for the technologies the standards specify to perform functions included in the standards.

309.  As described above, Wi-LAN holds monopoly power in the relevant Wireless Technologies Markets, assuming that the Patents-in-Suit are—as Wi-LAN claims—essential to the IEEE 802.16 and 3GPP LTE standards, valid, and enforceable. In the alternative, even if one or more of the Patents-in-Suit were ultimately determined not to be essential to the IEEE 802.16 and 3GPP LTE standards (or were determined to be invalid or unenforceable), Wi-LAN would still hold a monopoly position in the relevant Wireless Technologies Markets until such a determination were established conclusively.  Merely by asserting the Patents-in-Suit, Wi-LAN can (and has) extracted royalties or other licensing terms for those patents that greatly exceed what it could have obtained before the IEEE and 3GPP standardized the technologies that Wi-LAN claims are covered by the Patents-in-Suit.  Wi-LAN enjoys that hold-up power because, absent a license, IEEE 802.16 and 3GPP LTE implementers must risk possible injunction against the sale of products implementing the IEEE 802.16 and 3GPP LTE standards, potential treble damages in an infringement action, and/or the prosecution of a lengthy and expensive legal challenge to the validity, enforceability, or essentiality of the Patents-in-Suit.  Moreover, that hold-up power is enhanced where Wi-LAN holds and has asserted multiple declared essential patents, as it did in this instance, by seeking to extract exorbitant royalties for its entire portfolio of declared-essential patents and non-essential patents.  By the assertion of multiple patents, the likelihood that some or even many may

prove actually not to be essential (or to be invalid or unenforceable), does not prevent Wi-LAN from extracting monopoly royalties or other license terms.

## Wi-LAN's Anticompetitive and Exclusionary Conduct

310.   Wi-LAN acquired and maintained its current alleged position in an unlawful manner, through at least three distinct types of anticompetitive and exclusionary conduct, each of which independently violates Section 2 of the Sherman Act, 15 U.S.C. § 2: (1) deceptive conduct before the IEEE 802.16 and/or 3GPP LTE standards bodies; (2) affirmative misrepresentations regarding Wi-LAN's intent to license its IEEE 802.16 and/or 3GPP LTE essential patents on FRAND or RAND terms, and subsequent failure to do so; and (3) objectively baseless assertions of invalid and unenforceable patents, despite Wi-LAN's knowledge of their invalidity and unenforceability, for improper purposes.

## Standards Body Deception

311.   Wi-LAN's misconduct extends to deceptive conduct before the IEEE 802.16 and 3GPP LTE standards bodies.   As set forth in detail above, Wi-LAN (and its predecessors) fraudulently deceived the IEEE, 3GPP (and 3GPP's Organizational Partners), and their members.

312.   A subsequent patent owner, such as Wi-LAN, can never stand in a better position than the prior owner(s) because it takes the patent subject to the consequences of the bad acts of its predecessor and steps into the shoes of its predecessor with respect to the defenses that can be asserted against the patent.

313.   In order to reduce the likelihood that owners of patents will abuse the standards process, and to guard against unscrupulous conduct by the manipulation of the standard-setting process, SSOs, such as the IEEE and 3GPP, have rules requiring members to disclose the existence of patents or patent applications that they believe are relevant to standards under consideration and to either (a) disclaim the right to enforce any of its present or future patents against any person or entity using the patents to comply with the standard; or (b) promise to license their technologies on fair, reasonable,

and non-discriminatory terms.   These disclosures and licensing declarations permit standards-setting organizations, such as the IEEE and 3GPP, to evaluate and select from competing technologies with full knowledge of claimed intellectual proprietary rights that may affect the costs of implementing the standard.

314.   As alleged above, Wi-LAN has unlawfully monopolized each of the relevant Wireless Technologies Markets by deliberately and deceptively failing to timely disclose—before and after standardization—IPR that Wi-LAN claims is essential to the IEEE 802.16 and/or 3GPP LTE standards, in violation of the IEEE, ETSI, ATIS, and 3GPP rules and policies.   Wi-LAN has undertaken this course of misconduct with the intent to monopolize the relevant Wireless Technologies Markets.

