# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WI-LAN INC.; WI-LAN USA, INC.; and WI-LAN LABS, INC.,<br><br>                                        Plaintiffs,<br><br>v.<br><br>LG ELECTRONICS, INC.; LG ELECTRONICS U.S.A., INC; and LG ELECTRONICS MOBILECOMM U.S.A., INC.,<br><br>                                        Defendants. | Case No.:  18-cv-01577-H-BGS<br><br>**ORDER:**<br><br>**(1) CLAIM CONSTRUCTION ORDER; AND**<br><br>**(2) DENYING DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT THAT CERTAIN CLAIMS ARE INVALID AS INDEFINITE**<br><br>[Doc. No. 82.] |

In the present action, Plaintiffs Wi-Lan Inc., Wi-Lan USA, Inc., and Wi-Lan Labs, Inc. assert claims of patent infringement against Defendants LG Electronics, Inc., LG Electronics U.S.A., Inc., and LG Electronics Mobilecomm U.S.A., Inc., alleging infringement of U.S. Patent Nos. 8,787,924, 8,867,351, 9,226,320, and 9,497,743.  (Doc. No. 1, Compl.)  On March 8, 2019, the parties filed their joint claim construction prehearing statement, chart, and worksheet, identifying the disputed claim terms from the patents-in-suit.  (Doc. Nos. 67-69.)  On April 19, 2019, the parties each filed an opening claim

construction brief.  (Doc. Nos. 83, 85.)  On May 3, 2019, the parties each filed a responsive claim construction brief.  (Doc. Nos. 91, 92.)

In addition, on April 19, 2019, LG filed a motion for partial summary judgment that claims 1-2, 5-9, and 12-16 of the '924 patent are invalid as indefinite under 35 U.S.C. § 112, ¶ 2.  (Doc. No. 82.)  On May 10, 2019, Wi-LAN filed a response in opposition to LG's motion for summary judgment.  (Doc. No. 100.)  On May 17, 2019, LG filed its reply. (Doc. No. 104.)

On May 23, 2019, the Court issued a tentative claim construction order and an order tentatively denying LG's motion for partial summary judgment.  (Doc. No. 108.)  The Court held a claim construction hearing on May 24, 2019.  Christopher M. First, Eric J. Enger, Leslie V. Payne, and Victor M. Felix and appeared for Wi-LAN.  Richard D. Harris, Gary R. Jarosik, Callie J. Sand, and Matthew J. Levinstein appeared for LG.  After considering the parties' briefs, the parties' arguments at the hearing, and all relevant information, the Court construes the disputed terms from the patents-in-suit.  In addition, for the reasons below, the Court denies LG's motion for partial summary judgment that certain claims of the '924 patent are invalid as indefinite.

## Background

On July 11, 2018, Wi-LAN filed a complaint for patent infringement against LG, alleging infringement of U.S. Patent Nos. 8,787,924, 8,867,351, 9,226,320, and 9,497,743. (Doc. No. 1.)  Specifically, Wi-LAN alleges that LG's wireless communication products that are compliant with the 3rd Generation Partnership Project 4G LTE standard directly infringe the patents-in-suit.  (Id. ¶¶ 37, 40, 53, 66, 79.)

On October 10, 2018, LG filed an answer to Wi-LAN's complaint along with counterclaims for: (1) declaratory judgments of non-infringement and invalidity of the patents-in-suit; (2) declaratory judgment of unenforceability for failure to disclose to standard setting organizations; (3) declaratory judgment of unenforceability of the '351 patent; (4) declaratory judgment that LG is entitled to license the patents-in-suit on FRAND/RAND terms and conditions; (5) breach of contract; (6) monopolization and

attempted monopolization in violation of section 2 of the Sherman Act; and (7) unfair business practices under California Business and Profession Code § 17200 *et seq*.  (Doc. No. 17.)

On November 13, 2018, the Court issued a scheduling order in the action.  (Doc. No. 36.)  On April 12, 2019, the Court granted in part and denied in part Wi-LAN's motions to dismiss LG's counterclaims, and the Court dismissed LG's counterclaim for declaratory judgment of unenforceability of the '351 patent due to infectious unenforceability with prejudice.  (Doc. No. 79.)  By the present claim construction briefs and motion for summary judgment, the parties request that the Court construe several disputed claim terms from the patents-in-suit.[1]  (Doc. Nos. 83, 85, 82-1.)

## Discussion

## I.    Legal Standards for Claim Construction

Claim construction is an issue of law for the court to decide.  Teva Pharm. USA, Inc. v. Sandoz, Inc., 135 S. Ct. 831, 838 (2015); Markman v. Westview Instr., Inc., 517 U.S. 370, 372 (1996).  Although claim construction is ultimately a question of law, "subsidiary factfinding is sometimes necessary."  Teva, 135 S. Ct. at 838.

"The purpose of claim construction is to 'determin[e] the meaning and scope of the patent claims asserted to be infringed.'"  O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co., 521 F.3d 1351, 1360 (Fed. Cir. 2008).  "It is a 'bedrock principle' of patent law that the 'claims of a patent define the invention to which the patentee is entitled the right to exclude.'"  Phillips v. AWH Corp., 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc).

Claim terms "'are generally given their ordinary and customary meaning[,]'" which "is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention."  Id. at 1312–13.  "In some cases, the ordinary meaning of

---

[1]    The Court notes that LG's motion for partial summary judgment addresses the proper scope of the claim terms "at least one of the UL connections" and "the at least two connections" from the '924 patent. (Doc. No. 82-1 at 5-10.)  Thus, LG's motion for partial summary judgment is in essence additional claim construction briefing.

claim language as understood by a [PHOSITA] may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." Id. at 1314. "However, in many cases, the meaning of a claim term as understood by persons of skill in the art is not readily apparent." O2 Micro, 521 F.3d at 1360. If the meaning of the term is not readily apparent, the court must look to "those sources available to the public that show what a person of skill in the art would have understood disputed claim language to mean," including intrinsic and extrinsic evidence. See Phillips, 415 F.3d at 1314. A court should begin with the intrinsic record, which consists of the language of the claims, the patent specification, and, if in evidence, the prosecution history of the asserted patent. Id.; see also Vederi, LLC v. Google, Inc., 744 F.3d 1376, 1382 (Fed. Cir. 2014) ("In construing claims, this court relies primarily on the claim language, the specification, and the prosecution history.").

In determining the proper construction of a claim, a court should first look to the language of the claims. See Vitronics, 90 F.3d at 1582; see also Comark Commc'ns v. Harris Corp., 156 F.3d 1182, 1186 (Fed. Cir. 1998) ("The appropriate starting point . . . is always with the language of the asserted claim itself."). The context in which a disputed term is used in the asserted claims may provide substantial guidance as to the meaning of the term. See Phillips, 415 F.3d at 1314. In addition, the context in which the disputed term is used in other claims, both asserted and unasserted, may provide guidance because "the usage of a term in one claim can often illuminate the meaning of the same term in other claims." Id. Furthermore, a disputed term should be construed "consistently with its appearance in other places in the same claim or in other claims of the same patent." Rexnord Corp. v. Laitram Corp., 274 F.3d 1336, 1342 (Fed. Cir. 2001); accord Microprocessor Enhancement Corp. v. Texas Instruments Inc., 520 F.3d 1367, 1375 (Fed. Cir. 2008); see also Paragon Sols., LLC v. Timex Corp., 566 F.3d 1075, 1087 (Fed. Cir. 2009) ("We apply a presumption that the same terms appearing in different portions of the claims should be given the same meaning." (internal quotation marks omitted)). Moreover, "'[a] claim construction that gives meaning to all the terms of the claim is preferred over

one that does not do so.'" <u>Vederi</u>, 744 F.3d 1383.

A court must also read claims "in view of the specification, of which they are a part." <u>Markman</u>, 52 F.3d at 979; <u>see</u> 35 U.S.C. § 112(b) ("The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the inventor or a joint inventor regards as the invention."). "'Apart from the claim language itself, the specification is the single best guide to the meaning of a claim term.'" <u>Vederi</u>, 744 F.3d at 1382. For example, "a claim construction that excludes [a] preferred embodiment [described in the specification] 'is rarely, if ever, correct and would require highly persuasive evidentiary support.'" <u>Adams Respiratory Therapeutics, Inc. v. Perrigo Co.</u>, 616 F.3d 1283, 1290 (Fed. Cir. 2010).

But "[t]he written description part of the specification does not delimit the right to exclude. That is the function and purpose of claims." <u>Markman v. Westview Instruments, Inc.</u>, 52 F.3d 967, 980 (Fed. Cir. 1995) (en banc). Therefore, "it is improper to read limitations from a preferred embodiment described in the specification—even if it is the only embodiment—into the claims absent a clear indication in the intrinsic record that the patentee intended the claims to be so limited." <u>Dealertrack, Inc. v. Huber</u>, 674 F.3d 1315, 1327 (Fed. Cir. 2012); <u>see also</u> <u>Kara Tech. Inc. v. Stamps.com Inc.</u>, 582 F.3d 1341, 1348 (Fed. Cir. 2009) ("The patentee is entitled to the full scope of his claims, and we will not limit him to his preferred embodiment or import a limitation from the specification into the claims.").

