Victor M. Felix, SBN 179622
Victor.Felix@procopio.com
PROCOPIO, CORY, HARGREAVES
& SAVITCH LLP
525 B Street, Suite 2200
San Diego, CA 92101
Tel. (619) 515-3229
Fax (619) 744-5409

Leslie V. Payne (TX Bar No. 00784736) (admitted *Pro Hac Vice*)
lpayne@hpcllp.com
Eric J. Enger (TX Bar No. 24045833) (admitted *Pro Hac Vice*)
eenger@hpcllp.com
Christopher M. First (TX Bar No. 24095112) (admitted *Pro Hac Vice*)
cfirst@hpcllp.com
Alden G. Harris (TX Bar No. 24083138) (admitted *Pro Hac Vice*)
aharris@hpcllp.com
HEIM, PAYNE & CHORUSH LLP
1111 Bagby St., Suite 2100
Houston, TX 77002
T: (713)221-2000 F: (713)221-2021

Attorneys for Plaintiffs *Wi-LAN*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| WI-LAN INC.; WI-LAN USA, INC.; & WI-LAN LABS, INC., <br><br> Plaintiffs, <br><br> vs. <br><br> LG ELECTRONICS, INC.; LG ELECTRONICS U.S.A., INC.; LG ELECTRONICS MOBILECOMM U.S.A., INC. <br><br> Defendants. | Case No. 3:18-cv-01577-H-AGS <br><br> **WI-LAN'S OPPOSITION TO LG'S CONSOLIDATED MOTIONS FOR SUMMARY JUDGMENT THAT THE ASSERTED CLAIMS LACK PRIORITY AND THAT THE CLAIMS ARE INVALID UNDER 35 U.S.C. § 102** <br><br> **DEMAND FOR JURY TRIAL** |

## <u>TABLE OF CONTENTS</u>

I.   **Summary of Argument** ................................................................................ 1

II.   **Legal Standards** ..................................................................................... 2

III.  **The '924 and '743 Claims are Entitled to Their Priority Date** .................. 4

    A.   The '924 and '743 Patents Claim Cellular Devices ....................................... 4

    B.   The '518 App. Supports the Claims ................................................................ 4

    C.   The Prosecution History Confirms Possession of the Claims ........................ 6

    D.   A Prior Court Order Rejected LG's "Fixed" Argument ................................. 7

    E.   The Fallacies in LG's Brief ............................................................................ 9

IV.  **LG Cannot Meet its Invalidity Burden for the '924 and '743 Patents** ..... 13

V.   **The '351 Claims Are Entitled To Their Priority Date** ........................... 14

    A.   LG Recycles Arguments the PTAB Already Rejected .................................. 14

    B.   LG Mischaracterizes Dr. Gitlin's Report ...................................................... 16

    C.   The '373 App. Discloses Traffic Shaping Using an Associated Rate as a Limit on a Per Logical Channel Basis ........................................................... 16

    D.   The '373 App. Discloses a Link Controller According to the Claims ......... 17

        1.   *"Operating" Limitation* ...................................................................... 18

        2.   *"Selecting" Limitation* ....................................................................... 19

        3.   *"Allocating" Limitation* ..................................................................... 19

        4.   *"Repeatedly Consider" Limitation* .................................................... 19

VI.  **LG Cannot Meet its Invalidity Burden for the '351 Patent** ...................... 20

# **TABLE OF AUTHORITIES**

**Cases**

*Ariad Pharm., Inc. v. Eli Lilly & Co.*
  598 F.3d 1336 (Fed. Cir. 2010) ...................................................................2

*Bradford Co. v. Conteyor N. Am., Inc.*
  603 F.3d 1262 (Fed. Cir. 2010) ...................................................................2

*Brooktree Corp. v. Advanced Micro Devices, Inc.*
  977 F.2d 1555 (Fed. Cir. 1992) ...................................................................7

*Chiron Corp. v. Abbott Lab.*
  902 F. Supp. 1103 (N.D. Cal. 1995) ...........................................................3

*Crown Packaging Tech., Inc. v. Ball Metal Beverage Container Corp.*
  635 F.3d 1373 (Fed. Cir. 2011) ...................................................................3

*Delew v. Adamson*
  293 Fed. Appx. 504 (9th Cir. 2008) ............................................................3

*In re Daniels*
  144 F.3d 1452 (Fed. Cir. 1998) ...................................................................2

*Koito Mfg. Co. v. Turn-Key-Tech, LLC*
  381 F.3d 1142 (Fed. Cir. 2004) ...................................................................2

*Metro. Life Ins. Co. v. Bancorp Servs., L.L.C.*
  527 F.3d 1330 (Fed. Cir. 2008) ...................................................................3

*PowerOasis v. T-Mobile*
  522 F.3d 1299 (Fed. Cir. 2008) ...............................................................2, 3

*Pozen Inc. v. Par Pharm., Inc.*
  696 F.3d 1151 (Fed. Cir. 2012) ...................................................................2

*Provenz v. Miller*
  102 F.3d 1478 (9th Cir. 1996) .....................................................................3

*Tech. Licensing Corp. v. Videotek, Inc.*
  545 F.3d 1316 (Fed. Cir. 2008) ...................................................................3

*TurboCare Div. of DeMag Delaval Turbomachinerary Corp. v. General Elec. Co.*
  264 F.3d 1111 (Fed. Cir. 2001) ...................................................................3

*Wi-LAN USA, Inc. v. Apple Inc.*
    830 F.3d 1374 (Fed. Cir. Aug. 1, 2016) ................................................................. 8

# I.   SUMMARY OF ARGUMENT

The claims of Wi-LAN's '924, '743, and '351 Patents find ample support in their priority applications. LG's priority arguments rely on written description—a pure question of fact for the jury.

On these quintessential fact questions, Wi-LAN presented competent expert testimony from its validity expert, Dr. Richard Gitlin. His report includes over *90 pages* of evidence and analysis relating to the issues raised in LG's motion. *See* Ex. K (Gitlin Rpt.) at PDF pages 317-355, 476-527, 602-616. Dr. Gitlin concludes that all challenged claims are supported by their priority applications. In contrast to Dr. Gitlin's detailed analysis, LG presents roughly *6 pages* of conclusory opinions from its expert, Mr. Proctor. LG has no meaningful expert testimony, while Wi-LAN has detailed expert testimony establishing priority. This disparity reveals fact questions.

