Victor M. Felix, SBN 179622
Victor.Felix@procopio.com
PROCOPIO, CORY, HARGREAVES
& SAVITCH LLP
525 B Street, Suite 2200
San Diego, CA 92101
Tel. (619) 515-3229
Fax (619) 744-5409

Leslie V. Payne (TX Bar No. 00784736) (*Pro Hac Vice*)
lpayne@hpcllp.com
Eric J. Enger (TX Bar No. 24045833) (*Pro Hac Vice*)
eenger@hpcllp.com
Christopher M. First (TX Bar No. 24095112) (*Pro Hac Vice*)
cfirst@hpcllp.com
Alden G. Harris (TX Bar No. 24083138) (*Pro Hac Vice*)
aharris@hpcllp.com
HEIM, PAYNE & CHORUSH LLP
1111 Bagby St., Suite 2100
Houston, TX 77002
T: (713) 221-2000
F: (713) 221-2021

Attorneys for Plaintiffs *Wi-LAN*

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WI-LAN INC.; WI-LAN USA, INC.; and WI-LAN LABS, INC.,<br><br>                                    Plaintiffs,<br><br>v.<br><br>LG ELECTRONICS, INC.;<br>LG ELECTRONICS U.S.A., INC.; and<br>LG ELECTRONICS MOBILECOMM<br>U.S.A., INC.,<br><br>                                    Defendants. | Case No.:  3:18-cv-01577-H-AGS<br><br>**STATEMENT OF GENUINE DISPUTES RE: LG'S MOTION FOR SUMMARY JUDGMENT THAT (1) THE ASSERTED CLAIMS OF THE PATENTS-IN-SUIT ARE NOT ENTITLED TO PLAINTIFFS' CLAIMED PRIORITY DATES; AND (2) THE ASSERTED CLAIMS OF THE PATENTS-IN-SUIT ARE INVALID UNDER 35 U.S.C. § 102** |

Along with its Motion for Summary Judgment regarding the priority dates of the '924, '743, and '351 Patents, LG filed a "statement of undisputed material facts" that is nothing of the sort. *See* ECF No. 188-2 at 2. LG's statement of "facts" is largely composed of attorney argument reflecting LG's positions in this case. *See, e.g.*, ECF No. 188-2 at par. 45 ("The term 'traffic shaping' appears several times in the specification of the '373 App., but none of those instances has anything to do with a traffic shaping rate.") In other instances, LG goes even further, presenting the ultimate legal conclusions argued by LG in its Motion as "undisputed" facts. *See, e.g.*, *id*. at par. 49 ("The '373 App. does not disclose 'allocat[ing] a portion of the data transmission capacity to the selected logical channel queue, wherein the allocated portion is limited by the traffic shaping rate associated with the selected logical channel queue…'"). LG has no good-faith basis to contend these "facts" are "undisputed" by Wi-LAN.

Moreover, LG's arguments do not conform to FED. R. CIV. P. 56 simply because LG calls them "facts." These arguments couched as "facts" do not support summary judgment and should be disregarded by the Court. *See Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003); *Block v. City of Los Angeles*, 253 F.3d 410, 418-19 (9th Cir. 2001). Indeed, no formal response or objections is required to such "facts" because "objections to evidence on the ground that it is irrelevant, speculative, and/or argumentative, or that it constitutes an improper legal conclusion are all duplicative of the summary judgment standard itself" and need not be memorialized. *See Burch v. Regents of Univ. of Cal.*, 433 F.Supp.2d 1110, 1119 (E.D. Cal. 2006). Nevertheless, Wi-LAN specifically disputes the below "facts" (LG's most egregious mischaracterizations) and incorporates by reference into this responsive statement of facts its opposition filed herewith. For any facts not specifically addressed below, Wi-LAN includes evidentiary citations in its opposition to the extent they bear on the issues addressed in the Motion.

| Alleged Uncontroverted Fact in LG's Separate Statement of Uncontroverted Facts (Dkt. No. 188) | Wi-Lan's Response to Alleged Uncontroverted Fact |
|---|---|
| 15. Each of the Asserted Claims of the '924 patent requires "a wireless cellular mobile unit," "a wireless cellular communication system," or "a wireless communication network." ('924 patent, Ex. 11, at Claims 1, 2, 17, and 19.) | Wi-LAN disputes LG's characterization of the '924 patent to the extent it seeks to modify the plain language of the claims by suggesting that the terms it refers to appear in "each" claim. The claims speak for themselves. '924 patent, LG Ex. 11, at Claims 1, 2, 17, and 19. *See also* evidence cited in Opposition filed herewith. |
| 16. Each of the Asserted Claims of the '743 patent requires a "cellular telephone" in a "wireless communication system." ('743 patent, Ex. 12, at Claims 6-9.) | Wi-LAN disputes LG's characterization of the 743 patent to the extent it seeks to modify the plain language of the claims by suggesting that the terms it refers to appear in "each" claim. The claims speak for themselves. '743 patent, Ex. 12, at Claims 6-9. *See also* evidence cited in Opposition filed herewith. |
| 17. The term "wireless cellular mobile unit" does not appear anywhere in the '518 App. (*See generally* '518 App., Ex. 1.) | Wi-LAN disputes LG's mischaracterization of the contents of the '518 App. and the term "wireless cellular mobile unit." Wi-LAN was in possession of the "wireless cellular mobile unit." Gitlin Expert Rpt. Ex. K at ¶¶1141-43. *See also* evidence cited in Opposition filed herewith. |
| 18. The term "cellular telephone" (from the '743 patent) appears only once in the '518 App. in the context of the larger phrase "mobile cellular telephone systems." ('518 | Wi-LAN disputes LG's mischaracterization of the contents of the '518 App. and the term "cellular telephone." |