315.   Wi-LAN's non-disclosure excluded viable alternative technologies from the relevant Wireless Technologies Markets.   Had Wi-LAN properly disclosed the existence of its IPR, the IEEE and 3GPP would have decided to standardize alternative technologies to perform the relevant functions.   Alternatively, the IEEE and 3GPP would have continued to leave the relevant functions out of the standards, in which case implementers would have been free to choose various alternative technologies to perform those functions, and the IEEE and 3GPP would have been free to continue to evaluate competing alternative technologies for potential standardization in future iterations of the standards.   In either case, but for Wi-LAN's non-disclosures, alternative viable technologies would not have been excluded from the relevant Wireless Technologies Markets.   For each of the Patents-in-Suit, the IEEE and 3GPP had multiple viable alternatives to standardizing the technologies Wi-LAN now claims are covered by its patents:

> (a) For the '924 and '743 patents, the IEEE and 3GPP could have utilized an alternative involving a system having a shared system resource by maintaining logical queues associated with the various data sources that require access to the shared system resource.   The IEEE and 3GPP alternatively could have adopted a system utilizing an individual polling

technique for bandwidth allocation.  The IEEE and 3GPPP could also have adopted systems involving group polling methods or piggybacking techniques in order to allocate bandwidth efficiently.  Accordingly, there were viable alternatives that the IEEE and 3GPP could have adopted.

(b) For the '351 patent, the IEEE and 3GPP could have utilized different types of Quality of Service attributes to select a logical channel queue, allocate data transmission capacity, and limit any allocated portion. Instead of the claimed priority-based attribute coupled with the undefined "traffic shaping rate [that is not reached]" attribute, the IEEE and 3GPP could have utilized other QoS attributes such as those described in the specification as known in the art  (e.g., traffic shaping, segmentation prohibition,  data rate requirements, latency restrictions, reliability requirements, header compression techniques, probability of block errors).  Similarly, the IEEE and 3GPP could have chosen not to use the aforementioned set of attributes when repeatedly considering a next logical channel queue for selecting and allocating.  Accordingly, there were viable alternatives that the IEEE and 3GPP could have adopted.

(c) The '320 patent relates to the handoff functionality built into mobile devices to identify particular devices and use pre-allocated codes to respond faster to requests from mobile devices ("Handover Technology").  The Handover Technology described in the '320 patent is used to reduce or eliminate the possibility of contention during the handover process.  The Handover Technology identified in the '320 patent was not the only available Handover Technology.   In fact, alternative methods for reducing or eliminating the possibility of contention during the handover process have been around for years— many of which are described in prior art patents and patent applications.

Additionally, the original drafts of the relevant 3GPP LTE standards did not include the Handover Technology.  Instead, the drafts taught the use of randomly selected codes during handover.  The use of dedicated codes during handover was added to later drafts of the relevant 3GPP LTE standards, during meetings at which Wi-LAN's (or Wi-LAN's predecessors-in-interest's) representatives attended and participated.  Accordingly, there were viable alternatives that the IEEE and 3GPP could have adopted.

316.  Had Wi-LAN properly disclosed its IPR in a timely manner, the IEEE 802.16 working group would not have adopted the current form of the IEEE 802.16 standard, and 3GPP would not have adopted the current form of its LTE standard—standards which Wi-LAN now alleges, or has alleged, require use of the subject matter claimed in the Patents-in-Suit in products designed based upon those standards (an allegation with which LG strongly disagrees).  Rather, absent Wi-LAN's deceptive conduct before the IEEE 802.16 and 3GPP LTE standards bodies, the IEEE and 3GPP would have adopted alternative versions of the standards.  Alternatively, the IEEE and 3GPP would have continued to leave the relevant functions out of the standards, in which case implementers would have been free to choose various alternative technologies to perform the relevant functions, and the IEEE and 3GPP would have been free to continue to evaluate competing alternative technologies for potential standardization in future iterations of the standard.  Wi-LAN thus would not have obtained a monopoly in the relevant Wireless Technologies Markets.