In most situations, analysis of the intrinsic evidence will resolve claim construction disputes. <u>See</u> <u>Vitronics</u>, 90 F.3d at 1583; <u>Teva</u>, 135 S. Ct. at 841. However, "[w]here the intrinsic record is ambiguous, and when necessary," district courts may "rely on extrinsic evidence, which 'consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises.'" <u>Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.</u>, 711 F.3d 1348, 1360 (Fed. Cir. 2013) (quoting <u>Phillips</u>, 415 F.3d at 1317). A court must evaluate all extrinsic evidence in light of the intrinsic evidence. <u>Phillips</u>, 415 F.3d at 1319. "Extrinsic evidence may not be

used 'to contradict claim meaning that is unambiguous in light of the intrinsic evidence.'" Summit 6, LLC v. Samsung Elecs. Co., 802 F.3d 1283, 1290 (Fed. Cir. 2015); see also Bell Atl. Network Servs., Inc. v. Covad Commc'ns Grp., Inc., 262 F.3d 1258, 1269 (Fed. Cir. 2001) ("[E]xtrinsic evidence . . . may not be used to vary, contradict, expand, or limit the claim language from how it is defined, even by implication, in the specification or file history."); Vederi, 744 F.3d at 1382 ("[E]xtrinsic evidence may be less reliable than the intrinsic evidence."). In cases where subsidiary facts contained in the extrinsic evidence "are in dispute, courts will need to make subsidiary factual findings about that extrinsic evidence." Teva, 135 S. Ct. at 841.

"[D]istrict courts are not (and should not be) required to construe every limitation present in a patent's asserted claims." O2 Micro, 521 F.3d at 1362. In certain situations, it is appropriate for a court to determine that a claim term needs no construction and its plain and ordinary meaning applies. See id.; Phillips, 415 F.3d at 1314. But "[a] determination that a claim term 'needs no construction' or has the 'plain and ordinary meaning' may be inadequate when a term has more than one 'ordinary' meaning or when reliance on a term's 'ordinary' meaning does not resolve the parties' dispute." O2 Micro, 521 F.3d at 1361. If the parties dispute the scope of a certain claim term, it is the court's duty to resolve the dispute. Id. at 1362; accord Eon Corp. IP Holdings v. Silver Spring Networks, 815 F.3d 1314, 1318 (Fed. Cir. 2016).

## II.   Legal Standards for a Motion for Summary Judgment

Summary judgment is appropriate under Rule 56 of the Federal Rules of Civil Procedure if the moving party demonstrates that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). A fact is material when, under the governing substantive law, it could affect the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc., 618 F.3d 1025, 1031 (9th Cir. 2010). "A genuine issue of material fact exists when the evidence is such that a reasonable jury could return a verdict for the nonmoving party."

18-cv-01577-H-BGS

*Fortune Dynamic*, 618 F.3d at 1031 (internal quotation marks and citations omitted); accord *Anderson*, 477 U.S. at 248.  "Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment."  *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

A party seeking summary judgment always bears the initial burden of establishing the absence of a genuine issue of material fact.  *Celotex*, 477 U.S. at 323.  The moving party can satisfy this burden in two ways: (1) by presenting evidence that negates an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to establish an essential element of the nonmoving party's case that the nonmoving party bears the burden of proving at trial.  *Id.* at 322-23; *Jones v. Williams*, 791 F.3d 1023, 1030 (9th Cir. 2015).  Once the moving party establishes the absence of a genuine issue of material fact, the burden shifts to the nonmoving party to "set forth, by affidavit or as otherwise provided in Rule 56, 'specific facts showing that there is a genuine issue for trial.'"  *T.W. Elec. Serv.*, 809 F.2d at 630 (quoting former Fed. R. Civ. P. 56(e)); accord *Horphag Research Ltd. v. Garcia*, 475 F.3d 1029, 1035 (9th Cir. 2007).  To carry this burden, the non-moving party "may not rest upon mere allegation or denials of his pleadings."  *Anderson*, 477 U.S. at 256; see also *Behrens v. Pelletier*, 516 U.S. 299, 309 (1996) ("On summary judgment, . . . the plaintiff can no longer rest on the pleadings.").  Rather, the nonmoving party "must present affirmative evidence . . . from which a jury might return a verdict in his favor."  *Anderson*, 477 U.S. at 256.

When ruling on a summary judgment motion, the court must view the facts and draw all reasonable inferences in the light most favorable to the non-moving party.  *Scott v. Harris*, 550 U.S. 372, 378 (2007).  The court should not weigh the evidence or make credibility determinations.  *See Anderson*, 477 U.S. at 255.  "The evidence of the non-movant is to be believed."  *Id.*  Further, the Court may consider other materials in the record not cited to by the parties, but it is not required to do so.  *See* Fed. R. Civ. P. 56(c)(3); *Simmons v. Navajo Cnty.*, 609 F.3d 1011, 1017 (9th Cir. 2010).

///

18-cv-01577-H-BGS

## III.     Agreed Claim Constructions

In their joint claim construction hearing statement, the parties agree upon the constructions for four claim terms.  (Doc. No. 67 at 2-3.)  In light of this:

1.     The Court construes the term "bandwidth" from the '924 patent as "data transmission resources in a particular time period;"

2.     The Court construes the term "an indication of [a first reserved set of access identifiers usable for non-contention access / a non-contention reserved access identifier]" from the '320 patent as "information from which the mobile station may determine [a first reserved set of access identifiers usable for non-contention access / a non-contention reserved access identifier];"

3.     The Court construes the term "operable to" from the '320 patent as "capable of;" and

4.     The Court construes the term "QoS" from the '924 patent as "quality of service."

(See id.; Doc. No. 83 at Appx. 1.)

## III.     Disputed Claim Terms from the '924 Patent and '743 Patent

### A.     The '924 Patent and the '743 Patent

The '924 patent and the '743 patent are both entitled "Method and Systems for Transmission of Multiple Modulated Signals Over Wireless Networks" and share a common specification.  U.S. Patent No. 8,787,924, at (54) (filed Jul. 22, 2014); U.S. Patent No. 9,497,743, at (54) (filed Nov. 15, 2016).  The invention disclosed in the '924 patent and the '743 patent "relates to wireless communication systems, and more particularly to a method and apparatus for efficiently allocating bandwidth between base stations and customer premises equipment in a broadband wireless communication system."  '924 Patent at 1:23-27.

As an exemplary claim, claim 1 of the '924 Patent provides:

1. A method of operating a wireless cellular mobile unit registered with a base station in a bandwidth on demand wireless cellular communication system,

the method comprising:

transmitting from the wireless cellular mobile unit a one bit message requesting to be provided an allocation of uplink (UL) bandwidth in which to transmit a bandwidth request for at least one connection served by the wireless cellular mobile unit;

receiving at the wireless cellular mobile unit the allocation of UL bandwidth in which to transmit the bandwidth request, the allocation of UL bandwidth received pursuant to the one bit message;

transmitting from the wireless cellular mobile unit the bandwidth request within the allocation of UL bandwidth, the bandwidth request being indicative of a pending amount of UL data associated with the at least one connection;

receiving at the wireless cellular mobile unit an UL bandwidth grant for the wireless cellular mobile unit, the UL bandwidth grant received pursuant to the bandwidth request; and

allocating the received UL bandwidth grant to at least two UL connections served by the wireless cellular mobile unit, based on a QoS parameter of the at least two UL connections.

Id. at 22:42-67.

B.    "UL connection(s) served by the wireless cellular mobile unit"

Wi-LAN proposes that the claim term "[UL] connection(s) served by the wireless mobile unit" be construed as "the [uplink] connection(s) between the wireless cellular mobile unit and its users." (Doc. No. 83 at 3.)  LG proposes that this claim term be construed as "[uplink] connection(s) between the wireless cellular mobile unit and other end user physical devices." (Doc. No. 85 at 4-5.)  Here, in their proposed constructions for this claim term, the parties agree that the term encompasses uplink connections between the wireless mobile unit and something else, but the parties dispute whether that something else is the mobile devices' users or other end user physical devices.

The Court begins its analysis of the parties' dispute by examining the claim language.  Claim 1 of the '924 patent claims: "A method of operating a wireless cellular

mobile unit registered with a base station in a bandwidth on demand wireless cellular communication system, the method comprising" among other steps "allocating the received UL bandwidth grant to at least two UL connections served by the wireless cellular mobile unit." '924 Patent at 22:42-66. Here, the claim language refers to a wireless mobile unit and a base station. The claim language makes no reference to other end user devices. Thus, the claim language does not support LG's proposed construction.

In support of its proposed construction for this claim term, LG relies on the following language from the '924 patent's specification: "CPEs 110 request bandwidth allocations from their respective base stations 106 based upon the type and quality of services requested by the customers served by the CPEs." (Doc. No. 85 at 5 (citing '924 Patent at 2:21-24).) But, here, the specification is not describing the claimed invention. Rather, the specification is describing prior art. See '924 Patent at 1:22 ("Description of Related Art"). Further, in this passage, the specification expressly states that it is a describing an "exemplary broadband wireless communication system." Id. at 2:3-4. A court should not import limitations from the specification into the claims absent a clear disclaimer of claim scope. See Andersen Corp. v. Fiber Composites, LLC, 474 F.3d 1361, 1373 (Fed. Cir. 2007) ("[W]e have warned against importing limitations from the specification into the claims absent a clear disclaimer of claim scope."); Digital-Vending Servs. Int'l, LLC v. Univ. of Phoenix, Inc., 672 F.3d 1270, 1276 (Fed. Cir. 2012). The cited passage's description of an exemplary broadband wireless communication system does not constitute a clear disclaimer of claim scope. As such, the Court rejects LG's reliance on the '924 patent's specification to support its proposed construction.[2]

LG also argues that its proposed construction is supported by an analysis of the claim language in a related patent, U.S. Patent No. 7,006,530. (Doc. No. 85 at 5-6.) LG notes,

---

[2]    For this same reason, the Court rejects LG's reliance on U.S. Patent No. 6,016,311's specification to support its proposed construction. (Doc. No. 85 at 6.) Although the '924 patent references the '311 patent, it only does so when describing exemplary communication systems in the relevant art. There is no language in the '924 patent's specification stating that the claimed invention should be limited to any of the disclosures contained in the '311 patent.

for example, claim 1 of the '530 patent claims: "[a] method of obtaining bandwidth requests from a plurality of users of a communication base station . . . where each user is an individual connection and the plurality of users is connected to the base station through one or more corresponding customer premise equipment (CPE) stations." U.S. Patent No. 7,006,530 (filed Feb. 28, 2006), at 39:30-36. LG notes that this claim language in the '530 patent expressly states that the bandwidth requests are from "a plurality of users." (Doc. No. 85 at 5.) But this is of no consequence because the claims at issue, the claims in the '924 patent, do not include any claim language reciting "a plurality of users" or similar language. See generally '924 Patent at 22:42-24:48. As such, the Court rejects LG's reliance on the claim language from the '530 patent. See Advanced Cardiovascular Sys., Inc. v. Medtronic, Inc., 265 F.3d 1294, 1305 (Fed. Cir. 2001) (finding the prosecution history of other patents irrelevant because those patents did not contain limitations in common with the patent-in-suit); see also Curtiss-Wright Flow Control Corp. v. Velan, Inc., 438 F.3d 1374, 1380 (Fed. Cir. 2006) ("Different claims with different words can, of course, define different subject matter within the ambit of the invention.").