Besides expert testimony, the documentary evidence presents many fact questions for the jury—any one of which precludes summary judgment. For example, for the '924/'743 Patents: (i) the specification provides express disclosure of cellular devices; (ii) the specification describes a "CPE," which a person of skill in the art ("POSITA") would understand to include cellular devices; (iii) the patent examiner suggested and added the language challenged by LG here, leading to an "especially weighty presumption" the claims are supported; and (iv) a prior court rejected the essence of LG's argument that the specification is limited to "fixed" devices.

Similarly, for the '351 Patent, the specification provides express disclosure of implementing traffic shapers on a per logical channel basis to data rate limit certain data types. In one of its many failed *inter partes review* ("IPR") petitions before the Patent Trial and Appeal Board ("PTAB"), LG argued the '351 claims were not entitled to priority—the same argument it makes here. The PTAB flatly rejected LG's arguments, finding LG failed to show even a "reasonable likelihood" of prevailing on its priority-based invalidity arguments. The PTAB's ruling, by itself, shows a reasonable jury could find in Wi-LAN's favor on these questions of fact.

1   Finally, the Court need not even address the merits here, because LG waived

2   its theories by not including them in its invalidity contentions or final election of

3   §102/§103 invalidity theories. For this reason, LG's theories should be struck as

4   untimely. And for the '743 Patent, statutory estoppel bars LG's invalidity position

5   given LG's loss at the PTAB.

6   ## II.   LEGAL STANDARDS

7   To be entitled to an earlier application's filing date, a continuation application

8   must comply with the written description requirement of 35 U.S.C. § 112, ¶ 1. *In re*

9   *Daniels*, 144 F.3d 1452, 1456 (Fed. Cir. 1998). Determining whether a priority

10  application contains sufficient disclosure to comply with the written description

11  requirement is a **question of fact**. *Bradford Co. v. Conteyor N. Am., Inc.*, 603 F.3d

12  1262, 1268 (Fed. Cir. 2010); *Ariad Pharm., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336,

13  1351 (Fed. Cir. 2010) (*en banc*).

14  The test for written description is whether "the disclosure of the application

15  relied upon reasonably conveys to those skilled in the art that the inventor had

16  possession of the claimed subject matter as of the filing date." *Ariad*, 598 F.3d at 1351.

17  The terms used in the claims need not be identical to those used in the specification.

18  *See Koito Mfg. Co. v. Turn-Key-Tech, LLC*, 381 F.3d 1142, 1154 (Fed. Cir. 2004);

19  *Pozen Inc. v. Par Pharm., Inc.*, 696 F.3d 1151, 1167 (Fed. Cir. 2012) (disclosure

20  "does not have to provide *in haec verba* support for the claimed subject matter").

21  LG argues "***it is the patentee's burden*** 'to come forward with evidence to

22  prove entitlement to claim priority to an earlier filing date.'" LG Br. at 5-6 (emphasis

23  in original). This statement is incomplete, if not misleading. As a threshold, LG must

24  first establish, by **clear and convincing evidence**, a *prima facie* case that an

25  intervening prior art reference (*i.e.*, a reference with an effective date between the

26  claimed priority date and the actual filing date of the application at issue) anticipates

27  the claims. *PowerOasis v. T-Mobile*, 522 F.3d 1299, 1305 (Fed. Cir. 2008) LG failed

28  to carry its initial burden. *See infra* at Sec. IV, VI.

Only after LG meets the threshold does the burden shift to Wi-LAN to come forward with some evidence supporting priority. Once Wi-LAN does so, LG, as the party asserting invalidity, bears the ultimate burden of proving lack of written description by **clear and convincing evidence**. *Tech. Licensing Corp. v. Videotek, Inc.*, 545 F.3d 1316, 1328-29 (Fed. Cir. 2008) ("a challenger has the burden of persuasion to show by clear and convincing evidence that [written description is lacking in an earlier application]. That ultimate burden never shifts, however much the burden of going forward may jump from one party to another…. *PowerOasis* is fully consistent with this understanding").

Furthermore, "[w]hen the defendant in a patent infringement case moves for summary judgment on an affirmative defense, the elements of which the defendant must prove by clear and convincing evidence, the non-moving party must simply produce enough evidence to allow a rational trier of fact to find that there is not clear and convincing evidence." *Chiron Corp. v. Abbott Lab.*, 902 F. Supp. 1103, 1110 (N.D. Cal. 1995). In case of a conflict between the parties' experts on a material issue, a fact question exists that defeats summary judgment. *Crown Packaging Tech., Inc. v. Ball Metal Beverage Container Corp.*, 635 F.3d 1373, 1384 (Fed. Cir. 2011); *see also Metro. Life Ins. Co. v. Bancorp Servs., L.L.C.,* 527 F.3d 1330, 1339 (Fed. Cir. 2008) ("The conflict in [expert] declarations created a genuine issue of material fact that made summary judgment inappropriate."); *Delew v. Adamson*, 293 Fed. Appx. 504, 506 (9th Cir. 2008) (quoting *Provenz v. Miller*, 102 F.3d 1478, 1490 (9th Cir. 1996)) ("As a general rule, summary judgment is inappropriate where an expert's testimony supports the non-moving party's case.").

Under this framework, LG's motion must fail if, after the Court credits all Wi-LAN's evidence and draws all inferences in Wi-LAN's favor, a fact dispute exists about whether the priority documents comply with the written description requirement. *TurboCare Div. of DeMag Delaval Turbomachinerary Corp. v. General Elec. Co.*, 264 F.3d 1111, 1118 (Fed. Cir. 2001) (reversing summary judgment of no

written description even though the "original disclosure is not a model of clarity");
*Technology Licensing,* 545 F.3d at 1327 ("[I]f the fact trier of the issue is left uncertain, the party with the burden loses").

## III.  THE '924 AND '743 CLAIMS ARE ENTITLED TO THEIR PRIORITY DATE

Each asserted claim of the '924 and '743 Patents is entitled to the May 21, 1999 priority date of U.S. Patent Application 09/316,518 ("the '518 App.").[1] *See* Ex. B.