| | |
|---|---|
| App., Ex. 1, at 1:22.) | The disclosures of the '518 App. speak for themselves. In addition, the '518 App. adequately describes the term "cellular telephone." Gitlin Expert Rpt. Ex. K at ¶¶ 1141-45. *See also* evidence cited in Opposition filed herewith. |
| 19. Wi-LAN's validity expert, Dr. Gitlin, relies upon the phrase "mobile cellular telephone systems" to opine that a person of ordinary skill in the art would understand that the '518 App. describes the claimed "cellular telephone" and "wireless cellular mobile unit" because the phrase "mobile cellular telephone systems" relates to a "'portable' wireless unit," a "mobile cellular telephone system," or a "personal communication system." (Gitlin Report, Ex. 3, ¶¶ 1142-1144 (citing '518 App., Ex. 1, at 1:19-23).) | Wi-LAN disputes LG's characterization of Dr. Gitlin's expert report. Dr. Gitlin's report speaks for itself. It eloquently describes his reasoning as to why the '518 App. adequately describes the terms "cellular telephone" and "wireless cellular mobile unit." *See* Gitlin Expert Rpt. Ex. K at ¶¶ 1141-45. *See also* evidence cited in Opposition filed herewith. |
| 20. To one of ordinary skill in the art at the time of the alleged invention of the '924 patent, a "wireless cellular mobile unit" is a unit designed to wirelessly connect to a cellular system and that is designed for "on-the-go" use in more than one location, *i.e.,* designed for handovers from one cell to the next while maintaining the same communications session. (Proctor Invalidity Report, Ex. 2, ¶ 404; *see also* Lomp Dep. Tr., Ex. 8, at 32:7-33:3 ("Q. My question is what's a mobile terminal that's not cellular? A. It's a mobile terminal that is communicating with something other than what we normally think of as a cellular network. Q. What's a cellular | Wi-LAN disputes LG's undisputed fact to the extent it mischaracterizes the '924 patent. None of the '924 claims mention "handover." *See generally,* '924 Patent, LG Ex. 11; Gitlin Expert Rpt. Ex. K at ¶ 1140 ("None of the '924 claims require the wireless cellular mobile unit to execute any type of handover, or communicate with more than one base station."). Instead, the '924 patent claims cover requesting and allocating bandwidth. '924 22:42- |

network? A. The common understanding of the term cellular network is a network that covers a geographical area or region with coverage areas. Coverage areas themselves are referred to as cells, and the cells have usually a central base station or tower which has a footprint of coverage which defines the cell. Q. Okay. So the cellular is defined from the actual word 'cell'; is that correct? A. I'm not sure of the etymology, but – it sounds good, but I'm not sure. Q. Okay. It's not—I guess my question is: Is that how you get cell phone? Is that from cellular phone? A. My personal opinion is that's correct, yeah."); *see also* 7/29/19 Stanwood 30(b)(6) Dep. Tr., **Ex. 15**, at 93:14-94:3 (Q. What is—I'm looking at your abstract. And I see this a lot in your patents, capacity and spectrum constrained multiple access communication systems. What is that? A. Basically, a cellular system. Q. Cellular. A. For example, LTE."); *Wi-LAN USA, Inc. v. Telefonaktiebolaget LM Ericsson*, Case No. 12-cv-23569 (S.D. Fla.) ("Ericsson Case"), Supplemental Expert Report of Dr. Paul Min, **Ex. 16**, ¶ 83 (WiL-LG2-00051791) ("In order to provide coverage to a larger geography, multiple base stations are used in a cellular network. When a mobile device moves out of a region served by one base station and into a region served by another, it is necessary to coordinate these base stations to maintain the connection to the mobile device, a process known as handover.").)

24:48.

The above notwithstanding, the '518 App. shows possession of a cell phone that can perform handover. Even LG admits that a POSITA recognizes such cell phones are "designed for handovers from one cell to the next." Proctor Invalidity Report, LG Ex. 2, ¶ 404.

*See also* evidence cited in Opposition filed herewith.

| | |
|---|---|
| 21. To one of ordinary skill in the art at the time of the alleged invention of the '743 patent, a "cellular telephone" is a mobile telephone designed to connect to and permit communication from a cellular telephone | Wi-LAN disputes LG's characterization of the term "cellular telephone," Dr. Lomp and Kenneth Stanwood's testimony. The testimonies speak |

| | |
|---|---|
| network. (Proctor Invalidity Report, Ex. 2, ¶ 405; *see also* Lomp Dep. Tr., Ex. 8, at 32:7-33:3 ("Q. My question is what's a mobile terminal that's not cellular? A. It's a mobile terminal that is communicating with something other than what we normally think of as a cellular network. Q. What's a cellular network? A. The common understanding of the term cellular network is a network that covers a geographical area or region with coverage areas. Coverage areas themselves are referred to as cells, and the cells have usually a central base station or tower which has a footprint of coverage which defines the cell. Q. Okay. So the cellular is defined from the actual word 'cell'; is that correct? A. I'm not sure of the etymology, but – it sounds good, but I'm not sure. Q. Okay. It's not—I guess my question is: Is that how you get cell phone? Is that from cellular phone? A. My personal opinion is that's correct, yeah."); *see also* 7/29/19 Stanwood 30(b)(6) Dep. Tr., Ex. 15, at 93:14-94:3 (Q. What is—I'm looking at your abstract. And I see this a lot in your patents, capacity and spectrum constrained multiple access communication systems. What is that? A. Basically, a cellular system. Q. Cellular. A. For example, LTE.").) | for themselves. <br><br> Dr. Lomp's testimony simply explains what a cellular network is. *See* Lomp Dep. Tr. Ex. LG Ex. 8 at 32:7-33:3. It does not define what is a "cellular telephone." <br><br> Similarly, named inventor Kenneth Stanwood's deposition testimony does not define a "cellular telephone." *See* 7-29-19 Stanwood 30(b)(6) Dep. Tr. LG Ex. 15 at 93:14-94:3. He simply states that LTE is an example of a cellular system. <br><br> *See also* evidence cited in Opposition filed herewith. |
| 22. A "cellular telephone" is not designed for use in a single, fixed location, but is designed to travel from cell to cell and communicate with multiple base stations while maintaining communication during the handover. (Proctor Invalidity Report, Ex. 2, ¶ 405.) | Wi-LAN disputes LG's mischaracterization of the term "cellular telephone." <br><br> None of the '924 and '743 claims require the wireless cellular mobile unit, or cellular telephone, "to execute any handover or communicate with multiple base stations." Gitlin Expert Rpt. Ex K at ¶¶ 73, 1140. |

| | |
|---|---|
| | *See also* evidence cited in Opposition filed herewith. |
| 23. A "cellular telephone" is not a CPE because it is designed to travel from cell-to-cell during a call, *i.e.*, not designed to be used in a single, fixed location. (Proctor Invalidity Report, Ex. 2, ¶ 411.) | Wi-LAN disputes LG's mischaracterization of the term "cellular telephone." |
| | Persons of ordinary skill recognize that a CPE can be a "cellular telephone." Gitlin Expert Rpt. Ex. K at ¶¶ 1148-50. As Dr. Gitlin describes, a person of ordinary skill would have been aware of art that refers to CPEs as "wireless cellular phones," "cellular telephones," and "wireless communication systems." *Id.* Further, the '518 App. clearly distinguishes between a CPE and a "fixed subscriber station." *Id.* at ¶ 1150. Accordingly, a CPE can include a "cellular telephone." |
| | None of the '924 and '743 claims require the wireless cellular mobile unit, or cellular telephone, "to execute any handover or communicate with multiple base stations." Gitlin Expert Rpt. Ex K at ¶¶ 73, 1140. |
| | *See also* evidence cited in Opposition filed herewith. |
| 24. A "wireless cellular mobile unit" is not a CPE because it is designed for "on-the-go" use in more than one location, *i.e.*, designed for handovers from one cell to the next while maintaining the same communications | Wi-LAN disputes LG's mischaracterization of the term "wireless cellular mobile unit." Persons of ordinary skill |