317.  Wi-LAN has not disclosed the Patents-in-Suit after standardization.

### False FRAND Declarations

318.  As discussed above, Wi-LAN and Wi-LAN's predecessors-in-interest have submitted declarations to the IEEE and ETSI committing to irrevocably license the Patents-in-Suit on FRAND or RAND terms.  Wi-LAN's failure to inform the IEEE, ETSI, and 3GPP that, contrary to its undertakings, it in fact would not meet its

commitments under its FRAND declarations was intentional and made with deceptive intent in order to induce the IEEE and 3GPP to include in the IEEE 802.16 and 3GPP LTE standards technologies that Wi-LAN claims are covered by the Patents-in-Suit. Wi-LAN's objective was to first cause the technologies of the Patents-in-Suit to be standardized through its advocacy for their adoption and its simultaneous deceit, as described above, and then to take advantage of the lock-in effect by demanding exorbitant royalties or other license terms that were unfair, unreasonable, and/or discriminatory, which objective was flatly inconsistent with its prior explicit FRAND undertakings to the IEEE and ETSI.

319. Combined with its advocacy for adoption of the subject technologies and the deliberate concealment of IPR for each of Patents-in-Suit during the standardization process, Wi-LAN's concealment of its true intention not to offer FRAND terms to all those implementing the IEEE 802.16 and 3GPP LTE standards—despite its prior written commitments to the contrary—induced the IEEE and 3GPP to standardize each of the technologies that Wi-LAN claims is covered by the Patents-in-Suit. Had Wi-LAN disclosed its IPR and its true intention not to offer FRAND license terms for each of the Patents-in-Suit, the IEEE and 3GPP would not have standardized the technologies that Wi-LAN now claims to be covered by each of the Patents-in-Suit. Rather, the IEEE and 3GPP would have decided either to standardize alternative technologies to perform the relevant functions, or continued to leave the relevant functions out of the standards, in which case implementers would have been free to choose various alternative technologies to perform those functions and the IEEE and 3GPP would have been free to continue to evaluative competing alternative technologies for potential standardization in future iterations of the standards.

320. Each of Wi-LAN's false IPR declarations was deliberately contrary to Wi-LAN's undisclosed true intention not to offer FRAND terms for the Patents-in-Suit. Each written undertaking nevertheless constitutes a promise that all interested parties are entitled to license the relevant standards-essential patents on FRAND terms, foreclosing

the patentee from claiming infringement of its patents or seeking to obtain an injunction to prohibit an implementer from practicing the standard.

321.   Wi-LAN's FRAND declarations falsely represented that Wi-LAN would license its claimed essential patents on FRAND terms.   None of Wi-LAN's FRAND declarations covering any of the Patents-in-Suit disclosed that Wi-LAN would take the position that parties practicing the relevant standards were not licensed or entitled to a FRAND license to its claimed essential patents, refuse to offer FRAND license terms to certain parties, or attempt to prevent parties from practicing the relevant standards.

322.   Once the IEEE and 3GPP participants selected technologies that Wi-LAN claims are covered by its patents, they effectively lost the option to instead include or use alternative technologies capable of performing those functions, thereby excluding such technologies from the relevant Wireless Technologies Markets, or to continue to leave the relevant functions out of the standards, in which case implementers would have been free to choose various alternative technologies to perform those functions and continue to evaluate competing alternative technologies for potential standardization in future iterations of the standards.   Accordingly, to the extent that Wi-LAN's Patents-in-Suit are essential to any standard, it was Wi-LAN's untimely disclosure of its IPR and/or its false FRAND declarations—not the inherent attributes of its purportedly essential technologies or the uncorrupted operation of the standard-setting process—that conferred monopoly power on Wi-LAN with respect to the technologies that perform the functions included in the relevant standards.

323.   Wi-LAN's FRAND declarations are binding contractual commitments made to the IEEE and ETSI, its members, and designers and sellers of products implementing IEEE and ETSI/3GPP standards (including LG), for the benefit of the IEEE, ETSI, 3GPP, their members, and any entity that implements the IEEE 802.16 or 3GPP LTE standards (or any other IEEE, ETSI, or 3GPP standard for which Wi-LAN declared essential IPR and undertook a FRAND commitment).   Therefore, in accordance with the IEEE's and ETSI's IPR policies, Wi-LAN bound itself to license on FRAND terms to

LG, a seller of products that implement IEEE 802.16 and 3GPP LTE standards and a member of IEEE and ETSI.