Finally, LG also relies on the Federal Circuit's decision in Wi-LAN USA, Inc. v. Apple Inc., 830 F.3d 1374 (Fed. Cir. 2016). (Doc. No. 85 at 6-7.) But the Federal Circuit's Wi-LAN v. Apple decision provides no support to LG. In Wi-LAN v. Apple, Wi-LAN appealed the district court's construction of the claim term "UL connections" from U.S. Patent No. 8,315,640, a patent related to the '924 patent. 830 F.3d at 1380. The Federal Circuit rejected Wi-LAN's proposed construction and affirmed the district court's construction for the term "UL connections." See Wi-LAN, 830 F.3d at 1379-80, 1392-93.

But, here, Wi-LAN does not offer the same proposed construction for the term "[UL] connection(s)" that it argued for on appeal in the Wi-LAN v. Apple case. Compare Wi-LAN, 830 F.3d at 1380 with Doc. No. 83 at 3. Rather, Wi-LAN's proposed construction for the term "[UL] connection(s)" in this case mirrors the construction that was adopted by the district court and affirmed by the Federal Circuit in the Wi-LAN v. Apple case. See Wi-LAN, 830 F.3d at 1379 n.2 (The district court "adopted the construction 'an uplink

18-cv-01577-H-BGS

connection between the wireless subscriber radio unit and its users.'"").  Thus, the Wi-LAN v. Apple decision actually supports Wi-LAN's proposed construction, not LG's proposal.

In sum, the Court adopts Wi-LAN's proposed construction for this claim term, and the Court rejects LG's proposed construction.  The Court construes "the claim term "[UL] connection(s) served by the wireless mobile unit" as "the [uplink] connection(s) between the wireless cellular mobile unit and its users."

### C.   "UL services"

Wi-LAN proposes that the term "UL Services" be construed as "applications that generate data for transmission upstream towards the base station."  (Doc. No. 83 at 7.)  LG argues that this claim term is indefinite under 35 U.S.C. § 112, ¶ 2.  (Doc. No. 85 at 11.)  In the alternative, LG proposes that the claim term be construed as "functionalities supported by an end user physical device connected to the wireless cellular mobile unit."  (Id.)

Section 112 of the Patent Act requires that a patent's specification "conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as [the] invention."  35 U.S.C. § 112, ¶ 2.  In Nautilus, Inc. v. Biosig Instruments, Inc., 134 S. Ct. 2120, 2124 (2014), the Supreme Court "h[e]ld that a patent is invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention."  See also id. at 2129 ("[W]e read § 112, ¶ 2 to require that a patent's claims, viewed in light of the specification and prosecution history, inform those skilled in the art about the scope of the invention with reasonable certainty.").  Definiteness is measured from the viewpoint of a PHOSITA at the time the patent was filed.  Id. at 2128.

Indefiniteness is a question of law involving underlying factual determinations.  Teva Pharm. USA, Inc. v. Sandoz, Inc., 789 F.3d 1335, 1341 (Fed. Cir. 2015); Green Edge Enters., LLC v. Rubber Mulch Etc., LLC, 620 F.3d 1287, 1299 (Fed. Cir. 2010).  The party challenging the validity of the patents-in-suit bears the burden of proving indefiniteness by

clear and convincing evidence.  See Nautilus, 134 S. Ct. at 2130 n.10 (citing Microsoft Corp. v. i4i Ltd. Partnership, 131 S. Ct. 2238, 2242 (2011)); see, e.g., Teva, 789 F.3d at 1345.

LG argues that the term "UL services" is indefinite because the term "UL services" only appears in the '924 patent's claim language, and the specification fails to provide sufficient information to determine the meaning of the term.  (Doc. No. 85 at 11-12.)  Specifically, LG argues that the '924 patent fails to adequately explain to a person of ordinary skill in the art whether the term "UL services" refers to "services" or "connections."  (Id.)  In response, Wi-LAN argues that a person of ordinary skill in the art would understand with reasonable certainty that "UL services" refers to services.  (Doc. No. 91 at 2.)  The Court agrees with Wi-LAN.

Although the specific term "UL services" only appears in the claim language, the claim language itself provides ample guidance as to the meaning of that claim term.  First, that the term "UL services" uses the word "services" suggests that the term refers to services.  Second, the claim language provides several examples of claimed "UL services:" "voice service," "data service," "video service," and "real time service."  '924 Patent at 24:42-48.  These examples suggest that the term refers to services.  Third, the specification also supports the contention that "UL services" refers to services.  See '924 Patent at 6:46-50 ("[D]ata service applications are relatively delay tolerant.  In contrast, real-time service applications such as voice and video services require that bandwidth allocations be made in a timely manner . . . ."), at 1:66-67 ("broadband services such as voice, data and video services").  Indeed, LG concedes in its briefing that these passages in the specification suggest that "UL services" refers to services.  (Doc. No. 85 at 11.)

In an effort to create ambiguity as to the meaning of the term "UL services," LG argues that the '924 patent contains claim language suggesting that a "UL service" may be viewed as a "[UL] connection."  (Doc. No. 85 at 12.)  The Court disagrees.  To support this contention, LG relies on the fact that the other independent claims in the '924 patent, specifically claims 1 and 9, use similar language in reciting the claim term "[UL]

connections" as independent claim 17 does in reciting the term "UL services." (Id.)  But this is of no consequence because "[d]ifferent claims with different words can, of course, define different subject matter within the ambit of the invention."  Curtiss-Wright Flow Control, 438 F.3d at 1380.

In addition, the Court notes that a review of the claim language shows that although the claims use similar language in reciting the term "[UL] connections" as the term "UL services," the claims do not use the terms interchangeably.  For example, dependent claims 6 and dependent claim 14 recite:  "wherein one of the at least two connections provides a voice service."  '924 Patent at 23:15-16, 24:11-12.  And dependent claim 18 recites: "wherein one of the at least two UL services is a voice service." Id. at 24:41-42.  Here the claim language distinguishes between "[UL] connections" and "UL services," explaining that a UL service "is" a service whereas a [UL] connection is something that "provides" a service.  In sum, LG has failed to meet its burden of establishing that the claim term "UL services" is indefinite.

Turning to the proper construction of the term "UL services," in support of its alternative proposed construction, LG relies on the arguments that it used to support its proposed construction for the claim term "UL connection(s) served by the wireless cellular mobile unit."  (Doc. No. 85 at 12-13.)  But the Court has rejected LG's proposed construction for that claim term.  See supra.

Wi-LAN's proposed construction is supported by the intrinsic record.  The specification refers to the voice, video, and data services as "applications."  '924 Patent at 6:46-50.  Further, the relevant claim language explains that the data generated by the "UL services" is "transmitt[ed] to the base station."  See id. at 24:35-40.

In sum, the Court adopts Wi-LAN's proposed construction for this claim term, and the Court rejects LG's proposed construction.  The Court construes "UL Services" as "applications that generate data for transmission upstream towards the base station."

///

///

D.   "queue" / "operable to queue data"

Wi-LAN proposes: (1) that the term "queue" from claims 2 and 12 of the '924 patent be construed as "structure containing data to be transmitted;" (2) that the term "queue" from claim 6 of the '743 patent be construed as "to place into a structure containing data to be transmitted;" and (3) that the term "operable to queue data" from the '743 patent be construed as "capable of placing data to be transmitted into a structure." (Doc. No. 83 at 8.) LG proposes: (1) that the term "queue" from claims 2 and 12 of the '924 patent be construed as "structure containing data to be transmitted that relates to a particular quality of service level;" (2) that the term "queue" from claim 6 of the '743 patent be construed as "to place into a structure containing data to be transmitted that relates to a particular quality of service level;" and (3) that the term "operable to queue data" from the '743 patent be construed as "capable of placing data received from another end user physical device connected to a cellular telephone into a structure." (Doc. No. 85 at 13.)

Here, the parties agree that the term "queue" encompasses a structure containing data to be transmitted. (Doc. No. 83 at 8; Doc. No. 85 at 13.) The parties dispute whether the term further encompasses the additional requirement that the queue relate to a particular quality of service level. (Id.)

The Court begins its analysis of the parties' dispute by analyzing the claim language. Claim 2 of the '924 patent claims: "A method as claimed in claim 1, wherein the wireless cellular mobile unit maintains one or more queues, each queue for grouping data pertaining to connections with similar QoS." '924 Patent at 23:1-4. By stating that each queue pertains to connections with similar QoS, the claim language implies that each queue relates to a QoS. This supports LG's proposed construction.

Further, the common specification for the '924 patent and the '743 patent provides additional support for LG's position. The specification explains: "The base station MAC maintains a set of queues for each physical channel that it serves. Within each physical channel queue set, the base station maintains a queue for each QoS." '924 Patent at 4:25-28. Wi-LAN concedes that this passage describes each queue having its own QoS. (Doc.