### A.  The '924 and '743 Patents Claim Cellular Devices

The '924 and '743 claims recite a "wireless cellular mobile unit" or a "cellular telephone." LG Ex. 11 ('924) 22:42-24:48; LG Ex. 12 ('743) 24:2-25:31. Both patents' claims relate to a multi-stage process by which the cellular device obtains uplink bandwidth. *Id.* None of the claims require a cellular device to communicate with multiple base stations or maintain communication during any handover. *Id.*

### B.  The '518 App. Supports the Claims

The '518 App. states "[t]his invention relates to wireless communication systems." Ex. B at 1:11-14. The '518 App. explains "a wireless communication system facilitates two-way communication between a plurality of subscriber radio stations or subscriber units (fixed and **portable**) and a fixed network infrastructure." *Id.* at 1:19-21 (emphasis added). The '518 App. next teaches "[e]xemplary communication systems include **mobile cellular telephone systems, personal communication systems (PCS)**,[2] and cordless telephones." *Id.* at 1:22-23 (emphasis added). The '518 App. further explains those **portable** subscriber units make "'uplink' transmissions" to a base station. *Id.* at 2:2-3.

These disclosures show the inventors possessed the invention in the context of

---

[1] LG does not challenge continuity of disclosure, but the same or similar disclosures are in each application in the priority chain. *E.g.*, Ex. C (App. 09/859,561); Ex. D (App. 11/170,392); Ex. E (App. 12/645,937); Ex. F (App. 13/649,986); Ex. G (App. 14/338,103); Ex. H (App. 14/523,573); Ex. I (App. 14/738,712); Ex. J (App. 14/523,755).

[2] PCS includes advanced cell phones. Ex. K (Gitlin Rpt.) at ¶ 1144.

uplink transmissions between a base station and a "portable," "mobile cellular telephone," *i.e.*, the claimed cellular devices.[3] The '518 App. even calls that context "exemplary" (meaning an example of the invention). Dr. Gitlin examines these disclosures and concludes that they support priority. Ex. K at ¶¶ 1142-1146, Ex. C thereto at pages 447-513, 602-616.

The '518 App. does not stop there. It goes on to describe a preferred embodiment comprising a Customer Premises Equipment ("CPE"). Ex. B at 2:12-13. Dr. Gitlin provides his opinion that a POSITA would "recognize that a CPE can be a 'wireless cellular mobile unit' and 'cellular telephone.'" Ex. K at ¶ 1148. He cites two different patent applications filed near the relevant time to support his opinion. For example, U.S. Patent No. 6,301,609, assigned to Lucent Technologies, states "the CPE [] may include, but is not limited to, a … wireless cellular phone." Ex. L at 3:31-34. U.S. Patent No. 6,658,455, assigned to AT&T, states "the CPE [] may be any communications device, for example, a cellular telephone." Ex. M at 5:33-39. LG argues that these patents are "irrelevant," but the lone case cited by LG is totally inapt. LG Br. at 10, FN6. These contemporaneous patent applications, applied for by two different companies with an established presence in the space, directly support Dr. Gitlin's opinion that a POSITA would recognize the CPEs in the '518 App. to include "'wireless cellular mobile unit' and 'cellular telephone.'" Ex. K at ¶ 1148.

On top of its flawed arguments about cellular devices, LG appears to challenge the following claim terms: (1) "wireless cellular communication system"; (2) "wireless communication network"; and (3) "wireless communication system." LG Br. at 2-3, 11. These arguments also fail. First, as shown above, the '518 App. expressly discloses "a wireless communication system [that] facilitates two-way communication between a plurality of subscriber radio stations or subscriber units

---

[3] The '518 App. also discloses "user application[s]" and "service applications" that provide "voice, data, and video services." Ex. B at 10:22-11:3, 2:9-10. A POSITA recognizes that such "applications" reside on a cell phone and provide cell phone functionality. *See, e.g.*, Ex. K at ¶ 1154.

1  (fixed and portable) and a fixed network infrastructure" and further identifies "mobile
2  cellular telephone systems" as "exemplary." Ex. B at 1:19-23. Second, as shown
3  above, Dr. Gitlin opines these disclosures confirm priority. Ex. K at ¶¶1142-1146.

4       The above disclosures in the '518 App., along with Dr. Gitlin's opinions on
5  those disclosures, raise fact questions that defeat summary judgment.

6       C. The Prosecution History Confirms Possession of the Claims

7       The '924 prosecution history shows the Patent Examiner held the same view
8  as Wi-LAN and Dr. Gitlin that the specification supports the claim language at issue.
9  As shown above, the first page of the '518 App. describes "subscriber [ ] radio units"
10  in the context of a "wireless communication system." Ex. B at 1:19-21. Based on this
11  disclosure, the original claims in the '924 application recited a "wireless subscriber
12  radio unit." Ex. X at LGWL_00155851. After considering the '924 specification
13  (which is substantively identical to the '518 App.—*compare* LG Ex. 11 *with* Ex. B),
14  the Examiner noted he interpreted the term "wireless subscriber radio unit" to mean
15  a "mobile device." *See, e.g.,* Ex. X at LGWL_00155925. He concluded the
16  specification supported a "mobile device"—refuting LG's primary argument here.

17       Later during prosecution, Wi-LAN amended the claims to recite a "mobile
18  device," to align more closely with the Examiner's stated interpretation:

19
20    1.    (Currently Amended) A method of operating a ~~wireless subscriber radio unit~~ mobile
      device in ~~a wireless communication system, wherein the wireless communication system~~
21    ~~includes a wireless subscriber radio unit and a base station, and~~ wherein the ~~wireless subscriber~~
      ~~radio unit~~ is registered with ~~the~~ a base station in a wireless cellular communication system, the
22    method comprising:
23

24  *Id.* at LGWL_00156118-23 (Amendments); *id.* at LGWL_00156123 ("In addition,
25  the term 'wireless subscriber radio unit' has been replaced with the more compact
26  term 'mobile device'"). The Examiner observed that the amendment "modifie[d] the
27  scope of the claims" because "a mobile device need NOT be a device that
28  communicates ***wirelessly***" and is not necessarily "cellular." *Id.* at LGWL_00156143-

4 (emphasis in original). As a result, the Examiner recommended further amending the claims to include "wireless" and "cellular" together with "mobile." *Id.* at LGWL_00156160. The Examiner initiated a telephonic interview with Wi-LAN to discuss these changes. *Id*. at LGWL_00156173.