| | |
|---|---|
| session. (Proctor Invalidity Report, Ex. 2, ¶ 411.) | recognize that a CPE can be a "wireless cellular mobile unit." Gitlin Expert Rpt. Ex. K at ¶ 1148-50. As Dr. Gitlin describes, a person of ordinary skill would have been aware of art that refers to CPEs as "wireless cellular phones," "cellular telephones," and "wireless communication systems." *Id.* Further, the '518 App. clearly distinguishes between a CPE and a "fixed subscriber station." *Id.* at ¶ 1150. Accordingly, a CPE can include a "wireless cellular mobile unit." |
| | None of the '924 and '743 claims require the wireless cellular mobile unit, or cellular telephone, "to execute any handover or communicate with multiple base stations." Gitlin Expert Rpt. Ex K at ¶¶ 73, 1140. |
| | *See also* evidence cited in Opposition filed herewith. |
| 25. The '518 App., to which both the '924 and '743 patents claim priority, describes a fixed system in which fixed CPEs reside in the same cell as a base station. (*See generally* '518 App., Ex. 1; Proctor Invalidity Report, Ex. 2, ¶¶ 400-412; 1/18/18 Mollenauer Dep. Tr., **Ex. 17**, at 143:15-18; 144:2-9 (named inventor admitting that Ensemble patents do not disclose handover); 8/29/19 Gilbert Dep. Tr., **Ex. 18**, at 17:9-18 (Q. What are subscriber units? A. It's also called CPE, customer premise equipment. It's the—it's the other end of the radio link. It's what a user | Wi-LAN disputes LG's mischaracterization of the '924 and '743 patent claims and disclosures regarding fixed CPEs. <br><br> *First*, the '924 and '743 patents are not limited to fixed CPEs. For example, the '518 App. distinguishes between "CPEs" and "fixed subscriber stations." '518 App. Ex. B at 2:11-13; Gitlin Expert Rpt. Ex. K at 1150. |

would connect to—broadband wireless access means a fixed wireless system for businesses to access the Internet. And so the subscriber unit is what sits at the business and the base station is what the carrier deploys and connects directly to the Internet or the phone network.").)

*Second*, LG's characterization of fixed CPEs disregards the term's evolution to a more modern term encompassing equipment that is not fixed. *See* Lomp 2-7-19 Dep. Tr. Ex. S at 15:25-16:17, 18:10-24.

*Third*, the '518 App. discloses the communication system from Figure 1 operating on a point-to-multi-point basis. '518 App. Ex. B at 10:3-4. This point-to-multi-point communication is not limited to a single cell as mobility has no real relationship to the concept of "point-to-multi-point." Gitlin Expert Rpt. Ex. K at ¶ 94.

*Fourth*, none of the '924 and '743 claims require the wireless cellular mobile unit, or cellular telephone, "to execute any handover or communicate with multiple base stations." Gitlin Expert Rpt. Ex. K at ¶¶ 73, 1140.

*Finally*, Mr. Gilbert simply testified about specific "fixed wireless system for businesses to access the Internet." 8-29-19 Gilbert Dep. Tr. LG Ex. 18 at 17:12-14. However, the '518 App. clearly discloses embodiments beyond business access to internet. For example, the '518 App. provides disclosures for voice and video services. '518 App. Ex. B at 10:31-11:3.

| | Accordingly, Wi-LAN disputes LG's mischaracterization of the '924 and '743 patent claims and disclosures regarding fixed CPEs.<br><br>*See also* evidence cited in Opposition filed herewith. |
|---|---|
| 26. The '518 App. describes that a CPE receives a unique permanent address upon registering with a cell's base station, and that a CPE is fixed equipment designed for use at a single location, within a single cell. ('518 App., Ex. 1, at 15:11-13 ("A CPE 110 must first be registered and achieve uplink synchronization with a base station before it is allowed to request bandwidth allocation."); *id.* at 22:2-3, Figs. 12 and 13 (As part of this registration, each "CPE is assigned a unique permanent address … that is used in the registration process."); 3/26/14 Mollenauer Dep. Tr., **Ex. 19**, at 50:5-23 (named inventor explaining that the initial invention was a fixed wireless system, and that "the subscriber stations were expected to stay in one place, or if they did move, they had to reinitialize."); 1/18/18 Mollenauer Dep. Tr., Ex. 17, at 155:20-23 ("Q. And is it true that at the time that you were working for Ensemble, that CPEs will join the system infrequently? A. As a fixed system, yes.").) | Wi-LAN disputes LG's mischaracterization of the '518 App.'s disclosures regarding receiving a unique permanent address, registering with a cell's base station, and a CPE's fixed qualities.<br><br>Persons of ordinary skill recognize that cell phones are assigned a mix of permanent and temporary identifiers that are unique to a specific base. Gitlin Expert Rpt. Ex. K at ¶¶ 97-99. The fact that this happens, however, "does not mean that the cell phone is limited to a fixed, single cell environment." *Id.* at ¶ 99.<br><br>Disclosures of the '518 App. are not limited to fixed CPEs. For example, the '518 App. distinguishes between "CPEs" and "fixed subscriber stations." '518 App. Ex. B at 2:11-13; Gitlin Expert Rpt. Ex. K at 1150. Accordingly, Wi-LAN disputes LG's mischaracterization of the '518 App.'s disclosures. |