324.  LG, other members of the IEEE and ETSI, and other companies implementing the IEEE 802.16 and 3GPP LTE standards have reasonably relied on Wi-LAN's FRAND commitments to: (a) grant licenses to those patents and patent applications that Wi-LAN claims are essential on fair, reasonable, and non-discriminatory terms; and (b) not to seek to impose unfair, unreasonable, or discriminatory conditions on licensing, such as cross-licenses of patents covering proprietary technology that is not essential to any standard.  In particular, LG and others have relied on Wi-LAN's commitments that preclude Wi-LAN from seeking to enjoin them from practicing the IEEE 802.16 and 3GPP LTE standards (given that they are licensed as a result of Wi-LAN's FRAND commitments), and that require Wi-LAN to provide fair, reasonable, and non-discriminatory royalties and other license terms that would permit efficient competitors such as LG to profitably offer standards-compliant products.  LG has invested substantial resources in developing and marketing its products in reliance on Wi-LAN's FRAND commitments.   Wi-LAN reasonably should have expected that LG would do so.

325.  Consistent with its true intention throughout the relevant standardization period that it would not offer FRAND license terms to all implementers of the Patents-in-Suit, Wi-LAN has in fact failed to offer such terms to LG and has breached its FRAND obligation regarding the Patents-in-Suit.

326.  LG has asked Wi-LAN to quote FRAND license terms.  It has also asked Wi-LAN to provide basic information necessary for LG to determine whether any rate that Wi-LAN quotes is in fact fair, reasonable, and non-discriminatory, including (a) the royalty basis to which Wi-LAN contends the FRAND royalty rate would apply, (b) confirmation that other companies are also paying any royalty rate that Wi-LAN would seek from LG, and (c) copies or summaries of license agreements with manufacturers of IEEE 802.16 and/or 3GPP LTE-compliant mobile devices.

327.   LG believes (and Wi-LAN admits in its Complaint) that Wi-LAN has entered into license agreements covering the Patents-in-Suit with other makers of wireless communications devices that implement the IEEE 802.16 and 3GPP LTE standards on FRAND or RAND terms.

**Assertion of Invalid and Unenforceable Patents Despite Knowledge of Their Invalidity and Unenforceability**

328.   Notwithstanding the fact that the Patents-in-Suit are unenforceable based on Wi-LAN's fraudulent misrepresentations and/or omissions to various SSOs, and notwithstanding the fact that Wi-LAN knew or should have known that the Patents-in-Suit are invalid, Wi-LAN has nevertheless improperly asserted and asserts those patents against LG and others.  Additionally, Wi-LAN's assertions of those patents were and are objectively baseless and made for an improper purpose, including because Wi-LAN made those assertions despite knowing that the Patents-in-Suit are invalid and unenforceable in an effort to obtain license revenues it knows it is not entitled to, as well as additional patents to use as part of its improper licensing campaign.

329.   Notwithstanding Wi-LAN's knowledge of the invalidity and unenforceability of the Patents-in-Suit, Wi-LAN has nevertheless asserted claims for infringement of the Patents-in-Suit against LG and others as part of a long-standing and ongoing bad faith campaign, including by initiating and maintaining the present objectively baseless litigation, to improperly extract licenses, acquire additional patents, and extort money from LG and others.

330.   To this day, Wi-LAN continues to assert these patents against LG in bad faith through this litigation, knowing full well that those patents are invalid and unenforceable.  Wi-LAN's conduct is objectively baseless and unlawful.

331.   Wi-LAN's bad faith assertion of its patents, including those which Wi-LAN knows to be invalid and unenforceable, has also facilitated Wi-LAN's acquisition of a number of additional patents which Wi-LAN also improperly alleges are necessarily infringed by products having components designed based upon certain technical

standards.   Hence, Wi-LAN's exclusionary conduct also allowed Wi-LAN to amass additional patents that Wi-LAN now alleges are necessarily infringed by products having components designed based upon certain technical standards.