No. 83 at 9.)  Thus, the intrinsic record supports LG's proposed construction for the term "queue" requiring that the queue be related to a particular QoS level.

In response, Wi-LAN argues that the Court should not limit the claims to a preferred embodiment described in the specification.  (Doc. No. 83 at 9; Doc. No. 91 at 3.)  The Court recognizes that "it is improper to read limitations from a preferred embodiment described in the specification—even if it is the only embodiment—into the claims absent a clear indication in the intrinsic record that the patentee intended the claims to be so limited."  Dealertrack, 674 F.3d at 1327.  But the problem with Wi-LAN's argument is that even assuming the above passage from the specification is merely a description of a preferred embodiment, the Court is not reading a limitation from the specification into the claims.[3]  The claim language already includes the limitation at issue, and the Court is merely looking at the specification for additional guidance as to that limitation.  Claim 2 of the '924 patent states that each queue pertains to connections with similar QoS.  '924 Patent at 23:1-4.  Thus, the claim language itself states that each queue is related to a QoS.

Wi-LAN also argues that the specification teaches that the queues may be "associated with the various data sources."  (Doc. No. 83 at 9 (citing '924 Patent at 3:22-23).)  But in this passage cited by Wi-LAN, the specification is not describing the claimed invention.  Rather, the specification is describing certain prior art systems.  See '924 Patent at 3:20-25.  As a result, the Court rejects Wi-LAN's reliance on this passage from the specification.

---

[3]    Although the Court assumes for the purposes of this analysis that this passage is describing a preferred embodiment, the Court notes that the passage at issue is found in the portion of the specification describing "[t]he present invention."  '924 Patent at 3:60; see also id. at 3:58 ("Summary of the Invention").  The Court further notes that in this summary of the invention section, the specification at times expressly refers to certain aspects of the invention as being an "embodiment."  Id. at 4:38.  But in the passage at issue, the specification does not use the word embodiment.  See id. at 4:25-28.  In addition, the Court notes that the Federal Circuit has explained that "[w]hen a patentee describes the features of the present invention as a whole, he alerts the reader that this description limits the scope of the invention."  Pacing Techs., LLC v. Garmin Int'l, Inc., 778 F.3d 1021, 1025 (Fed. Cir. 2015) (internal quotation marks omitted); accord Luminara Worldwide, LLC v. Liown Elecs. Co., 814 F.3d 1343, 1353 (Fed. Cir. 2016); Regents of Univ. of Minnesota v. AGA Med. Corp., 717 F.3d 929, 936 (Fed. Cir. 2013).

Wi-LAN notes that unlike in the '924 patent, the claim language in the '743 patent does not mention a QoS for a "queue."  (Doc. No. 91 at 3; Doc. No. 83 at 9.)  In addition, Wi-LAN also notes that unlike the '924 patent, the claim language in the '743 patent uses the word "queue" as a verb.  (Doc. No. 83 at 9.)  Wi-LAN argues, therefore, that the Court's construction for the term "queue" in the '743 patent should not include the "particular QoS" limitation.  The Court acknowledges the distinctions between the '924 patent's claim language and the '743 patent's claim language, and, thus, the Court will not include the QoS limitation in its construction for the term "queue" in the '743 patent.

In addition, the parties dispute the proper construction for claim the term "operable to queue data."  LG argues that the Court's construction for this claim term should include the requirement that the data is received from another user physical device connected to the cellular telephone.  (Doc. No. 85 at 13-15.)  In support of this proposed construction, LG relies entirely on the arguments that it used to support its proposed construction for the claim term "UL connection(s) served by the wireless cellular mobile unit."  (Id. at 14-15.)  The Court has rejected LG's proposed construction for that claim term.  See supra.  As such, the Court also rejects LG's proposed construction for the claim term "operable to queue data."

In sum, the Court adopts LG's proposed constructions for the term "queue" in the '924 patent, and the Court adopts Wi-LAN's proposed construction for the terms "queue" and "operable to queue data" in the '743 patent.  The Court construes: (1) the term "queue" from claims 2 and 12 of the '924 patent as "structure containing data to be transmitted that relates to a particular quality of service level;" (2) the term "queue" from claim 6 of the '743 patent as "to place into a structure containing data to be transmitted;" and (3) the term "operable to queue data" from the '743 patent as "capable of placing data to be transmitted into a structure."

E.   "one bit message" / "requesting the base station to poll the cellular telephone"

Wi-LAN proposes that the claim term "one bit message [requesting to be provided an allocation of UL bandwidth in which to transmit a bandwidth request]" be construed as

"a bit sent by a currently active wireless cellular mobile unit that currently has bandwidth allocations indicating a request to be provided an allocation of UL bandwidth in which to transmit a bandwidth request." (Doc. No. 83 at 12.) LG proposes that this claim term be construed as "a bit sent by a currently active wireless cellular mobile unit in the process of transmitting data upstream to a base station that indicates to the base station that the wireless cellular mobile unit needs additional UL bandwidth." (Doc. No. 85 at 7.)

In addition, Wi-LAN proposes that the similar claim term "message requesting the base station to poll the cellular telephone" be construed as "a message sent by a currently active cellular telephone that currently has bandwidth allocations indicating a request to be provided a first UL transmission resource in which to transmit an indication of an amount of data awaiting transmission to the base station." (Doc. No. 83 at 12.) LG proposes that this claim term be construed as "a message sent by a currently active cellular telephone in the process of transmitting data upstream to a base station indicating a request to be provided a first UL transmission resource in which to transmit an indication of data awaiting transmission to the base station." (Doc. No. 85 at 7.)

With respect to these two claim terms, the parties agree that the claimed "bit message" is sent by a "currently active" cellular device. (Doc. No. 83 at 13; Doc. No. 85 at 7.) But the parties dispute what it means to be "currently active." Wi-LAN argues that a cellular device is "currently active" when it "currently has bandwidth allocations. (Doc. No. 83 at 13.) LG argues that a cellular device is "currently active" when "it is in the process of transmitting data upstream." (Doc. No. 85 at 7.) Because the parties dispute the scope of this claim term, the Court must resolve the parties' dispute. See O2 Micro, 521 F.3d at 1361; Eon, 815 F.3d at 1318.

The Court begins its analysis by analyzing the claim language. Here, the claim language is of no assistance in resolving the parties dispute because the term "currently active" is not found in the claim language. But the term "currently active" is found in several places in the specification. In the specification's summary of the invention, the specification explains that "only those currently active CPEs (CPEs that currently have

bandwidth allocations associated thereto) are permitted to request more bandwidth using either the piggybacking or poll-me bit methods." '924 Patent at 21:64-22:1. Here, the specification uses the term "currently active" to mean a device that "currently ha[s] bandwidth allocations." Id. This language supports Wi-LAN's proposed construction, and it does not support LG's proposal.

In an effort to support its proposed construction, LG relies on the prosecution history, specifically *inter partes* review proceedings involving the '924 patent and the '743 patent. (Doc. No. 85 at 8.) But the cited portions of the prosecution history are of no aid to LG and actually support Wi-LAN's proposed construction. In the IPR proceedings, the PTAB construed the claim terms at issue; explained that "[t]he ['924 patent/'743 patent] defines 'active CPEs' to mean 'currently have bandwidth allocations associate thereto;'" and ultimately adopted Wi-LAN's proposed constructions for these claim terms. (Doc. No. 84-11, Ex. 11 at 12-13; Doc. No. 84-12, Ex. 12 at 11-12.) Thus, Wi-LAN's proposed construction is supported by both the prosecution history and the language in the specification describing the invention.

In addition, with respect to the '924 patent only, the parties dispute whether the requested bandwidth may be used for only an additional bandwidth request as is proposed by Wi-LAN or whether the requested bandwidth may be used to transmit something else as is proposed by LG. (Doc. No. 85 at 7-8.) This dispute can be resolved by reviewing the claim language at issue. The claim language recites: "a one bit message requesting to be provided an allocation of uplink (UL) bandwidth in which to transmit a bandwidth request." '924 Patent at 22:46-49; accord id. at 23:28-31, 24:24-26. Thus, the claim language itself provides that the purpose of the requested bandwidth is to "transmit a bandwidth request." Id. As such, the claim language supports Wi-LAN's proposed construction, and it does not support LG's proposal.

In sum, the Court adopts Wi-LAN's proposed construction for this claim term, and the Court rejects LG's proposed construction. The Court construes the claim term "one bit message [requesting to be provided an allocation of UL bandwidth in which to transmit a

bandwidth request]" as "a bit sent by a currently active wireless cellular mobile unit that currently has bandwidth allocations indicating a request to be provided an allocation of UL bandwidth in which to transmit a bandwidth request."  And the Court construes the claim term "message requesting the base station to poll the cellular telephone" as "a message sent by a currently active cellular telephone that currently has bandwidth allocations indicating a request to be provided a first UL transmission resource in which to transmit an indication of an amount of data awaiting transmission to the base station."

     F.    <u>"allocation of UL bandwidth" / "UL bandwidth grant"</u>

     Wi-LAN argues the claim terms "allocation of UL bandwidth" and "UL bandwidth grant" do not need to be construed further beyond the parties' agreed upon construction for the claim term "bandwidth."  (Doc. No. 83 at 14.)  LG proposes that the claim terms "allocation of UL bandwidth" and "UL bandwidth grant" both be construed as "resources assigned for uplink data transmission." (Doc. No. 85 at 9.)  Because the parties dispute the scope of this claim term, the Court must resolve the parties' dispute.  <u>See</u> <u>O2 Micro</u>, 521 F.3d at 1361; <u>Eon</u>, 815 F.3d at 1318.