During the interview, Wi-LAN permitted the Examiner to amend the claim:

> 1. (Currently amended) A method of operating a ~~mobile device~~ wireless cellular mobile unit registered with a base station in a bandwidth on demand wireless cellular communication system, the method comprising:

*Id*. at LGWL_00156166 (Examiner's Amendment). After the Examiner memorialized the amendment and inserted the term "wireless cellular mobile unit," he allowed the '924 claims. *Id.* at LGWL_00156166-70.

This prosecution history shows the Examiner scrutinized the claim term "wireless cellular mobile unit" in light of the specification—going so far as to suggest adding the "wireless," "cellular" and "mobile" concepts—and concluded it was supported by the '518 App. *See* MPEP §2163 (instructing examiners that "[i]f the originally filed disclosure does not provide support for each claim limitation, … the priority or benefit claim must be denied").

In *Brooktree Corp. v. Advanced Micro Devices, Inc.*, the Federal Circuit held "a [claim] amendment without objection thereto as new matter . . . is entitled to an **especially weighty** presumption of correctness." 977 F.2d 1555, 1574-75 (Fed. Cir. 1992) (emphasis added). The court reasoned "patent examiners [are] presumed to have done their job." *Id.* This presumption is even weightier here, because not only did the Examiner not object to Wi-LAN's amendments, he affirmatively suggested them and even made the actual amendment himself. These facts lead to the inescapable conclusion that the Examiner approved this language. This creates another fact question that defeats summary judgment.

D. A Prior Court Order Rejected LG's "Fixed" Argument

LG's argument echoes an argument made by the defendant in the *Wi-LAN v.*

1  *Alcatel* case. The defendant in Alcatel argued "the definition and discussion of
2  subscriber units in the specification take place in the background section and relate
3  solely to the prior art" and was therefore irrelevant, based on the specification of
4  related Patent No. 8,249,014, (which has the same substantive specification as the
5  '518 App.). Ex. O at 50-54. The *Alcatel* court flatly rejected that argument, finding
6  the specification supported portable devices in the context of the invention, and
7  holding the claims were not limited to "fixed subscriber stations." *Id*. Relying on
8  some of the same specification passages cited by Wi-LAN here, the *Alcatel* court
9  noted that "the specification explicitly defines subscriber units as being 'fixed and
10 **portable**,' not just 'fixed.'" *Id.* at 51 (citing the equivalent of '518 App., Ex. B at
11 1:19-21) (emphasis added). While acknowledging "the system depicted in Figure 1
12 is described as including a base station and a plurality of CPEs 'positioned at fixed
13 customer sites,'" the *Alcatel* court found "this certainly does not lead to the
14 conclusion that CPEs in all broadband wireless communication system must be
15 buildings, as illustrated in Figure 1, and must be positioned at fixed customer sites."
16 *Id.* at 52-53 (citing the equivalent of '518 App. at 2:17-20). In sum, the *Alcatel* Court
17 was "not persuaded that the specification requires CPEs to be 'fixed.'" *Id.* at 52.

18      That the *Alcatel* court rejected LG's central argument confirms a reasonable
19 jury could find for Wi-LAN, precluding summary judgment. On the other hand, LG's
20 misplaced reliance on Federal Circuit *dicta* in a footnote characterizing Figure 1 as
21 having "immobile intermediary nodes" does not change this analysis. LG Br. at 7
22 (*citing Wi-LAN USA, Inc. v. Apple Inc.*, 830 F.3d 1374, 1379 n.2 (Fed. Cir. Aug. 1,
23 2016)). That footnote, in a prior *Apple* case, merely states the obvious: that the '640
24 Patent specification describes Figure 1 as having CPEs "positioned at fixed customer
25 sites." *Id*. Yet the specification makes clear Figure 1 is just "one exemplary
26 broadband wireless communication system" that does not limit the invention. *See,*
27 *e.g.*, LG Ex. 11 ('924 Patent) at 1:65-2:15; *see also id.* at 22:36-39 (invention not
28 "limited by the specific illustrated embodiment"), 5:22-25 ("the preferred

1  embodiment and examples shown should be considered as exemplars, rather than as

2  limitations on the present invention").

3     E. The Fallacies in LG's Brief

4     LG presents several untenable arguments about why the '518 App. is limited

5  to a "fixed, single-cell system." *First*, LG argues the disclosure of a "unique

6  permanent address" means that the CPE "would not function" if it traveled from cell

7  to cell. LG Br. at 6. But LG misinterprets the '518 App. Rather than teaching that all

8  CPEs must have a unique permanent address, the '518 App. instead teaches that "in

9  accordance with **one embodiment of the invention**, the addressing of CPEs is

10 **preferably** performed" with unique permanent addresses. Ex. B at 22:1-2 (emphasis

11 added). Nor does it follow that a "unique permanent address" limits a device to a

12 "fixed, single-cell" system. As Dr. Gitlin explains, modern cell phones are fully

13 functional for wireless cellular communication despite being assigned unique

14 permanent addresses. Ex. K at ¶ 1158 ("A mobile phone may have different identity

15 descriptors at each layer, some of which are permanent and some of which are

16 temporary.").

17    *Second*, LG argues that the '518 App.'s disclosure of "point-to-multi-point"

18 limits the invention to a "fixed location within a single cell." LG Br. at 7. Not true.

19 The term "point-to-multi-point" refers to "a circuit by which a single signal goes from

20 one origination point to many destination points." Ex. P; Ex. K at ¶ 1155, Ex. C

21 thereto at ¶¶ 94-95. This aligns with how the '518 App. uses the term. Ex. B at 10:3-

22 14 ("The downlink of the communication system shown in FIGURE 1 operates on a

23 point-to-multi-point basis (***i.e., from the base station 106 to the plurality of CPEs***

24 ***110***)") (emphasis added). "Point-to-multi-point" has nothing to do with mobility. Ex.

25 K at ¶1155 ("Mobility has no real relationship to the concept of 'point-to-multi-

26 point.'"). And in any event, mobile cell phones are "point-to-multi-point." *Id.* at

27 ¶1156 ("point (base station)-to-multipoint (CPE) architecture is not limiting in any

28 way since this is the classical wireless downlink architecture and modern cellular

wireless systems are full duplex, where the downlink is point (the base station) to multi-point (the CPE).").