| | |
|---|---|
| | *See also* evidence cited in Opposition filed herewith. |
| 27. If a CPE is assigned a unique permanent address, and is subsequently moved to a different cell served by a different base station, then the new base station would be ignorant of that CPE, and the new base station would not be able to allocate bandwidth to the CPE. (Proctor Invalidity Report, Ex. 2, ¶ 409.) | Wi-LAN disputes LG's mischaracterization of the CPE's inability to move from base station to base station.<br><br>Persons of ordinary skill recognize that cell phones are assigned a mix of permanent and temporary identifiers that are unique to a specific base. Gitlin Expert Rpt. Ex. K at ¶¶ 97-99. The fact that this happens, however, "does not mean that the cell phone is limited to a fixed, single cell environment." *Id.* at ¶ 99.<br><br>*See also* evidence cited in Opposition filed herewith. |
| 28. The '518 App. describes that communications between a CPE and a base station all occur within a single cell. ('518 App., Ex. 1, at 2:15-20, Figure 1 ("Each cell 102 provides wireless connectivity between the cell's base station 106 and a plurality of customer premises equipment (CPE) 110 positioned at fixed customer sites 112 throughout the coverage area of the cell 102."); *id.* at 10:3-4, 9-10 ("The downlink of the communication system shown in FIGURE 1 operates on a point-to-multi-point basis (i.e., from the base station 106 to the plurality of CPEs 110). . . . The base station is the only transmitter operating in the downlink direction, hence it transmits without having to coordinate with other base stations….").) | Wi-LAN disputes LG's mischaracterization of the communications between a CPE and a base station.<br><br>The '518 App. discloses the communication system from Figure 1 operating on a point-to-multi-point basis. '518 App. Ex. B at 10:3-4. This point-to-multi-point communication is not limited to a single cell as mobility has no real relationship to the concept of "point-to-multi-point." Gitlin Expert Rpt. Ex. K at ¶ 94. Accordingly, such communications between a CPE and a base station need not occur |

| | within a single cell. *See also* evidence cited in Opposition filed herewith. |
|---|---|
| 29. Where the '518 App. references alternative communication systems, those alternative systems use a CPE in a fixed location within a single cell. ('518 App., Ex. 1, at 34:12-14 (teaching that "the present invention can be used in a wired communication system. The only difference between the wired system and the wireless system described above is that the channel characteristics vary between the two.").) | Wi-LAN disputes LG's mischaracterization of alternative communication systems.<br><br>The language of the '518 App.'s specification speaks for itself. In the case of the wired communication system, "[t]he only difference between the wired system and the wireless system . . . is that the channel characteristics vary between the two." '518 App. Ex. B at 32:12-14. It does not detail whether it needs to be fixed, or within a single cell. *See* Gitlin Expert Rpt. Ex. K at ¶ 974 ("Wired and wireless networks have very different characteristics . . . .").<br><br>*See also* evidence cited in Opposition filed herewith. |
| 30. The only way that the invention disclosed in the '518 App. would work in a wired system is if the CPE is fixed at a single location, and communicates with a single base station within a single cell. (Proctor Invalidity Report, Ex. 2, ¶ 400.) | Wi-LAN disputes LG's mischaracterization of alternative communication systems.<br><br>The language of the '518 App.'s specification speaks for itself. In the case of the wired communication system, "[t]he only difference between the wired system and the wireless system . . . is that the channel characteristics vary between the two." '518 App. Ex. B at 32:12-14. It does not |

| | |
|---|---|
| | detail whether it needs to be fixed, or within a single cell. *See* Gitlin Expert Rpt. Ex. K at ¶ 974 ("Wired and wireless networks have very different characteristics . . . ."). <br><br> *See also* evidence cited in Opposition filed herewith. |
| 31. The named inventors of the '924 and '743 patents testified that their invention and initial product included fixed CPEs used in a fixed wireless system. (*See* 8/29/19 Gilbert Dep. Tr., Ex. 18, at 17:4-18 (named inventor confirming that the physical product contained subscriber units/CPEs for broadband wireless access in a fixed wireless system); *see also* 3/27/13 Mollenauer Dep. Tr., **Ex. 20**, at 137:20-23 (named inventor confirming that Fig. 1, shared with a related patent, shows a "fixed wireless system"); 36:14-37:10 (explaining the initial product plan was for a fixed wireless system); 3/26/14 Mollenauer Dep. Tr., Ex. 19, at 50:5-23 (explaining that the initial invention was a fixed wireless system); 1/18/18 Mollenauer Dep. Tr., Ex. 17, at 37:5-17 (admitting that the "focus of the work at Ensemble, initially, at least, was on fixed stations."); *see also id.* at 53:18-7 (admitting that his participation in standard-setting organizations while at Ensemble also focused on fixed systems), 66:23-8 ("Q. What does 'fixed' mean in the context of the standard in Exhibit 4? A. "'Fixed'" means that it is assumed that the position of the subscriber unit does not change."), 140:16-23 ("Q. At Ensemble you weren't designing any LTE handsets, were you? A. Come on. Come on. LTE did not | Wi-LAN disputes LG's mischaracterization of the named inventors' testimonies to the extent LG seeks to imply that the '924 and '743 patents were only directed to fixed CPEs. <br><br> None of the deposition testimony cited by LG contains testimony that "their invention" was limited to a fixed system. *See* 8/29/19 Gilbert Dep. Tr., LG Ex. 18, at 17:4-18; *see also* 3/27/13 Mollenauer Dep. Tr., LG Ex. 20, at 137:20-23; 3/26/14 Mollenauer Dep. Tr., Ex. 19, at 50:5-23; 1/18/18 Mollenauer Dep. Tr., Ex. 17, at 37:5-17; *see also id.* at 53:18-7, 66:23-8, 140:16-23; *Wi-LAN v. Apple, Inc.*, Case No. 14-cv-1507 (S.D. Cal.) ("Apple Case"), Trial Tr., Dkt. No. 514, **Ex. 21**, at 43:13-19, 44:1-11; *see also id.* at 48:17-49:4. In fact, the inventors testified exactly opposite to LG's false characterization. Ex. Q at 25:5-11. *See also id.* at 79:24-80:5 ("we never intended not to do a mobile product."); 142:16-18 ("Q: So is |

-13-

exist. Anything I did at Ensemble had nothing to do with LTE. It couldn't have. Q. Okay. At Ensemble you weren't designing any mobile handsets, were you? A. No."); *Wi-LAN v. Apple, Inc*., Case No. 14-cv-1507 (S.D. Cal.) ("Apple Case"), Trial Tr., Dkt. No. 514, **Ex. 21**, at 43:13-19, 44:1-11 (Q. You declared the inventions of the predecessor patents to those two standards? A. Yes. Q. So the patents that existed were declared to the 802.16 standard? A. Correct . . . Q. Now the 802.16 2001 standard was a fixed standard? A standard for fixed devices, right? A. Correct. Q. And fixed means not portable, not mobile, right? A. That's not true. Q. Fixed is the idea of it's actually stationary in one place? A. Yes. Q. It's not a cell phone? A. No. Q. It's not mobile? A. No.) (discussing related patents); *see also id.* at 48:17-49:4 (Q. So the fiberless product that you worked on for this time period was stationary? A. Yes. Q. It was a fixed not mobile system? A. That's correct. Q. And when you were at Ensemble, you didn't work on any products that involved a mobile handset? A. That's correct. Q. You didn't design any products for mobile technology? A. That's correct. Q. And you didn't do any product development for mobile technology? A. That's correct.).)

there any reason your invention would be limited to only use in a fixed system? A: Not at all."); 143:12-16 ("In the wireless case, especially in -- in this kind of metropolitan network it is very important, and the things we did at Ensemble work very favorably in making it as efficient as possible.")