### Harm to Competition Caused by Wi-LAN's Exclusionary Conduct

332.   Through the acts, practices and conduct described herein, Wi-LAN, through its own conduct and that of its predecessors-in-interest Ensemble and Nextwave, has engaged in unlawful anticompetitive and exclusionary conduct, including through (a) fraudulent misrepresentations and/or omissions to the IEEE 802.16 and 3GPP LTE standards bodies, and failure and refusal to abide by its FRAND/RAND licensing commitments made to the IEEE, ETSI, and their members; and (b) bad faith assertion of the Patents-in-Suit against LG and others in an objectively baseless fashion and despite the fact that those patents are invalid and/or unenforceable, or through a continuous campaign to improperly extract licenses, all in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

333.   By (a) wrongfully obtaining monopoly power in the relevant Wireless Technologies Markets through non-disclosure of its IPR during the standards-setting process and false commitments to offer FRAND license terms to implementers of the IEEE 802.16 and 3GPP LTE standards; and (b) by attempting to coerce LG to accept unfair, unreasonable, and discriminatory licensing terms by abusively accusing LG of infringement and seeking an injunction, Wi-LAN seeks to exclude from the manufacture and sale of downstream wireless devices and raise the costs of LG.   Moreover, Wi-LAN's conduct more broadly has and continues to threaten unlawfully to exclude other LG competitors from, and increase royalties and other costs associated with, the manufacture and sale of downstream wireless communications devices that implement the IEEE 802.16 and 3GPP LTE standards and chill competition to develop and sell innovative new IEEE 802.16 and/or 3GPP LTE-compliant products, resulting in increased prices and decreased quality and innovation in downstream product markets and complementary innovation markets.

334.   The foregoing conduct by Wi-LAN has caused and threatens to cause harm to competition.  These anticompetitive effects include each of the following:

(a) By deliberately failing to disclose purportedly essential IPR during the standards-setting process and by making false FRAND commitments to the IEEE and ETSI, Wi-LAN has improperly foreclosed competition in each of the relevant Wireless Technologies Markets.  Before standardization, each of the functionalities that are purportedly covered by the Patents-in-Suit and included in the relevant standards and all available technical alternatives competed in a relevant product market; following standardization, alternative technologies to perform functions necessary to practice the standards were no longer viable.

(b) Wi-LAN's unlawful monopolization has increased prices and decreased quality and innovation for technologies in the relevant Wireless Technologies Markets.

(c) Wi-LAN's conduct has and, unless enjoined, will continue to substantially increase costs associated with the manufacture and sale of downstream of mobile wireless communications devices that are compliant with the IEEE 802.16 and/or 3GPP LTE standards, and will chill innovation and quality competition for products that comply with the IEEE 802.16 and/or 3GPP LTE standards.

335.   Wi-LAN's violations of Section 2 of the Sherman Act have also caused and continue to cause harm to competition by improperly increasing barriers to entry such that potential competitors who would or might have produced products designed based upon the accused standards have been dissuaded from doing so and/or making investments in such activities, by forcing unnecessary defense expenditures by competitors or potential competitors who are unwilling to surrender to Wi-LAN's extortionate scheme to extract licensing revenue for patents that Wi-LAN has asserted in bad faith despite knowing them to be invalid and/or unenforceable, by facilitating Wi-LAN's demand for and extraction of improper supracompetitive license payments when Wi-LAN is not properly entitled to any such license payments including because its Patents-in-Suit do not cover products designed based upon the accused standards, by causing increased prices to consumers for products designed based upon the accused standards as a result of unnecessary defense expenditures and/or exorbitant licensing fees

for those who accede to Wi-LAN's improper demands, by chilling participation in the markets in which it operates and related markets, and by decreasing or eliminating competition from alternative technologies that would or might have had increased viability but for Wi-LAN's exclusionary conduct.  In addition, Wi-LAN's abuse of the standards-setting process also damages competition through chilling effects on standards participation, thereby reducing or eliminating the pro-competitive impacts that standards organizations can have in the right circumstances when the process is not abused.

336.   Wi-LAN's violations of Section 2 of the Sherman Act have also caused injury to LG in its business and property, including by forcing LG to incur great expense in defending against Wi-LAN's bad faith and objectively baseless assertions of its alleged patents, and also through the loss of past, present and future profits and other harm to LG's business.

337.   Wi-LAN's violations of Section 2 of the Sherman Act have further caused injury to LG in its business and property in the form of loss of goodwill, embarrassment, and reputational harm.