     Here, the parties agree that the claim term bandwidth should be construed as "data transmission resources in a particular time period."  (Doc. No. 85 at 10; Doc. No. 83 at 14) <u>See</u> <u>Wi-LAN USA, Inc. v. Ericsson, Inc.</u>, 675 F. App'x 984, 993 (Fed. Cir. 2017).  LG argues that the '924 patent's specification indicates that the "allocation of UL bandwidth" and "UL bandwidth grant" are resources specifically assigned for uplink data transmission. (Doc. No. 85 at 10 (citing '924 Patent at 17:34-39, 6:23-27, 8:50-53).)  But none of the passages in the specification cited by LG actually refer to "assigning" resources for uplink data transmission.  <u>See</u> '924 Patent at 17:34-39, 6:23-27, 8:50-53.  Further, in each of the passages cited by LG, the specification is describing preferred embodiments.  <u>See</u> <u>id.</u>; <u>see also</u> <u>id.</u> at 5:22-27.  "[I]t is improper to read limitations from a preferred embodiment described in the specification—even if it is the only embodiment—into the claims absent a clear indication in the intrinsic record that the patentee intended the claims to be so limited."  <u>Dealertrack</u>, 674 F.3d at 1327; <u>accord</u> <u>GE Lighting Sols., LLC v. AgiLight, Inc.</u>,

750 F.3d 1304, 1309 (Fed. Cir. 2014).  Here, there is no such clear indication that the claims should be limited.

In sum, the Court rejects LG's proposed construction for these claim terms.  The Court declines to construe the terms "allocation of UL bandwidth" and "UL bandwidth grant" beyond the parties' agreed upon construction for the claim term "bandwidth."

G.     "at least one of the UL connections"

In its motion for partial summary judgment, LG argues that the claim term "at least one of the UL connections" from claim 9 of the '924 patent is indefinite under 35 U.S.C. § 112 ¶ 2 because it lacks an antecedent basis.  (Doc. No. 82-1 at 5.)  "[A] patent is invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention."  Nautilus, 134 S. Ct. at 2124.  LG, as the party challenging the validity of the patents-in-suit, bears the burden of proving indefiniteness by clear and convincing evidence.  See Nautilus, 134 S. Ct. at 2130 n.10; see, e.g., Teva, 789 F.3d at 1345.

The Federal Circuit has explained that "a claim could be indefinite if a term does not have proper antecedent basis where such basis is not otherwise present by implication or the meaning is not reasonably ascertainable."  Halliburton Energy Servs., Inc. v. M-I LLC, 514 F.3d 1244, 1249 (Fed. Cir. 2008).  Further, the Federal has held that "[a] district court can correct [errors in] a patent only if (1) the correction is not subject to reasonable debate based on consideration of the claim language and the specification and (2) the prosecution history does not suggest a different interpretation of the claims."  Novo Indus., L.P. v. Micro Molds Corp., 350 F.3d 1348, 1357 (Fed. Cir. 2003).

LG argues that the scope of the term "at least one of the UL connections" cannot be ascertained because it lacks a proper antecedent basis, and it would be unclear to a person of skill in the art reading claim 9 whether the antecedent basis for the term should be the term "a UL connection" or the term "at least two connections."  (Doc. No. 82-1 at 5-6.)  In response, Wi-LAN argues that when read in its proper context, it is clear that the term "at

least two connections" provides the antecedent basis for the term "at least one of the UL connections."  (Doc. No. 100 at 7-8.)  The Court agrees with Wi-LAN.

The claim at issue refers to "UL connections" in the plural, which implies that it is referring to the previously mentioned "at least two connections," which is also plural, and not the singular "a UL connection."  Further, although the claims as written do not expressly describe the "at least two connections" as UL connections, it is clear from the context of the claims that they are UL connections.  Claim 9 explains that the "UL bandwidth grant" is allocated to the "at least two connections."  '924 Patent at 23:40-41.  Thus, they are UL connections.  This is also supported by the language in claim 10, which recites: "one of the at least two UL connections."  Id. at 23:49.  Here, the claim language expressly refers to the claimed two connections as being "two UL connections."  Id.

Further, that the term "at least two connections" provides an antecedent basis for the term "at least one of the UL connections" is supported by the structure of claim 9 and an understanding of the method claimed therein.  Claim 9 recites a method involving several distinct steps, including determining an amount of data; transmitting a message to be provided with a bandwidth request; receiving an allocation of bandwidth to transmit a bandwidth request; transmitting a bandwidth request; receiving a bandwidth grant; and allocating the bandwidth grant.  See '924 Patent at 23:26-45.  That these are distinct steps is supported by the specification, which explains that "[t]he present invention utilizes a combination of a number of bandwidth request and allocation techniques to control the bandwidth request process."  Id. at 1:67-2:2.  Here, the specification distinguishes between bandwidth request techniques and allocation techniques, both of which are claimed in claim 9 of the '924 patent.  Further, in its motion for summary judgment, LG acknowledges that the '924 patent's claims recite a distinct multi-step process.  (See Doc. No. 92-1 at 5 ("The Asserted Claims describe a two-step process for requesting bandwidth involving an initial message, followed by a bandwidth request.  When the requested bandwidth is received, it is allocated to various connections."))

That claim 9 recites separate and distinct steps is important because the term "at least

one of the UL connections" is contained within and is part of the "allocating" step of the claimed method.  See '924 Patent at 23:40-45.  The term "at least two connections" is also contained in and part of the "allocating" step.  See id.  Further, the term "a UL connection" is found in different steps of the claimed method.  See id. at 23:26-27, 23:35-37.  Thus, an analysis of the structure of claim 9 demonstrates that the term "at least one of the UL connections" refers to and has an antecedent basis in the term "at least two connections" because they are both part of the claimed "allocating" step.  And the term "at least one of the UL connections" does not refer to the term "a UL connection" because that term is part of different and separate steps.

LG further argues that claim 9 remains indefinite even under the Court's interpretation of the claim and the antecedent basis for the term "at least one of the UL connections" because it is unclear from the claim how the "a UL connection" limitation recited earlier in the claim relates to the "at least two connections" limitation recited later in the claim.  The Court disagrees and does not share LG's purported confusion.  As explained above, claim 9 recites a method involving several distinct steps, with a first set of steps being related to bandwidth request techniques and the final step being related to allocation techniques.  See '924 Patent at 23:26-45, 1:67-2:2.  The claimed "a UL connection" is recited in and part of the bandwidth request techniques in the claimed method, and the "at least two connections" is recited in and part of the allocation techniques in the claimed method.  Id.  Further, that the bandwidth techniques portion of the method refers to "a UL connection" (i.e., a single connection) and the allocation techniques portion of the method refers to "at least two connections" (i.e., two or more connections) causes no confusion when the intrinsic record is considered.  In order to request bandwidth and receive a bandwidth grant from the base station, the mobile device need only possess one connection with the base station.  But to allocate the received bandwidth grant among different connections, the mobile device would need to possess at least two connections.  See WEBSTER'S' THIRD NEW INTERNATIONAL DICTIONARY 57 (1981) (defining "allocate" as "1: to apportion for a specific purpose or to particular persons or things"); see also id. at

105 (defining "apportion" as "to divide and assign in proportion: divide and distribute proportionally").

In addition, the specification in the "summary of the invention" provides further clarity in explaining:

> The CPE[, i.e., the mobile device,] is responsible for distributing the allocated uplink bandwidth in a manner that accommodates the services provided by the CPE. The CPE is free to use the uplink bandwidth that was allocated to it in a manner that is different than that originally requested or granted by the base station. The CPE advantageously determines which services to give bandwidth to and which services must wait for subsequent bandwidth requests.

Id. at 4:5-12.[4]  This passage from the specification combined with the claim language more than adequately explains to one skilled in the art with reasonable certainty the relationship and difference between the claimed "a UL connection" and the claimed "at least two connections."

In sum, the claim language provides one skill in the art with reasonable certainty that the term "at least two connections" provides an antecedent basis for the term "at least one of the UL connections."  As a result, LG has failed to meet its burden of establishing that the claim term "at least one of the UL connections" is indefinite, and the Court denies LG's motion for partial summary judgment on this issue.

H.    "the at least two connections"

In its motion for partial summary judgment, LG also argues that the claim term "the at least two connections" from claims 6-8 of the '924 patent is indefinite under 35 U.S.C. § 112 ¶ 2 because they lack an antecedent basis.  (Doc. No. 82-1 at 8-10.)  In response, Wi-LAN argues that when read in its proper context, it is clear that the term "the at least two"

---

[4]    The Court notes that in this passage, the specification discusses allocating bandwidth among "services," not connections.  '924 Patent at 4:6.  But this does not cause any confusion as a review of claim language in claims dependent to claim 9 shows that the claimed "at least two connections" can be utilized to provide a service.  See id. at 24:14-15 ("wherein a connection from the at least two connections provides a voice service, a data service or a video service"); 24:17-18 ("wherein a connection from the at least two connections provides a real time service").

18-cv-01577-H-BGS

UL connections" provides the antecedent basis for the term "the at least two connections." (Doc. No. 100 at 11-12.)  The Court agrees with Wi-LAN.

Similar to the prior claim term, the claim language when read in the context of the entire intrinsic record provides reasonable certainty that the term "the at least two connections" refers to the term "the at least two UL connections" because: (1) both terms refer to "connections" in the plural; (2) the connections at issue are UL connections; and (3) both terms are part of the "allocating" step of the claimed method.  In sum, LG has failed to meet its burden of establishing that the claim term "the at least two connections" is indefinite, and the Court denies LG's motion for partial summary judgment on this issue.

## IV.   The Disputed Claim Terms from the '351 Patent

### A.   The '351 Patent

The '351 Patent is entitled "apparatus, system and method for the transmission of data with different QoS attributes."  U.S. Patent No. 8,867,351, at (54) (filed Oct. 21, 2014). The invention disclosed in the '351 patent "relates to an apparatus, system and method for providing and managing QoS for data flows transmitted over at least one link in a data network capable of transmitting data with different [quality of service] QoS requirements and/or attributes."  Id. at 1:21-26.