*Third*, LG argues "Wi-LAN and the named inventors have testified that the invention of the '518 App. and their initial product and commercial embodiment employed fixed CPEs in a fixed, single-cell wireless system." LG Br. at 7-8. Not true. The inventors provided testimony not about "the '518 App.," but about Ensemble's **original commercial product**—the "Fiberless" system—which began as a fixed system because "that was the first step." Ex. Q at 24:17-23. Ensemble took this route because "Ensemble's customers used frequencies that weren't conducive to mobility at the time." Ex. R at 38:5-11. That Ensemble's initial commercial development occurred on a fixed system has no legal significance. Indeed, when LG asked an inventor whether Ensemble discussed making a mobile system in 1998, he testified that "we did discuss it sometimes, but we have to take a step at a time." Ex. Q at 25:5-11; *see also id*. at 79:24-80:5 ("we never intended not to do a mobile product."); 142:16-18 ("Q: So is there any reason your invention would be limited to only use in a fixed system? A: Not at all."); 143:12-16.

*Fourth,* LG argues Dr. Gitlin conceded a "CPE is not the same thing as a cellular telephone or wireless cellular mobile unit." LG Br. at 10. But LG's cited portion shows Dr. Gitlin addressing a specific item from Mr. Proctor's report on the DOCSIS alleged prior art reference:

> For this preamble only, Mr. Proctor appears to allege that a Customer Premises Equipment or "CPE" is the claimed "wireless cellular mobile unit;" for all other claim elements, Mr. Proctor focuses only on the cable modem. … This inconsistent mapping of the claim to the prior art is improper, and contrary to the understanding of those of ordinary skill. While I agree that CPEs generally include cellular phones, I disagree that a POSITA would understand the CPEs in the DOCSIS references to include cellular phones. … It would not make sense for a cell phone to only communicate via a cable modem attached to a wired cable network; the cell phone would not be mobile. (I note that this DOCSIS CPE scenario is very different from the case where a CPE cell phone communicates wirelessly with a cellular base station).

1    Ex. K at ¶¶ 224, 604. The DOCSIS reference disclosed a "Customer Premises

2    Equipment" as a computer attached to a cable modem. Ex. K at ¶¶ 224, 604. Dr. Gitlin

3    noted that the computer in DOCSIS would not be "mobile" because it is *necessarily*

4    tethered. Thus, the plain language of Dr. Gitlin's report undermines LG's claim.

5        LG also misstates Dr. Lomp's deposition testimony from LG's failed IPRs[4]

6    on the meaning of the term "CPE." Dr. Lomp did not testify "that a CPE was known

7    in the art as a fixed device," as LG says. LG Br. at 8. LG cites only the first portion

8    of Dr. Lomp's testimony, where he explained the origin of the term CPE (which arose

9    from traditional phone services). *Id*. The testimony immediately following LG's

10   excerpt shows Dr. Lomp testified exactly opposite to LG's false characterization:

11       **A.** But then the term evolved, because of wireless developments that
         provided initially fixed access using wireless to replace the wires, but still
12       being fixed, and then I suppose the term further evolved, once wireless was
         part of this picture, to include all customer equipment.
13

14   Ex. S at 16:12-17. And LG ignores the rest of Dr. Lomp's later testimony on this

15   same issue—it not only omitted the testimony from its brief, it cut off its exhibit to

16   avoid it (*see* ECF No. 188-17):

17       **Q.** Sure. Would a person of ordinary skill in the art in 1999 consider a CPE
         to be fixed?
18       **A.** I would say not necessarily.
         **Q.** Why not?
19       **A.** Because in 1999, there was a rather complete development of wireless
         access using cellular telephone frequencies and equipment, and the -- there
20       was a blend of fixed and mobile services that had been used over the -- over
         that whole decade, I would say, even going back to the '80s. So I think by
21       then the original term that I alluded to previously had been superseded and
         was more general.
22

23

24   Ex. S at 18:10-24.

25       Finally, citing the *Markman* order (at pages 10 and 16), LG argues that the

26   Court should ignore most of the pertinent specification passages because they come

27

28   ───────────────────
     [4] Dr. Lomp was also Wi-LAN's expert in the IPR proceedings.

1    from a "portion of the specification [that] 'is not describing the claimed invention.

2    Rather, the specification is describing prior art.'" LG Br. at 10. LG's reliance on the

3    *Markman* order is wrong for several reasons. First, the specification portion LG seeks

4    to ignore is relevant to the written description inquiry for the simple reason that Dr.

5    Gitlin, the *Alcatel* court and the patent Examiner all consider that portion to relate to

6    the invention. For example, Dr. Gitlin reviewed this portion of the specification and

7    opined that a POSITA "would review the statements in the '518 App. (and/or the

8    specifications of the '924/'743 Patents) and conclude that they provide information

9    about the invention. I disagree that a [POSITA] would ignore or exclude these

10    statements as solely 'distinguishing' prior art." Ex. K at ¶¶ 1146, 1136-1167 (and

11    evidence cited therein). This alone creates a fact question for the jury.

12        Second, as noted above, the *Alcatel* court explicitly rejected the defendant's

13    argument that "the definition and discussion of subscriber units in the specification

14    take place in the background section and relate solely to the prior art." Ex. O at 51.

15    This is the same argument that LG is making—this Court should also reject it.

16        Third, the portion of the specification that LG seeks to ignore falls under the

17    major heading "BACKGROUND OF THE INVENTION." Those words state that

18    what follows relates to "the invention." Indeed, much of this section describes the

19    "wireless communications system" environment in which the claimed cellular

20    devices function. *See* '924 Patent at 1:29-2:59.

21        Fourth, the context of the *Markman* order does not support LG's sweeping

22    argument. During claim construction, LG sought to import alleged limitations from

23    the specification. The Court declined to import limitations into the claims, finding the

24    sentence (at 2:21-24) relied on by LG was "describing prior art," and thus did not

25    constitute a "clear disclaimer of claim scope." ECF No. 112 at 10. The Court also

26    rejected Wi-LAN's reliance on a specific portion of the '924 Patent to show the

27    meaning of the term "queue" (at 3:20-25), finding that excerpt was "describing

28    certain prior art systems" and could not overcome the other specification citations the

Court believed said the opposite. ECF No. 112 at 16. Neither passage is implicated by LG's motion. Moreover, the Court was not analyzing written description (which is a fact question with a starkly different burden and analysis than claim construction) but was instead simply resolving the meaning of disputed claim terms.