Gilbert simply testified about specific "fixed wireless system for businesses to access the Internet." 8-29-19 Gilbert Dep. Tr. LG Ex. 18 at 17:12-14. However, the '518 App. clearly discloses embodiments beyond business access to internet. For example, the '518 App. provides disclosures for voice and video services. '518 App. Ex. B at 10:31-11:3.

Mollenauer testified about subscriber units not being tied to specific end users. Mollenauer Dep. Tr. LG Ex. 17, at 137:14-17. Whether it is a "fixed wireless system" is not answered by Mollenauer—it is simply a statement from the attorney deposing Mollenauer. *See id.* at 137:20-23 ("Q. This is a fixed wireless system. A. You know, and we had the idea of a rooftop antenna and various users inside the building.").

In another deposition, Mollenauer

| | |
|---|---|
| | also testified that the invention, initially, could also be applied to mobile, rather than only fixed stations. *See* 01-18-18 Mollenauer Dep. Tr. at 38:2-4 ("A. I'm quite sure that we never – I think I would have definitely noted that in some way, that this was fixed only."); *see also* 65:22-66:3 ("Q. Outside of communications with counsel, do you have any basis of knowing that the LTE standards implement your patents at all? A. Yeah, I do."). *See also supra.*<br><br>While the '924 and '743 patents include a fixed embodiment, they also disclose mobile CPEs. *See* Gitlin Expert Rpt. Ex. K at ¶¶ 1141-45.<br><br>*See also* evidence cited in Opposition filed herewith. |
| 32. Wi-LAN and the named inventors also testified that the commercial embodiment of the '518 App., named "Fiberless," was a fixed, not mobile, system:<br>Q. So the fiberless product that you worked on for this time period was stationary?<br>A. Yes.<br>Q. It was a fixed not mobile system?<br>A. That's correct.<br>Q. And when you were at Ensemble, you didn't work on any products that involved a mobile handset?<br>A. That's correct.<br>Q. You didn't design any products for mobile technology?<br>A. That's correct. | None of the deposition testimony cited by LG contains testimony that the original commercial embodiment of Ensemble's "Fiberless" system was limited to a fixed system. *See* 8/29/19 Gilbert Dep. Tr., LG Ex. 18, at 17:4-18; *see also* 3/27/13 Mollenauer Dep. Tr., LG Ex. 20, at 137:20-23; 3/26/14 Mollenauer Dep. Tr., Ex. 19, at 50:5-23; 1/18/18 Mollenauer Dep. Tr., Ex. 17, at 37:5-17; *see also id.* at 53:18-7, 66:23-8, 140:16-23; *Wi-LAN v. Apple, Inc.*, Case No. 14-cv-1507 (S.D. Cal.) ("Apple |

| | |
|---|---|
| Q. And you didn't do any product development for mobile technology? A. That's correct. (Apple Case, Trial Tr., Dkt. No. 514, Ex. 21, at 43:13-19.) | Case"), Trial Tr., Dkt. No. 514, **Ex. 21**, at 43:13-19, 44:1-11; *see also id.* at 48:17-49:4. In fact, the inventors testified exactly opposite to LG's false characterization. Ex. Q at 25:5-11. *See also id.* at 79:24-80:5 ("we never intended not to do a mobile product."); 142:16-18 ("Q: So is there any reason your invention would be limited to only use in a fixed system? A: Not at all."); 143:12-16 ("In the wireless case, especially in -- in this kind of metropolitan network it is very important, and the things we did at Ensemble work very favorably in making it as efficient as possible.") *See also* evidence cited in Opposition filed herewith. |
| 33. Wi-LAN's infringement expert, Dr. Lomp, testified that CPEs are fixed devices. (Case No. IPR2018-00673, 2/7/19 Lomp Dep. Tr., **Ex. 22**, at 15:24-16:10 ("Q. Are CPE fixed devices? A. In the original use of the term that I am aware of, that was the term for the inside wiring and instruments of the telephone network, the old wire telephone network, which is sometimes called 'POTS,' plain old telephone service. So the phone companies, Bell system, they used to refer to that equipment, which was inside the customer's house, as 'CPE,' and in which case it was—traditionally was fixed because it was wired.").) | Wi-LAN disputes LG's mischaracterization of the term "CPE" as a fixed device. In that same deposition that LG cites, Dr. Lomp describes the term's evolution to a more modern term encompassing equipment that is not fixed. *See* Lomp 2-7-19 Dep. Tr. Ex. S at 16:12-17 ("A. But then the term evolved, because of wireless developments that provided initially fixed access using wireless to replace the wires, but still being fixed, and then I suppose the term further evolved, once wireless was part of |

| | | |
|---|---|---|
| | | this picture, to include all customer equipment."). A few lines later, Dr. Lomp actually stated that the CPEs are not necessarily fixed. *Id.* at 18:10-11, 18:14 (Q. Would a person of ordinary skill in the art in 1999 consider a CPE to be fixed? . . . A. I would say not necessarily.). *See also* evidence cited in Opposition filed herewith. |
| 34. Wi-LAN's 30(b)(6) witness and the named inventors testified that Ensemble declared the '518 App. and its related applications to the IEEE 802.16 standard, which was a standard for ***fixed*** devices. (7/29/19 Stanwood 30(b)(6) Dep. Tr., Ex. 15, at 150:18-152:3; Apple Case, Trial Tr., Dkt. No. 514, Ex. 21, at 43:13-19, 44:1-11 (Q. You declared the inventions of the predecessor patents to those two standards? A. Yes. Q. So the patents that existed were declared to the 802.16 standard? A. Correct . . . Q. Now the 802.16 2001 standard was a fixed standard? A standard for fixed devices, right? A. Correct. Q. And fixed means not portable, not mobile, right? A. That's not true. Q. Fixed is the idea of it's actually stationary in one place? A. Yes. Q. It's not a cell phone? A. No. Q. It's not mobile? A. No.) (discussing related patents).) | | Wi-LAN disputes LG's mischaracterization of the '518 App.'s relationship with the IEEE 802.16 standard. Wi-LAN also disputes LG's mischaracterization that the 802.16 standard was only "a standard for fixed devices." The '518 App. discloses both fixed and non-fixed devices. '518 App. Ex. B at 2:11-13; Gitlin Expert Rpt. Ex. K at 1150. *See also* evidence cited in Opposition filed herewith. |
| 35. A significant portion of the Ensemble technology ended up becoming part of the IEEE 802.16 standard. (7/18/19 Mollenauer Dep. Tr., **Ex. 23**, at 27:1-19, 35:4-36:13; 7/29/19 Stanwood 30(b)(6) Dep. Tr., Ex. 15, at 151:23-152:3; 4/2/14 Gilbert Dep. Tr., **Ex.** | | Wi-LAN disputes LG's mischaracterization of Ensemble's technology in the IEEE 802.16 standard. Simply put, portions of the |