338.   LG has suffered irreparable injury by reason of the acts, practices and conduct of Wi-LAN alleged herein, and will continue to suffer such injury until and unless the Court enjoins such acts, practices, and conduct.

339.   Wi-LAN's anticompetitive conduct has affected and is affecting a substantial volume of interstate and foreign commerce, including commerce in this District.

## COUNT XIV

## ATTEMPTED MONOPOLIZATION IN VIOLATION OF SECTION 2 OF THE SHERMAN ACT

340.   Counterclaim-Plaintiffs LG incorporate and reallege the allegations set forth in Counterclaim Paragraphs 1-339, above, as if set forth fully herein.

341.   Wi-LAN has willfully engaged in the anticompetitive conduct described above with the specific intent to acquire and maintain market power in a relevant antitrust

market—namely, the relevant Wireless Technologies Market—and destroy competition therein.  There is a dangerous probability that, unless restrained, Wi-LAN's conduct will (according to its allegations) succeed, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

342.  Wi-LAN's violations of Section 2 of the Sherman Act caused and continue to cause harm to competition, including by improperly increasing barriers to entry such that potential competitors who would or might have produced products designed based upon the accused standards have been dissuaded from doing so and/or making investments in such activities, by forcing unnecessary defense expenditures by competitors or potential competitors who are unwilling to surrender to Wi-LAN's extortionate scheme to extract licensing revenue for patents that Wi-LAN has asserted in bad faith despite knowing them to be invalid and unenforceable, by facilitating Wi-LAN's demand for and extraction of improper supracompetitive license payments when Wi-LAN is not properly entitled to any such license payments including because its Patents-in-Suit do not cover products designed based upon the accused standards, by causing increased prices to consumers for products designed based upon the accused standards as a result of unnecessary defense expenditures and/or exorbitant licensing fees for those who accede to Wi-LAN's improper demands, by chilling participation in the markets in which it operates and related markets, and by decreasing or eliminating competition from alternative technologies that would or might have had increased viability but for Wi-LAN's exclusionary conduct.  In addition, Wi-LAN's abuse of the standards-setting process also damages competition through chilling effects on standards participation, thereby reducing or eliminating the pro-competitive impacts that standards organizations can have in the right circumstances when the process is not abused.

343.  Wi-LAN's violations of Section 2 of the Sherman Act have also caused injury to LG in its business and property, including by forcing LG to incur great expense in defending against Wi-LAN's bad faith and objectively baseless assertions of its alleged patents, and also through the loss of past, present and future profits and other

harm to LG's business.   LG has suffered irreparable injury by reason of the acts, practices and conduct of Wi-LAN alleged herein, and will continue to suffer such injury until and unless the Court enjoins such acts, practices and conduct.

344.   Wi-LAN's anticompetitive conduct has affected and is affecting a substantial volume of interstate and foreign commerce, including commerce in this District.

## COUNT XV

## UNFAIR BUSINESS PRACTICES UNDER CAL. BUS. & PROF. CODE § 17200

345.   Counterclaim-Plaintiffs LG incorporate and reallege the allegations set forth in Counterclaim Paragraphs 1-344 above, as if set forth fully herein.

346.   Unfair business practices under Cal. Bus. & Prof. Code § 17200 *et seq.* include any unfair, unlawful, or fraudulent business act or practice.   The conduct described above in paragraphs 1-344 comprises unfair business practices under Section 17200 *et seq.*

347.   Misconduct and injuries pertaining to the above-referenced conduct have occurred within California, either of which gives rise to a § 17200 claim.  With respect to injury in California, LG conducts business related to the accused standards and products in California, and sells accused products to customers located in California.

348.   In addition to injuries in California, various acts of misconduct alleged in the preceding counts occurred in California, including relevant meetings of standards-setting organizations and Wi-LAN's bad faith assertion of the Patents-in-Suit against LG.

349.   LG is entitled to remedies, including attorneys' fees and disgorgement of Wi-LAN's ill-gotten gains, including investments, licensing royalties, or any recoveries obtained through the inappropriate conduct set forth in paragraphs 1-344 above.