Claim 1 of the '351 patent claims:

1. A method of operating a mobile device, comprising:

operating a plurality of logical channel queues, each of the logical channel queues associated with a priority and a traffic shaping rate;

selecting, from the plurality of logical channel queues, a highest priority logical channel queue having data for transmission and whose traffic shaping rate is not reached;

allocating a portion of a data transmission capacity available to the mobile device, to the selected logical channel queue, wherein the allocated portion is limited by:

the traffic shaping rate associated with the selected logical channel queue,

the data available for transmission in the selected logical channel queue, and the data transmission capacity;

repeatedly considering a next highest priority logical channel queue for selecting and allocating, until at least one of:

the data transmission capacity is exhausted, and

each of the plurality of logical channel queues is considered for selecting; and thereafter

allocating a remaining portion, if any, of the data transmission capacity to one or more of the logical channel queues having data for transmission, selected in priority order.

B.    "each of the logical channel queues associated with a priority and a traffic shaping rate"

Wi-LAN proposes that the claim term "each of the logical channel queues associated with a priority and a traffic shaping rate" does not need to be construed, and that the phrase should just be given its plain and ordinary meaning.  (Doc. No. 83 at 15; Doc. No. 92 at 5-6.)  LG proposes that claim term be construed as "each of the logical channel queues having the priority and traffic shaping rate quality of service attributes of the held packets."  (Doc. No. 85 at 16.)  Here, the parties dispute whether the priority and traffic shaping rate are associated with just the logical channel queues as is Wi-LAN's position or whether they are specifically associated with packets that are held within the logical channel queues as is LG's position.  Because the parties dispute the scope of this claim term, the Court must resolve the parties' dispute.  See O2 Micro, 521 F.3d at 1361; Eon, 815 F.3d at 1318.

The Court begins its analysis of the parties' dispute by analyzing the claim language.  Claim 1 of the '351 patent claims a method comprising, among other steps, "operating a plurality of logical channel queues, each of the logical channel queues associated with a priority and a traffic shaping rate."  '351 Patent at 13:56-58.  Similarly, claim 7 of the '351 patent claims a mobile device comprising, among other things, "a link controller operable

to: operate a plurality of logical channel queues, each of the logical channel queues is capable of being associated with a priority and a traffic shaping rate." Id. at 14:33-37. Here, the plain language of claims explains that the priority and the traffic shaping rate are "associated" or "capable of being associated" with the logical channel queues. See also id. at 13:59-62 ("a highest priority logical channel queue . . . whose traffic shaping rate is not reached"). The claim language in the two independent claims of the '351 patent does not even mention "packets." Thus, the claim language supports Wi-LAN's position and not LG's position.

To support its position that the priority and the traffic shaping rate are associated with packets, LG relies on various passages from the '351 patent's specification. (Doc. No. 85 at 17.) But the '351 patent's specification actually conflicts with LG's proposed construction. LG argues that its proposed construction is correct because the specification explains that the packets are held in the logical channel queues, and the packets have the priority and traffic shaping rate QoS attributes. (Doc. No. 85 at 16-17.) But, in describing a preferred embodiment of the invention, the '351 patent's specification states:

> At step 124, classifier 112 determines if a logical channel queue LC is available for the packet and if such a logical channel queue is not available, the method creates the required logical channel queue at step 128, either by creating a new logical channel queue with the necessary QoS attributes, or by modifying the QoS attributes of an existing, empty, logical channel queue. When the required logical channel queue is available, the method enqueues the received packet at step 132.

'351 Patent at 7:59-67. In this passage, the specification describes an empty, existing logical channel queue that has QoS attributes, but does not possess a packet. LG's proposed construction requires that each logical channel queue hold a packet. (Doc. No. 85 at 16.) Thus, LG's proposed construction would read out this preferred embodiment described in the above passage of the specification. "[A] claim construction that excludes [a] preferred embodiment [described in the specification] 'is rarely, if ever, correct and would require highly persuasive evidentiary support.'" Adams Respiratory Therapeutics,

616 F.3d at 1290.  Here, there is no such highly persuasive support for LG's construction, particularly in light of the claim language which expressly states that the priority and the traffic shaping rate are associated with the logical channel queues.

In sum, the Court rejects LG's proposed construction for this claim term.  The Court declines to further construe the claim term "each of the logical channel queues associated with a priority and a traffic shaping rate" to require that the priority and the traffic shaping rate are associated with packets.

C.   "logical channel queues"

Wi-LAN proposes that the claim term "logical channel queues" be construed as "structures containing data to be transmitted over logical channels."  (Doc. No. 83 at 17.) LG proposes that this claim term be construed as "queues of packets to be transmitted wherein each entry in each queue holds one packet."  (Doc. No. 85 at 15.)  Here, the parties dispute whether the term "logical channel queues" requires that each entry in each queue holds one packet.

The Court begins its analysis of the parties' claim construction dispute by examining the claim language.  Claim 1 of the '351 patent describes the "logical channel queues" as "having data for transmission."  '351 Patent at 13:60-16; see also id. at 14:1-2, 14:57-59. This supports Wi-LAN's proposed construction.  Further, the claim language does not include any language stating that each entry in each logical channel queue holds one packet. Thus, the claim language does not support LG's proposed construction.

In support of its proposed construction, LG relies on the following passage from the '351 patent's specification describing a preferred embodiment:

> In the illustrated embodiment of the disclosure, each PQE 108 includes sixteen logical channel queues, specifically, LC.sub.0 through LC.sub.15. Logical channel queues LC.sub.i comprise queues of packets to be transmitted, where each entry in a queue holds one packet.

'351 Patent at 7:6-12.  (Doc. No. 85 at 15-16.)  But "it is improper to read limitations from a preferred embodiment described in the specification—even if it is the only

embodiment—into the claims absent a clear indication in the intrinsic record that the patentee intended the claims to be so limited." <u>Dealertrack</u>, 674 F.3d at 1327; <u>accord</u> <u>GE Lighting Sols., LLC v. AgiLight, Inc.</u>, 750 F.3d 1304, 1309 (Fed. Cir. 2014).  Here, there is no such indication that the patentee intended the term "logical channel queues" to be limited to this specific disclosure in the specification.  To the contrary, the passage at issue expressly describes this description of logical channel queues as merely be illustrative.  <u>See</u> '351 Patent at 7:7.  As a result, the Court rejects LG's reliance on this portion of the specification.

In sum, the Court adopts Wi-LAN's proposed construction for this claim term, and the Court rejects LG's proposed construction.  The Court construes "logical channel queues" as "structures containing data to be transmitted over logical channels."

D.    <u>"priority"</u>

Wi-LAN argues that the claim term "priority" does not need to be construed, and the term should just be given its plain and ordinary meaning.  (Doc. No. 91 at 6.)  LG proposes that the claim term "priority" be construed as "the priority of a packet placed into a logical channel queue compared to the priority of packets placed into other logical channel queues."  (Doc. No. 85 at 18.)  Here, the parties dispute whether the claimed "priority" refers to either a packet or a logical channel queue.  (Doc. No. 85 at 18; Doc. No. 91 at 6.)

To support their respective claim construction positions for this claim term, both parties rely on the same arguments they presented in support of their dispute regarding the claim term "each of the logical channel queues associated with a priority and a traffic shaping rate."  (<u>Id.</u>)  In construing that claim term, the Court rejected LG's contention that claim term "priority" is associated with a packet.  The plain language of the claims specifies that the "priority" is associated with a logical channel queue.  <u>See</u> '351 Patent at 13:56-58, 14:33-37.  As a result, the Court rejects LG's proposed construction.

In sum, the Court rejects LG's proposed construction for this claim term.  The Court declines to construe the term "priority" to require that the priority is associated with a packet.

E.   "traffic shaping rate"

Wi-LAN proposes that the term "traffic shaping rate" be construed as "a rate used to accomplish traffic shaping, where the rate is used to regulate traffic flow on the network." (Doc. No. 83 at 18.)  LG argues that this claim term is indefinite under 35 U.S.C. 112, ¶ 2.  (Doc. No. 85 at 18.)  In the alternative, LG proposes that the term "traffic shaping rate" be construed as "a maximum quantity of data that can be selected from a particular logical channel queue over a particular period of time."  (Id.)

"[A] patent is invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention."  Nautilus, 134 S. Ct. at 2124.  LG, as the party challenging the validity of the patents-in-suit, bears the burden of proving indefiniteness by clear and convincing evidence.  See Nautilus, 134 S. Ct. at 2130 n.10; see, e.g., Teva, 789 F.3d at 1345.

LG argues that the term "traffic shaping rate" and the related term "whose traffic shaping rate is not reached" is indefinite because the term "traffic shaping rate" is only found in the '351 patent's claim language, and it does not appear anywhere in the specification.  (Doc. No. 85 at 18-19.)  Although the specific term "traffic shaping rate" is only found in the claim language, LG concedes that the term "traffic shaping" has a plain and ordinary meaning.  (Id. at 19; see also Doc. No. 83-30, Ex. 29 at 488-89; Doc. No. 83-31, Ex. 30 at 466; Doc. No. 83-32, Ex. 31 at 407; Doc. No. 84-25 at 495.)

In addition, the claim language of the '351 patent provides guidance as to the meaning of the term "traffic shaping rate."  For example, claim 1 recites "[a] method of operating a mobile device" with multiple "logical channel queues" for data transmission, each of which is "associated with a priority and a traffic shaping rate."  '351 Patent at 13:55-58.  The claimed method requires that the mobile device "select[] . . . a highest priority logical channel queue . . . whose traffic shaping rate is not reached" and then "allocate a portion of the data transmission capacity available . . . to the selected logical channel queue."  Id. at 13:59-65.  The method further requires that the "traffic shaping rate

associated with the selected logical channel queue" limits the allocated portion of data transmission capacity.  Id. at 13:63-67.