## IV.    LG CANNOT MEET ITS INVALIDITY BURDEN FOR THE '924 AND '743 PATENTS

After presenting its flawed priority arguments, LG provides two paragraphs of conclusory analysis arguing that the 3GPP LTE standard documents must anticipate the Patents-in-Suit. LG Br. at 18. LG's argument fails for at least four reasons.

*First*, as shown above, there is at least a fact question that precludes summary judgment on the priority issue. *Second,* LG's invalidity contentions did not assert that "Release 8 of the 3GPP Standard" invalidates any of the Patents-in-Suit. *See* Ex. Y (LG's Contentions). Indeed, on September 20 (several weeks ago), LG narrowed its anticipation/obviousness theories to 5 grounds of invalidity for the '924 and '743 Patents under the Court's Order directing the parties the narrow the case. *See* ECF No. 119. LG's five elected grounds are (1) *Chuah* and *Kari*; (2) *DOCSIS* and *Eng*; (3) *Fischer* and *Sigle*; (4) *Karol* and *Sigle*; and (5) *Fischer* and *Karol* and *Sigle. See* ECF No. 187-11; *see also* ECF No. 187-1. Seven days later, LG filed this Motion with this new, unelected theory. LG's new invalidity theory is absent from its invalidity contentions, absent from LG's elected theories for trial, and is asserted here for the first time. This violates the Local Rules, the Court's scheduling Order, and the Court's Order Limiting Claims and Prior Art. *See* Patent LR 3.3; ECF Nos. 36, 143; ECF No. 119. It should be struck.

*Third*, for the '743 Patent, LG is estopped from presenting invalidity theories it raised or could have raised in the '743 IPR. *See* ECF No. 187 (Wi-LAN's Motion to Strike LG's '743 Obviousness Defenses Based on IPR Estoppel and Grant Partial Summary Judgment, incorporated by reference). LG has known about Release 8 of the 3GPP LTE Standards since before its IPRs, because LG's Accused Products which comply with those standards have been the subject of Wi-LAN's infringement

1   case since 2017. And LG knew of this theory, as it presented a motion on the same

2   grounds in the first *Wi-LAN v. LG* litigation. *See* Case No. 3:17-cv-358, at ECF No.

3   90. As a result, LG is statutorily estopped from asserting this theory for the same

4   reasons set forth in Wi-LAN's summary judgment motion. *See* ECF No. 187.

5        *Finally*, LG failed to prove anticipation by clear and convincing evidence. LG

6   seeks to rely on a narrow exception often called the *Vanmoor* exception. *See Vanmoor*

7   *v. Wal-Mart Stores, Inc*., 201 F.3d 1363, 1366 (Fed. Cir. 2000). But this "exception

8   requires an <u>identity</u> between the accused product and the asserted prior art."

9   *Metaswitch Networks Ltd. v. Genband US LLC*, No. 2:14-CV-744-JRG-RSP, 2016

10   WL 3618831, at *7 (E.D. Tex. Mar. 1, 2016) (emphasis in original). LG presented no

11   admissible evidence that any of the Accused Products were sold before the '924 or

12   '743 Patents' filing dates, so it cannot invoke the *Vanmoor* exception.

13   **V.   THE '351 CLAIMS ARE ENTITLED TO THEIR PRIORITY DATE**

14        LG argues almost every limitation of the '351 Patent lacks support in priority

15   Canadian Patent Application No. 2,393,373 ("the '373 App.", Ex. A) (filed July 15,

16   2002).[5] This demonstrates LG's continued overreach. Dr. Gitlin addresses each of the

17   limitations and opines that there is ample support. Moreover, three administrative

18   patent judges at the PTAB unanimously rejected LG's arguments.

19      A.   <u>LG Recycles Arguments the PTAB Already Rejected</u>

20        LG's arguments mirror the arguments LG made to the PTAB in IPR2018-

21   00710. In that IPR, LG asserted that alleged "prior art" (dated long after the priority

22   date) invalidated the claims because the claims were "neither actually nor inherently

23   disclosed by the Foreign Application." Ex. T (LG's IPR Petition) at 9, 5-10. For

24   example, LG argued "the '351 Patent does not describe any method in which a

25

26   ───────────────

27   [5] LG does not challenge continuity of disclosure, but the same or similar disclosures are in each application in the priority chain. *E.g.*, Ex. Z (App. 10/521,581); Ex. AA (App. 12/028,365); Ex. AB (App. 13/468,925); Ex. AC (App. 14/102,120); Ex. AD (14/292,380).

28

1  '**traffic shaping rate**' is used or where a '**traffic shaping rate is not reached**'—

2  much less using such a rate in the context of the algorithm now claimed. In fact, the

3  '351 Patent only disclosed a 'priority' based method and **never provides for utilizing**

4  **a 'traffic shaping rate,'** as now claimed." *Id*. at 7-8 (emphasis added). This is

5  essentially the same argument LG makes in its current motion.

6      The PTAB flatly rejected LG's arguments and "agree[d] with [Wi-LAN] that

7  the '351 patent is entitled to the filing date of the Foreign Application." Ex. U

8  (Decision Denying IPR Institution) at 17, 9-20. In other words: three different

9  administrative patent judges unanimously agreed with Wi-LAN that the '351 Patent

10  is entitled to its priority date. This alone defeats LG's motion for summary judgment.

11      The PTAB found LG's arguments "fail[ed] to consider the written disclosure

12  of the '351 patent from the perspective of a [POSITA] and narrowly focuses on Figure

13  5 in isolation." *Id*. at 17. LG does the same thing here—seeking to isolate portions of

14  the disclosure and arguing that those select portions do not use the exact term "traffic

15  shaping rate." *See*, *e.g*., LG Br. at 16 ("Dr. Gitlin confirmed that Figure 5 of the '373

16  App. says nothing about traffic shaping or a traffic shaping rate"). Moreover, the

17  PTAB found LG's expert failed to "tak[e] into account the general knowledge of a

18  [POSITA] at the time of filing of the Foreign Application" and held "the absence of

19  the exact claim term 'traffic shaping rate' does not show that the '351 patent does not

20  'reasonably convey to those skilled in the art that the inventor had possession of the

21  claimed subject matter as of the filing date.'" Ex. U at 18 (quoting *Ariad*, 598 F.3d at

22  1351).