| | |
|---|---|
| **24**, at 73:12-74:18.) | Ensemble technology ended up being part of the IEEE 802.16 standard. *See* 7-29-19 Stanwood 30(b)(6) Dep. Tr. LG Ex. 24 at 151:23-152:3. Wi-LAN even disclosed the relevant patents to the IEEE during the standard setting process. *Id*. at 151:18-22.<br><br>*See also* evidence cited in Opposition filed herewith. |
| 36. Wi-LAN's validity expert, Dr. Gitlin, testified that a CPE is not the same as a cellular telephone or wireless cellular mobile unit. (Gitlin Report, Ex. 3, ¶¶ 1147-48; Ericsson Case, Supplemental Expert Report of Dr. Paul Min, Ex. 16, ¶ 83 (WiL-LG2-00051791) ("In order to provide coverage to a larger geography, multiple base stations are used in a cellular network. When a mobile device moves out of a region served by one base station and into a region served by another, it is necessary to coordinate these base stations to maintain the connection to the mobile device, a process known as handover.").) | Wi-LAN disputes LG's mischaracterization of the term "CPE" as well as LG's mischaracterization of Dr. Gltin's testimony.<br><br>Persons of ordinary skill recognize that a CPE can be a "wireless cellular mobile unit." Gitlin Expert Rpt. Ex. K at ¶ 1148. As Dr. Gitlin describes, a person of ordinary skill would have been aware of art that refers to CPEs as "wireless cellular phones," "cellular telephones," and "wireless communication systems." *Id.* Further, the '518 App. clearly distinguishes between a CPE and a "fixed subscriber station." *Id.* at ¶ 1150. Accordingly, a CPE can include a "wireless cellular mobile unit" and "cellular telephone."<br><br>In addition, none of the '924 or '743 patent claims mention "handover." *See generally,* '924 Patent, LG Ex. 11, 12. Instead, the |

| | |
|---|---|
| | '924 patent claims cover requesting and allocating bandwidth. '924 22:42-24:48.<br><br>*See also* evidence cited in Opposition filed herewith. |
| 38. Wi-LAN's validity expert, Dr. Gitlin, distinguished the Asserted Claims from certain prior art references by arguing that a POSITA would not understand the CPEs in such references to include cellular phones. (Gitlin Report, Ex. 3, ¶¶ 224, 604.) | Wi-LAN disagrees with LG's mischaracterization of Dr. Gitlin's opinion.<br><br>In distinguishing the DOCSIS references, Dr. Gitlin explains that DOCSIS shows the CPE as a computer attached to a cable modem that communicates via a wired cable network. Gitlin Expert Rpt. Ex. XX at 224. Accordingly, "[i]t would not make sense for a cell phone to only communicate via a cable modem . . . the cell phone would not be mobile." *Id.* Further, Dr. Gitlin notes that this "DOCSIS CPE scenario is very different from the case where a CPE cell phone communicates wirelessly with a cellular base station." *Id.*<br><br>*See also* evidence cited in Opposition filed herewith. |
| 39. The '518 App. does not describe cellular phones or wireless cellular mobile units. (Proctor Invalidity Report, Ex. 2, ¶¶ 400-414.) | Wi-LAN disputes LG's mischaracterization of the '518 App.'s disclosures.<br><br>Persons of ordinary skill recognize that a CPE can be a "cellular telephone" and a "wireless cellular mobile unit." Gitlin Expert Rpt. Ex. K at ¶ |

-19-

| | |
|---|---|
| | 1148-50. As Dr. Gitlin describes, a person of ordinary skill would have been aware of art that refers to CPEs as "wireless cellular phones," "cellular telephones," and "wireless communication systems." *Id.* Further, the '518 App. clearly distinguishes between a CPE and a "fixed subscriber station." *Id.* at ¶ 1150. Accordingly, a CPE can include a "cellular telephone" and a "wireless cellular mobile unit."

*See also* evidence cited in Opposition filed herewith. |
| 40. As described in the '518 App., a CPE is equipment designed for use at a fixed location to communicate with a single base station within a single cell. (Proctor Invalidity Report, Ex. 2, ¶¶ 406-410; *see also* '518 App., Ex. 1, at 2:15-20, 10:3-4, 10:9-10, 15:11-13, 22:2-3, 34:9-14, Fig. 1.) | Wi-LAN disputes LG's mischaracterization of the '518 App. disclosures regarding fixed CPEs, at a single cell.

*First*, the '518 App. disclosures are not limited to fixed CPEs. For example, the '518 App. distinguishes between "CPEs" and "fixed subscriber stations." '518 App. LG Ex. 1 at 2:11-13; Gitlin Expert Rpt. Ex. K at 1150. That is, the '518 App. describes both fixed and mobile (not-fixed) wireless communication systems.

*Second*, LG's characterization of fixed CPEs disregards the term's evolution to a more modern term encompassing equipment that is not fixed. *See* Lomp 2-7-19 Dep. Tr. Ex. S at 15:25-16:17, 18:10-24. |