## PRAYER FOR RELIEF

WHEREFORE, LG respectfully requests the following relief:

A.     Dismissal of Wi-LAN's Complaint with prejudice, granting LG's Affirmative Defenses and Counterclaims, and denying each request for relief made by Wi-LAN;

B.     Entry of judgment in LG's favor on each and every count of Wi-LAN's Complaint;

C.     Entry of an Order directing that LG is not liable to Wi-LAN for any damages pursuant to Wi-LAN's Complaint;

D.     Entry of judicial declarations in favor of LG under Counts I through XV of Counterclaim-Plaintiff LG's Counterclaims that:

        1.     No claims of the Patents-in-Suit are infringed by LG;

        2.     The claims of the Patents-in-Suit are invalid; and

        3.     The Patents-in-Suit are unenforceable.

E.     An award to LG of compensatory damages, attorneys' fees and costs, and interest on its Affirmative Defenses and Counterclaims;

F.     Entry of an Order that LG is the prevailing party, that this is an exceptional case under 35 U.S.C. § 285 because Wi-LAN brought this action with wrongful intent, or at least gross negligence, and with knowledge that LG's accused products do not and cannot infringe any valid claim of the Patents-in-Suit, with knowledge that the claims of the Patents-in-Suit are invalid under 35 U.S.C. §§ 101, 102, 103, and/or 112, with knowledge that the claims of the Patents-in-Suit are unenforceable, and/or based on any other facts and circumstances warranting a finding of an exceptional case, in favor of LG;

G.     A judgment requiring Wi-LAN's specific performance under its contracts with the IEEE, ETSI, and/or IEEE and ETSI members to grant licenses to the Patents-in-Suit to LG on fair, reasonable, and non-discriminatory terms and conditions;

H.     A decree that LG is entitled to license the Patents-in-Suit from Wi-LAN on fair, reasonable, and non-discriminatory terms and conditions;

I.     An award to LG of its reasonable attorney fees and costs pursuant to 35 U.S.C. § 285; and/or

J.     Such other and further relief as this Court deems just and proper.

### JURY DEMAND

LG requests a trial by jury on all issues so triable.

DATED:  October 10, 2018

By: */s/ Joseph S. Leventhal*
Joseph S. Leventhal
joseph.leventhal@dinsmore.com
Dinsmore & Shohl LLP
655 West Broadway Suite 840
San Diego, CA 92101
Tel: 619-356-3518
Fax: 619-615-2082

Richard D. Harris
harrisr@gtlaw.com
James J. Lukas, Jr.
lukasj@gtlaw.com
Greenberg Traurig, LLP
77 West Wacker Drive  Suite 3100
Chicago, IL 60601
Tel: 312-456-8400
Fax: 312-456-8435

*Attorneys for Defendants and Counterclaim-Plaintiffs, LG Electronics, Inc., LG Electronics U.S.A., Inc., and LG Electronics Mobilecomm U.S.A., Inc.*

1

2

## CERTIFICATE OF SERVICE

3

I hereby certify that on October 10, 2018, I electronically filed:

4

5

**DEFENDANTS LG ELECTRONICS, INC., LG ELECTRONICS U.S.A., INC., AND LG ELECTRONICS MOBILECOMM U.S.A., INC.'S ANSWER TO COMPLAINT, AFFIRMATIVE DEFENSES, AND COUNTERCLAIMS,**

6

7

with the Clerk of the Court using the CM/ECF system, which sent notification of such

8

filing to the following:

9

10

**Victor M. Felix**
Procopio Cory Hargreaves and Savitch
LLP
525 B Street
Suite 2200
San Diego, CA 92101
(619) 515-3229
Fax: (619) 744-5409
Email: vmf@procopio.com

*Attorney for Plaintiffs*

11

12

13

14

15

16

**Christopher M. First**
**Eric J. Enger**
**Leslie V. Payne**
Heim, Payne & Chorush LLP
1111 Bagby Street
Suite 2100
Houston, TX 77002
713-221-2000
Email: cfirst@hpcllp.com
        eenger@hpcllp.com
        lpayne@hpcllp.com

*Attorneys for Plaintiffs*

17

18

19

I declare under penalty of perjury that the foregoing is true and correct.  Executed

20

on October 10, 2018, at San Diego, CA.

21

22

By:  */s/ Joseph S. Leventhal*
                Joseph S. Leventhal

23

24

25

26

27

28