Further, the specification provides additional guidance as to the meaning of the term "traffic shaping rate:"

> [T]raffic shapers can be implemented and configured on a per logical channel basis.  This allows, for example, voice telephony data to be transferred over link 40 as necessary, while other data types can be data rate limited according to parameters defined by the network operator.  Thus, a telephony call can be conducted unimpeded while a file transfer or other large data transfer can be subject to a leaky bucket, or other traffic shaping process.

Id. at 13:26-33.  Wi-LAN argues that this portion of the specification along with the claim language provides substantial guidance to a person of ordinary skill in the art as to the meaning of the term "traffic shaping rate."  (Doc. No. 91 at 7.)  The Court agrees.  As a result, LG has failed to meet its burden of establishing that the claim terms "traffic shaping rate" or "whose traffic shaping rate is not reached" are indefinite.

Turning to the parties' proposed constructions for the term "traffic shaping rate," LG's proposes that the Court's construction for this term require that the traffic shaping rate be the maximum quantity of data that can be selected from a particular logical channel queue over a period of time.  (Doc. No. 85 at 18.)  In response, Wi-LAN argues that LG's proposed construction is not supported by the claim language.  The Court agrees.  Nothing in the claim language supports LG's contention that traffic shaping rate sets a maximum cap on the data that can be selected from a logical channel queue.  Indeed, to the contrary, claim 1 of the '351 patent provides that under the claimed method, any remaining data transmission capacity will be allocated to the "logical channel queues" in their priority order.  '351 Patent at 14:10-14.  This additional data transmission capacity would allow a queue to exceed its traffic shaping rate, contrary to LG's proposed construction.

Further, in an effort to support its proposed construction, LG relies on a passage from the '351 patent's specification.  (Doc. No. 85 at 21 (citing '351 Patent at 5:66-6:12)).  But the cited portion of the specification does not discuss traffic shaping or traffic shaping

rates.  See '351 Patent at 5:66-6:12.  As such, the Court rejects LG's proposed construction.

Wi-LAN proposes that the Court construe the term "traffic shaping rate" as a rate used to accomplish traffic shaping where the rate is used to regulate traffic flow on the network.  (Doc. No. 83 at 18.)  Wi-LAN's proposed construction is supported by both the claim language and the specification.  See '351 Patent at 13:26-33, 13:55-67.  But the Court agrees with LG that Wi-LAN's proposed construction is circular because it uses the words "traffic shaping" and "rate" within its proposed construction for the term "traffic shaping rate."  (Doc. No. 92 at 8.)

In its briefing, Wi-LAN explains that under the claim language, the mobile device uses the "traffic shaping rate" to limit the amount of data transmission capacity allocated to a particular logical channel and regulate traffic follow on the network.  (Doc. No. 83 at 19.)  Wi-LAN also argues that the specification teaches that the "traffic shapers" limit the rate at which data can be transmitted over the network.  (Id.)  The Court agrees with Wi-LAN's interpretation, and the Court concludes that this interpretation would provide a more useful construction for this claim term.

In sum, the Court adopts Wi-LAN's proposed construction as modified, and the Court rejects LG's proposed construction.[5]  The Court construes "traffic shaping rate" as "a limitation on the amount of data transmission capacity allocated to a particular logical channel queue, where the rate is used to regulate traffic flow on the network."

## V.   Disputed Claim Terms from the '320 Patent

### A.   The '320 Patent

The '320 Patent is entitled "Pre-Allocated Random Access Identifiers."  U.S. Patent No. 9,226, 320 (filed Dec. 29, 2015), at (54).  The invention disclosed in the '320 patent relates to "[s]ystem and methods of pre-allocating identifiers to wireless devices for use in requesting resources over a random access channel . . . ."  '320 Patent at 1:37-39.

---

[5]    The Court notes that at the claim construction hearing, Wi-LAN did not object to the Court's modification of its proposed construction for this claim term.

Claim 1 of the '320 patent claims:

1. A method of operating a mobile station, comprising:

receiving, from a serving base station, an indication of a first reserved set of access identifiers usable for non-contention access over a first random access channel in a coverage area of the serving base station;

obtaining, during a handover of the mobile station from the serving base station to a target base station, an indication of a non-contention reserved access identifier identifying the mobile station in a coverage area of the target base station;

transmitting the non-contention reserved access identifier to the target base station over a second random access channel in the coverage area of the target base station;

receiving, from the target base station, a feedback message comprising a timing adjustment; and

adjusting at least one operating parameter of a transmission from the mobile station to the target base station based at least in part on the feedback message.

Id. at 21:7-25.

B.    "[a/the] non-contention reserved access identifier"

Wi-LAN proposes that the claim term "[a/the] non-contention reserved access identifier" be construed as "[a / the] reserved code that (i) is not randomly selected by the mobile station, (ii) identifies a mobile station to a base station, and (iii) avoids the probability of collision caused by randomly selected codes on a random access channel during handover."  (Doc. No. 83 at 21.)  LG proposes that this claim term be construed as ""[a / the] distinct reserved code that uniquely identifies a mobile station to a target base station independently of when it is transmitted and avoids the probability of collision on a random access channel during handover." (Doc. No. 85 at 21.)

In their proposed constructions for this claim term, the parties present several disputes regarding the proper scope of this claim term.  First, the parties dispute whether the claimed identifier must be a "distinct" code that "uniquely" identifies a mobile station

to a "target" base station.  (Doc. No. 83 at 22-23; Doc. No. 85 at 22-23.)  Second, the parties dispute whether the claimed identifier identifies a mobile station to a base station "independently of when it is transmitted."  (Doc. No. 83 at 23-25; Doc. No. 85 at 23-24.)  Third, the parties dispute whether the identifier must completely avoid collisions.  (Doc. No. 91 at 10; Doc. No. 85 at 24-25; Doc. No. 92 at 9.)  Fourth, the parties dispute whether the claimed identifier can be "randomly selected by the mobile station."  (Doc. No. 83 at 21-22; Doc. No. 85 at 25.)  Because the parties dispute the scope of this claim term, the Court must resolve the parties' dispute.  See O2 Micro, 521 F.3d at 1361; Eon, 815 F.3d at 1318.  The Court addresses each of these disputes in turn below.

> i.   whether the identifier is "distinct" and "unique"

Under their proposed constructions, the parties agree that the claimed "non-contention reserved access identifier" is a reserved code that identifies a mobile station to a base station.  (Doc. No. 83 at 21; Doc. No. 85 at 21.)  LG argues that the Court's construction for this claim term should include the additional requirements that the reserved code is "distinct" and that it "uniquely" identifies a mobile station to a target base station.  (Doc. No. 85 at 22-23.)

The Court begins by analyzing the claim language.  LG's proposal is not supported by the claim language.  The language in the '320 patent's independent claims does not include either the requirement that the code be distinct or that it uniquely identify a mobile station.  See, e.g., '320 Patent at 21:8-25.  Further, contrary to LG's position, dependent claim 15 recites, in its entirety: "The method of claim 12, wherein the non-contention reserved access identifier uniquely identifies the mobile station in the coverage area of the target base station."  Id. at 22:25-27; see also id. at 24:24-26.  LG's proposed construction would render dependent claim 15 meaningless.  The Federal Circuit has explained that "'each claim in a patent is presumptively different in scope.'  Thus, in a situation where dependent claims have no meaningful difference other than an added limitation, the independent claim is not restricted by the added limitation in the dependent claim."  Trustees of Columbia Univ. in City of New York v. Symantec Corp., 811 F.3d 1359, 1370

(Fed. Cir. 2016). Thus, it would be improper to construe the claims to import the single additional limitation from dependent claim 15 into the independent claims of the '320 patent.

To support its contention that the Court's construction should include these two requirements, LG relies on several passages in the '320 patent's specification. (Doc. No. 85 at 22 (citing '320 Patent at 2:66-3:1, 5:22-28, 6:26-28, 8:25-36, 15:64-67, 19:25-31, 19:58-61).) But in each of these passages, the specification is describing a preferred embodiment. See '320 Patent at 2:63. "[I]t is improper to read limitations from a preferred embodiment described in the specification—even if it is the only embodiment—into the claims absent a clear indication in the intrinsic record that the patentee intended the claims to be so limited." Dealertrack, 674 F.3d at 1327; accord GE Lighting Sols., 750 F.3d at 1309. Here, there is no such clear indication. Indeed, to the contrary, in many of the cited passages the specification uses permissive language in describing the features. See, e.g., '320 Patent at 6:14-15 ("an embodiment of a base station"), 8:25-26 ("[t]he configuration module 220 can pre-allocate a distinct code"), 15:64 ("[t]he base station can pre-allocate a distinct code"). As a result, the Court rejects LG's reliance of these portions of the specification.

Finally, LG relies on statements made by Wi-LAN during the prosecution history, specifically *inter partes* review proceedings involving the '320 patent. (Doc. No. 85 at 22 (citing Doc. No. 84-29, Ex. 29 at 5, 19; Doc. No. 84-30, Ex. 30 at 4, 22, 35; Doc. No. 84-32, Ex. 32 at 5, 7).) LG argues that during the IPR proceedings Wi-LAN repeatedly confirmed that the claimed "non-contention reserved access identifier" must uniquely identify the mobile station to the target base station. (Id.) "[S]tatements made by a patent owner during an IPR proceeding can be considered during claim construction and relied upon to support a finding of prosecution disclaimer." Aylus Networks, Inc. v. Apple Inc., 856 F.3d 1353, 1361 (Fed. Cir. 2017). "Under the doctrine of prosecution disclaimer, a patentee may limit the meaning of a claim term by making a clear and unmistakable disavowal of scope during prosecution." Purdue Pharma L.P. v. Endo Pharm. Inc., 438

F.3d 1123, 1136 (Fed. Cir. 2006); see also Golden Bridge Tech., Inc. v. Apple Inc., 758 F.3d 1362, 1365 (Fed. Cir. 2014) ("Prosecution disclaimer or disavowal must be clear and unmistakable.").