23      The PTAB concluded "the Foreign Application would have reasonably

24  conveyed to a person of ordinary skill in the art in 2002 that the inventors had

25  possession at that time of the later claimed subject matter." *Id*. at 20. As a result, the

26  PTAB found LG failed to show **even a "reasonable likelihood"** of prevailing on

27

28

1  invalidity. *Id*. at 22 (emphasis added).[6]

2      LG now repackages the same arguments the PTAB rejected. LG's attempt to

3  recycle the same arguments that failed to raise even a "reasonable likelihood" of

4  success, despite facing a more demanding burden on summary judgment, should

5  cause the Court to question the many strained characterizations LG makes across its

6  wide universe of MSJ briefing.

7     B. <u>LG Mischaracterizes Dr. Gitlin's Report</u>

8      LG incorrectly states "Dr. Gitlin failed to address all the limitations of the

9  Asserted Claims in his analysis of the '373 App." and only provided "conclusory

10  analysis." LG Br. at 12. Instead, it is LG's expert, Mr. Proctor, who failed to address

11  the claim limitations or provide any real analysis in the mere **2 pages** in which he

12  addresses the '373 App. *See* LG Ex. 2 (Proctor Rpt.) at ¶¶379-388. In contrast, Dr.

13  Gitlin's report includes **25 pages** of analysis: (1) ¶¶1168-1176; (2) claim charts

14  attached as part of exhibit C in his report (*see* PDF pages 513-527, which Dr. Gitlin

15  incorporates by reference into Ex. K at ¶1171); and (3) his prior declaration attached

16  as part of exhibit C (*see* ¶¶29-47 of prior dec, incorporated at n. 25 in his report). Dr.

17  Gitlin's detailed analysis creates fact questions that defeat summary judgment.

18      LG also argues Dr. Gitlin "incorrectly assumed that LG has the burden of

19  proving that the Asserted Claims are not entitled to their claimed priority date." LG

20  Br. at 12. But Dr. Gitlin followed the correct legal framework recited Section II, *supra*

21  (discussing shifting burdens). Ex. K at ¶1172. In contrast, Mr. Proctor did not follow

22  the law.

23     C. <u>The '373 App. Discloses Traffic Shaping Using an Associated Rate as a Limit</u>
24       <u>on a Per Logical Channel Basis</u>

25      LG's primary argument is an alleged lack of disclosure of the term "traffic

26  shaping rate" in the context of "logical channel queue[s]." LG Br. at 12-13. As shown

27   

28  [6] The PTAB also rejected LG's motion for reconsideration, finding LG's request relied on "mischaracterizing [the PTAB's] Decision." Ex. V at 3.

above, this is the same argument the PTAB rejected. Dr. Gitlin cites multiple specification passages as supporting the claimed features. Ex. K (at exhibit C thereto) at PDF pages 513-527 (citing, *e.g.*, Ex. A at 9:4-21; 11:17-12:30; 12:31-13:17; 13:14-18; 17:3-7; Figs 3-6); *id.* at pars. 1172-73. For example, the '373 App. explicitly teaches traffic shaping to limit the data rate (*i.e.*, a "traffic shaping rate") on a per logical channel basis:

> Further, **traffic shapers** can be implemented and configured on a **per logical channel basis**. This allows, for example, voice telephony data to be transferred over link 40 as necessary, while other data types can be data **rate** limited according to parameters defined by the network operator. Thus, a telephony call can be conducted unimpeded while a file transfer or other large data transfer can be subject to a leaky bucket, or other traffic shaping process.

Ex. A at 17:3-7. As Dr. Gitlin explained, a POSITA would "understand a 'traffic shaping rate' from this disclosure (and others)—even though the specification never uses all three terms ('traffic,' 'shaping,' and 'rate') back-to-back-to-back…" Ex. K at ¶ 1172.[7] Additionally, as Dr. Gitlin explains, a POSITA would understand the above-quoted passage's reference to "leaky bucket" to describe one type of traffic shaping rate algorithm. *See, e.g.*, Ex. K at PDF pages 592-597.

D. The '373 App. Discloses a Link Controller According to the Claims

LG alleges that the '373 App. does not disclose a "traffic shaping rate" as used in each of the traffic shaping rate limitations performed by the link controller. *See* LG Br. at 13-18. The '373 App. expressly discloses a link controller operable to carry out the described subject matter. For example, the '373 App. states the "**RLC** 140 performs the prioritization, segmentation and, if desired, **traffic shaping** of data

---

[7] LG claims Dr. Gitlin "testified during his deposition that a data rate limit is *not* a 'traffic shaping rate.'" LG Br. at 13. This is untrue. Here is the exchange: "Q. Is a data rate limit a traffic shaping rate? A. It's the other way around. **The traffic shaping rate is a data -- is a data rate limit.** Q. But is a data rate limit a traffic shaping rate? A. **Not necessarily**." Ex. W (Gitlin Tr.) at 127:2-8 (emphasis added). That a "data rate limit" can be used for things besides traffic shaping is of no moment.

packets for transmission over the available radio resources." Ex. A at 11:17-18. "RLC" stands for "radio link controller." *Id.* at 5:21-22 ("representing the steps performed by a Radio Link Controller to select and transmit a segment of a packet."); *id.* at Figure 5 (describing steps taken by link controller).

### 1. "Operating" Limitation

LG argues "[t]he '373 App. does not disclose…performing the step of 'operat[ing] a plurality of logical channel queues for transmitting data, ***each*** of the logical channel queues is capable of being associated with…a traffic shaping rate....'" LG Br. at 14. Dr. Gitlin's report shows this to be wrong. On top of the multiple specification passages cited above, Dr. Gitlin also cites the following '373 specification passages as supporting this feature because they describe the RLC operating logical channel queues: 4:20-23; 10:5-8; and 15:27-29. Ex. K (at exhibit C thereto) at PDF page 525, 513-527 (citing, *e.g.*, Ex. A at 9:4-21; 11:17-12:30; 12:31-13:17; 13:14-18; 17:3-7; Figs 3-6).