| | |
|---|---|
| | *Finally*, the '518 App. discloses the communication system from Figure 1 operating on a point-to-multi-point basis. '518 App. Ex. K at 10:3-4. This point-to-multi-point communication is not limited to a single cell as mobility has no real relationship to the concept of "point-to-multi-point." Gitlin Expert Rpt. Ex. K at ¶ 94.<br><br>*See also* evidence cited in Opposition filed herewith. |
| 41. Wi-LAN admits that a wireless system and a mobile system are different from a cellular system. (Lomp Dep. Tr., Ex. 8, at 32:7-33:3 ("Q. My question is what's a mobile terminal that's not cellular? A. It's a mobile terminal that is communicating with something other than what we normally think of as a cellular network. Q. What's a cellular network? A. The common understanding of the term cellular network is a network that covers a geographical area or region with coverage areas. Coverage areas themselves are referred to as cells, and the cells have usually a central base station or tower which has a footprint of coverage which defines the cell. Q. Okay. So the cellular is defined from the actual word 'cell'; is that correct? A. I'm not sure of the etymology, but – it sounds good, but I'm not sure. Q. Okay. It's not—I guess my question is: Is that how you get cell phone? Is that from cellular phone? A. My personal opinion is that's correct, yeah."); *see also* 7/29/19 Stanwood 30(b)(6) Dep. Tr., Ex. 15, at 93:14-94:3 (Q. What is—I'm looking at your abstract. And I see this a lot in your | Wi-LAN disputes LG's mischaracterization of Lomp and Stanwood's testimonies.<br><br>The testimonies speak for themselves. Dr. Lomp did not state "a wireless system and a mobile system are different from a cellular system." He simply explained that there can be instances where a base station communicates with many mobile units but not cellular terminals, such as in the case of the Hulyalkar prior art that was the subject of the deposition questioning. *See* 09-27-19 Lomp Dep. Tr. at 32:3-19.<br><br>Similarly, Stanwood explained that LTE is an example of a cellular system. *See* 7-29-19 Stanwood 30(b)(6) Dep. Tr. LG Ex. 15 at 93:15-22. None of LG's exhibits show Stanwood being |

| | |
|---|---|
| patents, capacity and spectrum constrained multiple access communication systems. What is that? A. Basically, a cellular system. Q. Cellular. A. For example, LTE.").) | asked about, or opining on, "whether a wireless system and a mobile system are different from a cellular system." <br><br> *See also* evidence cited in Opposition filed herewith. |
| 44. The term "traffic shaping rate" does not appear anywhere in the '373 App. (*See generally* '373 App., Ex. 7; *see also* Proctor Invalidity Report, Ex. 2, ¶ 383.) | Wi-LAN disputes LG's mischaracterization of the term "traffic shaping rate" to the extent it seeks to imply that the term is not disclosed in the '373 App. <br><br> The '373 App. explicitly teaches traffic shaping by limiting the data rate (i.e., a "traffic shaping rate"). *See* '373 App. at 17:3-7. Further, a "person of ordinary skill in the art would still understand a 'traffic shaping rate' from this disclosure (and others)—even though the specification never uses all three terms ('traffic,' 'shaping,' and 'rate') back-to-back-to-back . . . ." Gitlin Expert Rpt. Ex. K at ¶ 1172. <br><br> *See also* evidence cited in Opposition filed herewith. |
| 45. The term "traffic shaping" appears several times in the specification of the '373 App., but none of those instances has anything to do with a traffic shaping rate. (*See* '373 App., Ex. 7, at 9:9-12, 11:17-24, 17:3-7, Claim 8; *see also* Proctor Invalidity Report, Ex. 2, ¶ 384.) | Wi-LAN disputes LG's mischaracterization of the term "traffic shaping" to the extent it seeks to imply that the term "traffic shaping rate" is not disclosed in the '373 App. <br><br> The '373 App. explicitly teaches traffic shaping by limiting the data |

| | |
|---|---|
| | rate (i.e., a "traffic shaping rate"). *See* '373 App. at 17:3-7. Further, a "person of ordinary skill in the art would still understand a 'traffic shaping rate' from this disclosure (and others)—even though the specification never uses all three terms ('traffic,' 'shaping,' and 'rate') back-to-back-to-back . . . ." Gitlin Expert Rpt. Ex. K at ¶ 1172. Accordingly, the term "traffic shaping rate" is adequately supported by the '373 App.<br><br>*See also* evidence cited in Opposition filed herewith. |
| 46. The '373 App. does not disclose any algorithm or flow chart for performing "traffic shaping." (*See generally* '373 App., Ex. 7; *see also* Proctor Invalidity Report, Ex. 2, ¶ 384; Gitlin Dep. Tr., Ex. 4, at 130:1-7, 130:13-16, 130:23-131:5.) | Wi-LAN disputes LG's mischaracterization of the term "traffic shaping" to the extent it seeks to imply that the term "traffic shaping rate" is not disclosed in the '373 App.<br><br>During the IPR2018-000710, the Patent Office confirmed that the "method recited in claim 1 is merely the method of Figure 5 in which the disclosed 'optional' traffic shaping is performed in the first iteration." Gitlin's Exprert Rpt. Ex. K at ¶ 1174 (citing Institution Decision in IPR2018-000710 at 20). Accordingly, the '373 App. does disclose a flow chart for performing "traffic shaping."<br><br>*See also* evidence cited in |

| | |
|---|---|
| | Opposition filed herewith. |
| 47. The '373 App. does not use the term "traffic shaping" to refer to a limitation on the amount of data transmission capacity allocated to a particular logical channel queue that is used to regulate traffic flow on the network, but instead simply refers to "traffic shaping" in general. (*See* '373 App., Ex. 7, at 9:9-12, 11:17-24, 17:3-7, Claim 8; *see also* Proctor Invalidity Report, Ex. 2, ¶ 384.) | Wi-LAN disputes LG's mischaracterization of the term "traffic shaping" to the extent it implies that some of the '351 claims are not disclosed by the '373 App.<br><br>The '373 App. clearly states that "traffic shapers can be implemented and configured on a per logical channel basis." '373 App. Ex. B at 17:3-4. And in the next sentence, it teaches that the traffic shaper can be used to "limit[]" the amount of data transmitted by that logical channel queue over the link. Gitlin Expert Rpt. Ex. K at ¶ 1173; *id*. at 17:5. Accordingly, LG's quoted limitation is adequately supported by the '373 App.<br><br>*See also* evidence cited in Opposition filed herewith. |
| 48. The '373 App. does not disclose "select[ing], from the plurality of logical channel queues, a highest priority logical channel queue having data available for transmission and whose traffic shaping rate is not reached," but instead merely discloses selecting a highest priority logical channel queue having data available for transmission. (*See generally* '373 App., Ex. 7; *see also* Proctor Invalidity Report, Ex. 2, ¶ 385.) | Wi-LAN disputes LG's mischaracterization of the '373 App.'s disclosures to the extent it implies that the quoted limitation is not adequately supported by the '373 App.<br><br>Persons of ordinary skill recognize the relevant limitation when Figure 5 in the '373 App., step 204 states to "select the logical channel queue with the highest priority assigned to the channel and whose segmentation |