The Court has reviewed the statements at issue and the cited statement do not contain a clear and unmistakable disavowal of claim scope.  Many of the cited passages do not even use the word "unique" or "uniquely."  (See Doc. No. 84-29, Ex. 29 at 5, 19; Doc. No. 84-30, Ex. 30 at 4, 22, 35.)  In Wi-LAN's June 8, 2018 preliminary response, Wi-LAN refers to identifiers that are "not unique," but Wi-LAN only does so in describing a prior art reference, not the claimed invention.  (Doc. No. 84-32, Ex. 32 at 7.)  This is insufficient to constitute a clear and unmistakable disclaimer of claim scope.  In sum, the Court rejects LG's proposal to include in its claim construction the requirements that the reserved code is "distinct" and that it "uniquely" identifies a mobile station to a target base station.

> ii.   whether the claimed identifier identifies a mobile station to a base station "independently of when it is transmitted"

LG argues that the Court's construction for the term "non-contention reserved access identifier" should include the requirement that the code identify the mobile station "independently of when it is transmitted."  (Doc. No. 85 at 23-24.)  But there is no support for this particular limitation in the intrinsic record.  In its briefing, LG fails to identify any passage in the claim language or the specification of the '320 patent stating that the code identifies a mobile station independent of when it is transmitted.  Instead, LG relies on passages in the specification reciting that the claimed invention utilizes "pre-allocated codes."  (Doc. No. 85 at 23 (citing '320 Patent at Abstract, 1:42-49, 3:1-7).)  LG argues that because the invention utilizes codes and not unique transmission times, the Court's construction should include LG's proposed limitation.  (Id.)  The Court disagrees.  The Court declines to import a limitation into the claims that does not appear anywhere in the intrinsic record.

> iii.   whether the identifier must "avoid the probability of collisions"

The parties agree that the claimed "non-contention reserved access identifier" is a

reserved code that "avoids the probability of collision" "on a random access channel during handover." (Doc. No. 83 at 21; Doc. No. 85 at 21.) Wi-LAN asserts that the claimed identifier specifically avoids the probably of collision caused by randomly selected codes, whereas LG asserts that the claimed identifier must completely avoid and eliminate any collisions. (Doc. No. 85 at 24; Doc. No. 92 at 9.)

Here, the parties' dispute can be resolved by a review of the intrinsic record, specifically the '320 patent's specification.[6] In the summary of the invention section, the specification recites a base station that "reduces the probability of random access channel collisions" by pre-allocating codes to select wireless devices. '320 Patent at 1:42-46. In this passage, the specification refers to reducing collisions, not eliminating them, contrary to LG's position. The specification further states: "The use of pre-allocated codes avoids the collision probability associated with random subscriber selected access codes." Id. at 3:1-3. This passage is nearly identical to and supports Wi-LAN's proposed construction, and it does not support LG's position.

To support its contention, LG notes that during the IPR proceedings Wi-LAN stated that the claimed identifier "avoids" collision. (Doc. No. 85 at 24 (citing Doc. No. 84-32, Ex. 32 at 5, 44-45; Doc. No. 84-33, Ex. 33 ¶¶ 107, 138; Doc. No. 84-29, Ex. 29 at 4, 17-19; Doc. No. 84-30, Ex. 30 at 16; Doc. No. 84-34 ¶ 44; Doc. No. 84-35, Ex. 35 at 106-09, 112).) But this is of no aid to LG. In the cited passages, Wi-LAN merely takes the same position that it takes in its current claim construction briefing, that the claimed identifier specifically avoids the probably of collision caused by randomly selected codes. (See, e.g., Doc. No. 84-32, Ex. 32 at 5 ("The '320 Patent solves the aforementioned problems using pre-allocated codes that prevent collisions caused by randomly chosen identifiers . . . ."); Doc. No. 84-29, Ex. 29 at 4 (same), at 17 ("The '320 Patent, in contrast, 'avoids the collision probability associated with random subscriber selected access codes . . . .'")  In

---

[6] The '320 patent's claim language does not specifically refer to "avoid[ing] collisions." See '320 Patent at 21:8-24:26.

the cited passages, Wi-LAN never takes the position that the claimed identifier eliminates any and all collisions. In sum, the Court rejects LG's contention that the claimed identifier must completely avoid and eliminate any collisions.

        iv.    whether the reserved code can be "randomly selected by the mobile station"

Wi-LAN argues that the Court's construction for this claim term should include the limitation that the reserved code "is not randomly selected by the mobile station." (Doc. No. 83 at 21-22.) The Court begins its analysis by reviewing the claim language. None of the claims include the proposed requirement that the code is not randomly selected.

To support its proposed construction, Wi-LAN relies on the following passage from the '320 patent's specification:

> The code assignment module 320 can presume that those codes absent from the usage type map represent codes reserved for pre-allocation, and that the reserved codes are not to be randomly selected for a random access channel request and can indicate in the storage device that the codes are reserved or can otherwise indicate that the codes are not available for selection.

'320 Patent at 12:50-56. But in the cited passage, the specification is describing a preferred embodiment of the invention. See id. at 2:53-55, 2:63-64. "[I]t is improper to read limitations from a preferred embodiment described in the specification—even if it is the only embodiment—into the claims absent a clear indication in the intrinsic record that the patentee intended the claims to be so limited." Dealertrack, 674 F.3d at 1327; accord GE Lighting Sols., 750 F.3d at 1309. Here, there is no such clear indication. In the passage at issue, the specification uses permissive language in explaining that the code assignment module "can presume" this. See '320 Patent at 12:50-51. The passage does not state that this must occur.

In addition, the Court notes that in its decision granting IPR, the PTAB declined to import Wi-LAN's proposed limitation into the claims. (Doc. No. 84-38, Ex. 38 at 25-26.) Although this decision is not binding on the Court, the Court finds the reasoning and analysis presented by the PTAB with respect to this issue persuasive. Wi-LAN notes that

in the PTAB's September 5, 2018 decision granting IPR, the PTAB applied a different claim construction standard – the broadest reasonable interpretation standard – than the standard utilized by district courts.  (Doc. No. 91 at 9.)  Wi-LAN is correct.  Although beginning on October 11, 2018, the PTAB now uses the same claim construction standard that is utilized by district courts – the Phillips standard, see 37 C.F.R. 42.100(b), at the time of the September 5, 2018 decision, the PTAB was still utilizing the broadest reasonable interpretation standard.  (See Doc. No. 84-38, Ex. 38 at 6.)

Nevertheless, this is of no consequence because, in the analysis at issue, the PTAB utilized the legal principle that claims should not be limited to preferred embodiments or specific examples in the specification.  (Doc. No. 84-38, Ex. 38 at 25-26 (citing Williamson v. Citrix Online, LLC, 792 F.3d 1339, 1346-47 (Fed. Cir. 2015)).)  This same legal principle applies to district court claim constructions under the Phillips standard.  Indeed, Williamson is an appeal from a district court's claim construction under the Phillips standard.  See Williamson, 792 F.3d at 1345.

Wi-LAN also argues that the PTAB's analysis relied on the contention that there is a distinction between the "preallocated codes" in the specification and the "non-contention reserved access identifies" in the claims, but that LG has subsequently conceded the two are the same.[7]  (Doc. No. 91 at 9.)  Even assuming Wi-LAN is correct, this is of no consequence because the PTAB also rejected Wi-LAN's claim construction proposal on the grounds that Wi-LAN improperly sought to import limitations from preferred embodiments in the specification into the claims.  (See Doc. No. 84-38, Ex. 38 at 25-26 (citing Williamson v. Citrix Online, LLC, 792 F.3d 1339, 1346-47 (Fed. Cir. 2015)).)  It is this portion of the PTAB's analysis that the Court finds persuasive and consistent with the

_____

[7]     At the claim construction hearing, Wi-LAN asserted that this concession occurred during a recent trial before the PTAB during the relevant IPR proceedings, and Wi-LAN offered to supplement the record to provide the Court with the transcripts from the PTAB proceedings.  The Court declines Wi-LAN's offer to supplement the record with the transcript as it is unnecessary for resolution of the present claim construction dispute because, for the purposes of this analysis, the Court will assume that Wi-LAN's representation is correct.

Court's own analysis.

To support its proposed claim construction, Wi-LAN cites to only descriptions of preferred embodiments in the specification.  (See Doc. No. 83 at 21 ('320 Patent at 12:52-54, 7:37-40); Doc. No. 91 at 8-9 (citing '320 Patent at 12:5-54, 7:37-40).)  And Wi-LAN has failed to identify any language within those passages that would constitute a clear disclaimer.  As a result, the Court rejects Wi-LAN's proposal to include the limitation that the reserved code "is not randomly selected by the mobile station."

> v.   conclusion

In sum, the Court adopts in part Wi-LAN's proposed construction for this claim term, and the Court rejects LG's proposed construction.  The Court construes the claim term "[a/the] non-contention reserved access identifier" as "[a / the] reserved code that (i) identifies a mobile station to a base station, and (ii) avoids the probability of collision caused by randomly selected codes on a random access channel during handover."

## **Conclusion**

For the reasons above, the Court adopts the constructions set forth above.   In addition, the Court denies LG's motion for partial summary judgment that certain claims of the '924 patent are invalid as indefinite.

**IT IS SO ORDERED.**

DATED: May 28, 2019

MARILYN L. HUFF, District Judge
UNITED STATES DISTRICT COURT