Moreover, the specification language block-quoted above makes clear that "traffic shapers can be implemented and configured on a per logical channel basis." In other words, the RLC controls the traffic shaping rate for each logical channel queue. LG turns this specification language on its head, arguing that it "expressly discloses that certain data types (e.g., voice data) are ***not*** data rate limited and [ ] are expressly ***not capable of being associated with a traffic shaping rate*.**" LG Br. at 14. But the specification never states that any data type cannot be subject to a traffic shaping rate. Indeed, the fact that traffic shaping is optional and can be applied (or not) on a per logical channel queue basis supports <u>Wi-LAN's</u> position—not LG's. Nor did Dr. Gitlin make any admissions in his deposition when LG's counsel asked him to answer questions "strictly off of the [specification] passage I just read." *See, e.g.*, ECF No. 188-6 at 127:2-130:7. LG cannot credibly dispute Dr. Gitlin's opinion that the '373 App. supports this portion of the claim.

### 2. *"Selecting" Limitation*

LG argues "[t]he '373 App. also does not disclose … performing the step of 'select[ing], from the plurality of logical channel queues, a highest priority logical channel queue having data available for transmission and ***whose traffic shaping rate is not reached***.'" LG Br. at 15. But as shown above and as stated by Dr. Gitlin in his report, the '373 App. discloses "select[ing] the logical channel queue with the highest priority" and using a traffic shaper to data rate limit on a per logical channel basis. Ex. K (at exhibit C thereto) at PDF pages 513-527 (citing, *e.g.*, Ex. A at 9:4-21; 11:17-12:30; 12:31-13:17; 13:14-18; 17:3-7; Figs 3-6); *id.* at ¶1175. This leads the RLC to select the highest priority channel whose traffic shaping rate has not been reached. *Id.* All of LG's arguments wrongly seek to isolate Figure 5 from the rest of the specification—exactly as LG did before the PTAB.

### 3. *"Allocating" Limitation*

LG argues "[t]he '373 App. also does not disclose … performing the step of 'allocat[ing] a portion of the data transmission capacity to the selected logical channel queue, wherein the allocated portion is limited by the traffic shaping rate associated with the selected logical channel queue…'" LG Br. at 16. LG is wrong. This limitation simply relates to a logical channel queue's allocation being limited by the traffic shaping rate. For all the reasons set forth above, there is ample specification support for this feature, as described by Dr. Gitlin. *See* Section 2, *supra*; Ex. K (at exhibit C thereto) at PDF pages 513-527 (citing, *e.g.*, Ex. A at 3:26-29, 9:4-21; 11:17-12:30; 12:31-13:17; 13:14-18; 17:3-7; Figs 3-6).

### 4. *"Repeatedly Consider" Limitation*

LG argues "[t]he '373 App. also does not disclose … performing the step of 'repeatedly consider[ing] a next highest priority logical channel queue to select and allocate.'" LG Br. at 16. LG's own expert failed to address the limitation at all. Additionally, along with the evidence discussed above, the '373 App. discloses placing packets for transmission into logical channel queues and then eventually

"repeating steps (i) through (iii) and step (iv) as necessary." '373 App. at 3:26-29 (outlining steps (i) through (iv)). Dr. Gitlin relies on this specification passage on top of the other disclosures above to show support for this limitation. Ex. K (at exhibit C thereto) at PDF pages 513-527 (citing, *e.g.*, Ex. A at 3:26-29, 9:4-21; 11:17-12:30; 12:31-13:17; 13:14-18; 17:3-7; Figs 3-6); *id.* at ¶ 1176.

## VI.  LG CANNOT MEET ITS INVALIDITY BURDEN FOR THE '351 PATENT

Like the '924 and '743 patents, LG cannot meet its burden for the '351 patent. *First,* as shown above, each asserted claim of the '351 Patent is entitled to the July 15, 2002 priority date of the '373 App. *Second,* for the same reasons addressed above for the '924 and '743 patents, LG waived this defense because it failed to raise it in the invalidity contentions. *See* Ex. Y. Nor did LG include this defense in the 20 grounds of anticipation or obviousness it elected for the '351 Patent under the Court's Order directing the parties the narrow the case. *See* ECF No. 187-11, 119. This violates the Local Rules, the Court's scheduling Order, and the Court's Order Limiting Claims and Prior Art. *See* Patent LR 3.3; ECF Nos. 36, 143; ECF No. 119. The defense should be struck.

*Third*, as noted above, LG presented no admissible evidence that any of the Accused Products were sold before the '351 Patent's filing date, so it cannot invoke the *Vanmoor* exception.

1

2   Dated: October 11, 2019    By: */s/ Christopher M. First*

3                             Victor M. Felix, SBN 179622

4                             Victor.Felix@procopio.com

5                             PROCOPIO, CORY, HARGREAVES & SAVITCH LLP

6                             525 B Street, Suite 2200

7                             San Diego, CA 92101

8                             Tel. (619) 515-3229
Fax (619) 744-5409

9                             Leslie V. Payne
TX. Bar No. 00784736 (admitted *pro hac vice*)

10                          lpayne@hpcllp.com

11                        Eric J. Enger
TX. Bar No. 24045833 (admitted *pro hac vice*)

12                        eenger@hpcllp.com

13                        Christopher M. First
TX. Bar No. 24095112 (admitted *pro hac vice*)

14                        cfirst@hpcllp.com
HEIM, PAYNE & CHORUSH LLP

15                        1111 Bagby St., Suite 2100
Houston, TX 77002

16                        T: (713)221-2000 F: (713)221-2021

17                        Attorneys for Plaintiffs *Wi-LAN.*

18

19

20

21

22

23

24

25

26

27

28

1

## **CERTIFICATE OF SERVICE**

I hereby certify that on October 11, 2019, I served this **WI-LAN'S OPPOSITION TO LG'S MOTIONS FOR SUMMARY JUDGMENT THAT EVERY CLAIM LACKS PRIORITY AND THAT EVERY CLAIM IS INVALID ANTICIPATED UNDER 35 U.S.C. § 102** via ECF on the following:

| | |
|---|---|
| Joseph S. Leventhal<br>Dinsmore & Shohl LLP<br>655 West Broadway, Suite 840<br>San Diego, CA 92101<br>joseph.leventhal@dinsmore.com | Richard D. Harris<br>James J. Lukas, Jr.<br>Greenberg Traurig, LLP<br>77 West Wacker Drive, Suite 3100<br>Chicago, IL 60601<br>harrisr@gtlaw.com<br>lukasj@gtlaw.com |

By:    /s/ Christopher M. First
        Christopher M. First