| | cache is not empty," along with other portions of the specification that teach to also perform "traffic shaping." Gitlin Expert Rpt. Ex. K at ¶ 1175. Accordingly, LG's quoted limitation is adequately supported by the '373 App.<br><br>*See also* evidence cited in Opposition filed herewith. |
|---|---|
| 49. The '373 App. does not disclose "allocat[ing] a portion of the data transmission capacity to the selected logical channel queue, wherein the allocated portion is limited by the traffic shaping rate associated with the selected logical channel queue," but instead discloses that the allocated portion of the data transmission capacity is limited by at most the data available for transmission in the selected logical channel queue and by the data transmission capacity. (*See generally* '373 App., Ex. 7; *see also* Proctor Invalidity Report, Ex. 2, ¶ 386.) | Wi-LAN disputes LG's mischaracterization of the '373 App.'s disclosures to the extent it implies that the quoted limitation is not adequately supported by the '373 App.<br><br>Persons of ordinary skill recognize the relevant limitation when Figure 5 in the '373 App., step 204 states to "segment the contents of the selected segmentation cache to fit within the reported data transmission capacity of the channel," along with step 212 which states to "present the segment to the channel for transmission," and other portions of the specification that teach to also perform "traffic shaping." Gitlin Expert Rpt. Ex. K at ¶ 1176. Accordingly, LG's quoted limitation is adequately supported by the '373 App.<br><br>*See also* evidence cited in Opposition filed herewith. |
| 50. Wi-LAN has asserted that the Patents-in-Suit are essential to, read on, and/or require | Wi-LAN has asserted that the fact LG's Accused Products comply |

Release 8 of the 3GPP LTE standard, and that products that practice or comply with Release 8 of the 3GPP LTE standard necessarily infringe the Patents-in-Suit. (Complaint, Dkt. No. 1, ¶¶ 37, 41, 54, 67; Lomp Report, Ex. 25, ¶¶ 105, 112, 206, 379; Gitlin Report, Ex. 3, ¶ 1115 ("the inventions of the asserted claims appear in the 4G LTE specifications."); Wi-LAN's Final Infringement Contentions Cover Document, Ex. 14, at 2-5; Wi-LAN's First Supplemental Objections and Responses to LG's First Set of Interrogatories, Ex. 5, at 175, 179, 201; Wi-LAN's Objections and Responses to LG's Third Set of Interrogatories, **Ex. 26**, at 14; *Wi-LAN Inc. et al. v. LG Electronics, Inc. et al.*, Case No. 17-cv-358 (S.D. Cal.) ("Prior Litigation"), Wi-LAN's Objections and Responses to LG's First Set of Interrogatories, **Ex. 27**, at 15 ("Wi-LAN contends that products complying with the 3GPP LTE Standards (release 8+) infringe the patents-in-suit…"); *see also id.* at 11-13, 17, 28; Dkt. No. 146 at 1-4, 6, 10 (describing Wi-LAN's 3GPP LTE standard-based infringement theories.)

with Release 8 of the 3GPP LTE standard is evidence they infringe the Patents-in-Suit. Complaint, Dkt. No. 1, ¶¶ 37, 41, 54, 67; Lomp Report, LG Ex. 25, ¶¶ 105, 112, 206, 379; Gitlin Report, LG Ex. 3, ¶ 1115; Wi-LAN's Final Infringement Contentions Cover Document, LG Ex. 14, at 2-5; Wi-LAN's First Supplemental Objections and Responses to LG's First Set of Interrogatories, LG Ex. 5, at 175, 179, 201; Wi-LAN's Objections and Responses to LG's Third Set of Interrogatories, LG Ex. 26, at 14; *Wi-LAN Inc. et al. v. LG Electronics, Inc. et al.*, Case No. 17-cv-358 (S.D. Cal.), Wi-LAN's Objections and Responses to LG's First Set of Interrogatories, LG Ex. 27, at 15; *see also id.* at 11-13, 17, 28; Dkt. No. 146 at 1-4, 6, 10.

*See also* evidence cited in Opposition filed herewith.

51. Release 8 of the 3GPP LTE standard was finalized and publicly released in December of 2008. (*See* Lomp Report, Ex. 25, ¶ 108 ("Release 8 of the 3GPP standards, finalized in December 2008, was the first release for 4G LTE."), 109 ("With respect to infringement of the Asserted Claims, each of the Relevant 4G LTE standards has not changed since Release 8."); Gitlin Report, Ex. 3, at 317 n. 19 ("3GPP Release 8, the first version to include 4G LTE technology, was introduced in about 2008."); *see also* https://www.3gpp.org/technologies/keywords-

Release 8 of the 3GPP standards, finalized in December 2008, was the first release for 4G LTE. The admissible evidence cited by LG does not address public availability for prior art purposes. *See* Lomp Report, LG Ex. 25, ¶¶ 108 ("Release 8 of the 3GPP standards, finalized in December 2008, was the first release for 4G LTE."), 109 ("With respect to infringement of the Asserted Claims, each of the Relevant 4G

| | |
|---|---|
| acronyms/98-lte ("Release 8 was frozen in December 2008…"); https://portal.3gpp.org/#/55934-releases (showing that Release 8 is frozen).) | LTE standards has not changed since Release 8."); Gitlin Report, LG Ex. 3, at 317 n. 19 ("3GPP Release 8, the first version to include 4G LTE technology, was introduced in about 2008.")<br><br>*See also* evidence cited in Opposition filed herewith. |

Dated: October 11, 2019        Respectfully Submitted,


By: */s/ Christopher M. First*
    Leslie V. Payne
    TX Bar No. 00784736 (admitted *pro hac vice*)
    lpayne@hpcllp.com
    Eric J. Enger
    TX Bar No. 24045833 (admitted *pro hac vice*)
    eenger@hpcllp.com
    Christopher M. First
    TX Bar No. 24095112 (admitted *pro hac vice*)
    cfirst@hpcllp.com
    Alden G. Harris
    TX Bar No. 24083138 (admitted *pro hac vice*)
    aharris@hpcllp.com
    HEIM, PAYNE & CHORUSH LLP
    1111 Bagby St., Suite 2100
    Houston, TX 77002
    T: (713)221-2000  F: (713)221-2021

    Victor M. Felix, SBN 179622
    Victor.Felix@procopio.com
    PROCOPIO, CORY, HARGREAVES
    & SAVITCH LLP
    525 B Street, Suite 2200
    San Diego, CA 92101
    Tel. (619) 515-3229
    Fax (619) 744-5409

    Attorneys for Plaintiffs *Wi-LAN*.


## CERTIFICATE OF SERVICE

I hereby certify that on October 11, 2019 all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system.

*/s/ Christopher M. First*
Christopher M. First