# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WI-LAN INC.; WI-LAN USA, INC.; and WI-LAN LABS, INC., <br><br> Plaintiffs, <br><br> v. <br><br> LG ELECTRONICS, INC.; LG ELECTRONICS U.S.A., INC; and LG ELECTRONICS MOBILECOMM U.S.A., INC., <br><br> Defendants. | Case No.: 18-cv-01577-H-BGS <br><br> **ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO EXCLUDE CERTAIN EXPERT OPINIONS** <br><br> [Doc. No. 184.] |

On September 27, 2019, Defendants LG Electronics, Inc., LG Electronics U.S.A., Inc., and LG Electronics Mobilecomm U.S.A., Inc. filed a <u>Daubert</u> motion to strike and exclude certain expert opinions from Plaintiffs Wi-LAN Inc., Wi-LAN USA, Inc., and Wi-LAN Labs, Inc.'s experts. (Doc. No. 184.) On October 3, 2019, LG filed a notice of supplemental authority in support of its <u>Daubert</u> motion.[1] (Doc. No. 213.) On October 11,

---

[1] The Court notes that LG's notice of supplemental authority contains improper additional argument in support of its motion. <u>See</u> <u>Desper Prod., Inc. v. QSound Labs, Inc.</u>, 157 F.3d 1325, 1335 (Fed. Cir. 1998) (The rule allowing for the filing of a notice of supplemental authority "permits a party to bring

1
18-cv-01577-H-BGS

2019, Wi-LAN filed its response in opposition to the Daubert motion. (Doc. No. 253.) On October 18, 2019, LG filed its reply. (Doc. No. 274.)

The Court held a hearing on the matters on November 1, 2019. Leslie V. Payne, Eric J. Enger, and Christopher M. First appeared for Wi-LAN. Richard D. Harris, James J. Lukas, and Matthew J. Levinstein appeared for LG. For the reasons below, the Court grants in part and denies in part LG's Daubert motion.

## Background

On July 11, 2018, Wi-LAN filed a complaint for patent infringement against LG, alleging infringement of U.S. Patent Nos. 8,787,924, 8,867,351, 9,226,320, and 9,497,743. (Doc. No. 1, Compl.) Specifically, Wi-LAN alleges that LG's wireless communication products that are compliant with the 3rd Generation Partnership Project 4G LTE standard directly infringe the patents-in-suit. (Id. ¶¶ 37, 40, 53, 66, 79.)

On October 10, 2018, LG filed an answer to Wi-LAN's complaint along with counterclaims for: (1) declaratory judgments of non-infringement and invalidity of the patents-in-suit; (2) declaratory judgment of unenforceability for failure to disclose to standard setting organizations; (3) declaratory judgment of unenforceability of the '351 patent due to infectious unenforceability; (4) declaratory judgment that LG is entitled to license the patents-in-suit on FRAND/RAND terms and conditions; (5) breach of contract; (6) monopolization and attempted monopolization in violation of section 2 of the Sherman Act; and (7) unfair business practices under California Business and Profession Code § 17200 *et seq*. (Doc. No. 17.)

On April 12, 2019, the Court granted in part and denied in part Wi-LAN's motions to dismiss LG's counterclaims, and the Court dismissed with prejudice LG's counterclaim for declaratory judgment of unenforceability of the '351 patent due to infectious unenforceability. (Doc. No. 79.) On May 28, 2019, the Court issued a claim construction

---

supplemental authorities to the court's attention, not supplemental argument."); Hall v. Shinseki, 717 F.3d 1369, 1373 n.4 (Fed. Cir. 2013); United States v. LaPierre, 998 F.2d 1460, 1466 n.5 (9th Cir. 1993).

order in the action. (Doc. No. 112.) On September 3, 2019, the Court issued an amended scheduling order. (Doc. No. 143.)

On October 24, 2019, the Court issued an order on the parties' first set of motions for summary judgment. (Doc. No. 278.) Specifically, the Court: (1) denied LG's two motions for summary judgment of non-infringement of the patents-in-suit; (3) granted LG's motion for summary judgment of no willful infringement; (4) granted in part and denied in part LG's motion for summary judgment of its patent exhaustion defense; (5) denied Wi-LAN's cross-motion for summary judgment of no patent exhaustion based on the Qualcomm-SOMA agreements; and (6) granted Wi-LAN's motion for summary judgment of LG's standard development organization defenses and counterclaims. (Id. at 79.) In so doing, the Court granted summary judgment in favor of LG on: (1) Wi-LAN's claim for willful infringement of the patents-in-suit; and (2) LG's patent exhaustion defense as to the '351 patent based on the 2000 Qualcomm-SOMA agreement. (Id.) And the Court granted summary judgment in favor of Wi-LAN on: (1) LG's defense and counterclaim of unenforceability for failure to disclose to standard setting organizations; (2) LG's defense and counterclaim that LG is entitled to license the patents-in-suit on FRAND/RAND terms and conditions; (3) LG's counterclaim for monopolization; (4) LG's counterclaim for attempted monopolization; and (5) LG's counterclaim for unfair business practices under California's UCL. (Id.)

By the present motion, LG moves to strike: (1) certain opinions from Wi-LAN's technical expert Dr. Lomp; (2) certain opinions from Wi-LAN's survey expert Dr. Wecker; (3) certain opinions from Wi-LAN's damages expert Mr. Weinstein; and (4) certain opinions from Wi-LAN's SSO and FRAND licensing experts Drs. Mark and Huber. (Doc. No. 203 at 5-21.)

///

///

///

**Discussion**

I.  **Legal Standards for <u>Daubert</u> Motions**

A district court's decision to admit expert testimony under <u>Daubert</u> in a patent case is governed by the law of the regional circuit. <u>Summit 6, LLC v. Samsung Elecs. Co.</u>, 802 F.3d 1283, 1294 (Fed. Cir. 2015). When considering expert testimony offered pursuant to Rule 702, the trial court acts as a "gatekeeper" by "making a preliminary determination of whether the expert's testimony is reliable." <u>Elsayed Mukhtar v. Cal. State Univ., Hayward</u>, 299 F.3d 1053, 1063 (9th Cir. 2002); <u>see</u> <u>Kumho Tire Co. v. Carmichael</u>, 526 U.S. 137, 150 (1999); <u>Daubert</u>, 509 U.S. at 597. Under Rule 702 of the Federal Rules of Evidence, a court may permit opinion testimony from an expert only if "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." The test for reliability of expert testimony is flexible and depends on the particular circumstances of the case. <u>Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.</u>, 738 F.3d 960, 969 (9th Cir. 2013).

"Under <u>Daubert</u>, the district judge is 'a gatekeeper, not a fact finder.' When an expert meets the threshold established by Rule 702 as explained in <u>Daubert</u>, the expert may testify and the jury decides how much weight to give that testimony." <u>Primiano v. Cook</u>, 598 F.3d 558, 564-65 (9th Cir. 2010). "'[T]he test under <u>Daubert</u> is not the correctness of the expert's conclusions but the soundness of his methodology.'" <u>Primiano</u>, 598 F.3d at 564. "Shaky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion." <u>Id.</u> (citing <u>Daubert</u>, 509 U.S. at 594, 596); <u>accord</u> <u>Summit 6</u>, 802 F.3d at 1296. "Basically, the judge is supposed to screen the jury from unreliable nonsense opinions, but not exclude opinions merely because they are impeachable." <u>Alaska Rent-A-Car</u>, 738 F.3d at 969. Further, the Ninth Circuit has explained that "Rule 702 should be applied with a 'liberal thrust' favoring

admission." Messick, 747 F.3d at 1196.

Whether to admit or exclude expert testimony lies within the trial court's discretion. Gen. Elec. Co. v. Joiner, 522 U.S. 136, 141-42 (1997); United States v. Verduzco, 373 F.3d 1022, 1032 (9th Cir. 2004) ("We . . . have stressed that the 'trial court has broad discretion to admit or exclude expert testimony'."). The Ninth Circuit has explained that "[a] trial court not only has broad latitude in determining whether an expert's testimony is reliable, but also in deciding how to determine the testimony's reliability." Ellis v. Costco Wholesale Corp., 657 F.3d 970, 982 (9th Cir. 2011).

## II. Dr. Lomp

LG argues that the Court should strike and exclude Dr. Lomp's opinions on the benefits of the inventions claimed in the '924 and '743 patents because those opinions lack an adequate factual basis. (Doc. No. 203 at 5-9.) Specifically, LG argues that Dr. Lomp's benefits analysis relies on a relationship between voice quality and the technology claimed in the '924 and '743 patents that does not actually exist. (Id. at 1.) In response, Wi-LAN argues that the Court should not exclude Dr. Lomp's analysis because his opinions are directly tied to the claimed inventions. (Doc. No. 253 at 4-9.) Wi-LAN argues that LG's arguments go to the weight, not the admissibility, of Dr. Lomp's opinions. (Id. at 9-12.)

### A. Dr. Lomp's Benefits Analysis

In his expert report, Wi-LAN's infringement expert, Dr. Lomp, includes a section on the benefits of the '924 patent and the '743 patent, including a subsection entitled "Multiple Connections Benefits Analysis." (Doc. No. 207, Ex. 2 Lomp Expert Report ¶¶ 292-345.) In this section, Dr. Lomp explains that "the '924 and '743 Patents disclose an invention that enables a cellular device to allocate its allotted bandwidth across its various connections." (Id. ¶ 292.) Dr. Lomp explains:

> The '924 and '743 Patents provide inventions that permit, among other things, voice data flows between a cellular device and a cellular network (and ultimately to a remote telephone) to be transmitted at minimal latency and with minimal loss of data. This is accomplished by providing a separate connection for the voice data. This connection is dedicated to the voice data

flow and is not shared with other data flows. Conversely, the other data flows
that may exist in the cellular device, such as data flows for internet browsing,
email, etc., are carried on a different connection or connections.

(Id. ¶ 294.)

Dr. Lomp goes on to explain that in Voice over LTE ("VoLTE"), voice data packets are separated from other data packets and are transmitted on a special connection dedicated to the voice service in accordance with the teaching of the '924 and '743 Patents. (Id. ¶ 311.) In contrast, when transmitted over a 4G LTE network, SKYPE voice data is not segregated into its own connection with its own QoS characteristics, but rather SKYPE voice data is lumped in with all other data transmissions. (Id. ¶ 309.) Dr. Lomp explains that "SKYPE, therefore, does not take advantage of the inventions of the '924/'743 Patents." (Id.)

In light of this, Dr. Lomp performs an analysis that attempts to determine the extent of the multiple connections benefit of the '924 and '743 patents by comparing the technical benefits of VoLTE to Skype. (Id. ¶¶ 317-35.) In performing this analysis, Dr. Lomp relies on a study in the "Signals Ahead Report" that compared the voice quality of a VoLTE call to a SKYPE call under various conditions. (Id. ¶ 319.) Dr. Lomp opines the study's "results showed that the voice quality of a VoLTE call was far superior to the voice quality of a SKYPE call due to the claimed multiple connections." (Id.) To support this opinion, Dr. Lomp cites to the following passages from the report:

> According to the MOS (mean opinion score) results, VoLTE achieved a . . . measurably higher call quality that [*sic*] the HD voice service offered by Skype. And while other network traffic or background traffic downloading on a smartphone could bring Skype Voice to its knees, there was no indication that it impacted the VoLTE call. This result stems from VoLTE using QoS Class Identifier 1 (QCI=1), a guaranteed bearer [a "connection"] that isn't supported by OTT (over-the-top) applications [like Skype]."
>
> . . .

In the case of VoLTE, . . . running additional applications [in the background] . . . had no impact on the MOS. It was a completely different story for Skype, which does not support QCI=1, a key VoLTE feature that gives the voice data packets preferential treatment over best effort data packets, such as those generated by Skype."

(Id.)[2]

In his report, Dr. Lomp applies three different approaches to analyzing the data contained in the Signals Ahead Report in an effort to "isolate and remove [the non-claimed VoLTE] contributions so as to isolate the benefit due to the patents' teachings." (Id. ¶ 332; see id. ¶¶ 321-35.) After applying these three approaches, Dr. Lomp concludes that the average MOS benefits attributable to the inventions claimed in the '924 and '743 patents are approximately 1.43 to 1.69. (Id. ¶ 334.)

B. Daubert Analysis

"Upon a finding of infringement, the patentee is entitled to 'damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer.'" AstraZeneca AB v. Apotex Corp., 782 F.3d 1324, 1329–30 (Fed. Cir. 2015) (quoting 35 U.S.C. § 284). The Federal Circuit has "has sanctioned the use of the Georgia–Pacific factors to frame the reasonable royalty inquiry." Uniloc USA, Inc. v. Microsoft Corp., 632 F.3d 1292, 1317 (Fed. Cir. 2011). Georgia-Pacific factor 10 considers "'the nature of the patented invention, its character in the commercial embodiment owned and produced by the licensor, and the benefits to those who used it.'" AstraZeneca, 782 F.3d at 1338. As such, Dr. Lomp's benefits analysis is relevant to the reasonable royalty analysis in this case and, specifically, to Georgia-Pacific factor 10.

To be admissible, expert testimony opining on a reasonable royalty must 'sufficiently [tie the expert testimony on damages] to the facts of the case.'" Exmark Mfg.

---

[2] Dr. Lomp explains that "MOS, or mean opinion score, is a well-known and well-established method of evaluating voice quality." (Doc. No. 207, Ex. 2 Lomp Expert Report ¶ 312; see also Doc. No. 203 at 6 n.2.)

7

18-cv-01577-H-BGS

Co. Inc. v. Briggs & Stratton Power Prod. Grp., LLC, 879 F.3d 1332, 1349 (Fed. Cir. 2018) (quoting Uniloc, 632 F.3d at 1315); see also Fed. R. Evid. 702 (requiring that expert testimony be "based on sufficient facts or data" and "reliably appl[y] the principles and methods to the facts of the case"). Thus, "expert testimony opining on a reasonable royalty rate must 'carefully tie proof of damages to the claimed invention's footprint in the market place.'" Uniloc, 632 F.3d at 1317 (quoting ResQNet.com, Inc. v. Lansa, Inc., 594 F.3d 860, 869 (Fed. Cir. 2010)). "'If the patentee fails to tie the theory to the facts of the case, the testimony must be excluded.'" Exmark, 879 F.3d at 1349 (quoting Uniloc, 632 F.3d at 1315).

Here, Dr. Lomp's benefits analysis is sufficiently tied to claimed invention of the '924 and '743 patents and the facts of the case to withstand a Daubert challenge, at least for now. Dr. Lomp begins his analysis by explaining the relevant feature of the claimed invention: that it allows voice data flows between a cellular device and a cellular network (and ultimately to a remote telephone) to be transmitted at minimal latency and with minimal loss of data by providing a separate dedicated connection for the voice data. (Doc. No. 207, Ex. 2 Lomp Expert Report ¶¶ 292-94.) Dr. Lomp then finds a technology that he asserts utilizes this feature, VoLTE, and a technology that does not, Skype Voice. (Id. ¶¶ 308-11.) Dr. Lomp then analyzes data from a study comparing the voice quality of the two technologies to derive a measurement of the difference in voice quality between VoLTE and Skype that Dr. Lomp opines is due to VoLTE's use of the claimed invention. (Id. ¶¶ 321-35.) In so doing, Dr. Lomp bases his analysis on the invention claimed in '924 and '743 patents and the infringing technology at issue – the LTE standard and specifically VoLTE. This is sufficient satisfy Rule 702 at this time.

LG argues that it is improper for Dr. Lomp to rely on the Signals Ahead Report because the testing in the report relates to VoLTE and not specifically the '924 and '743 patents. (Doc. No. 203 at 5-7.) LG notes that the Signals Ahead Report never mentions the '924 patent or the '743 patent. (Id. at 6.) LG further notes that one of the named inventors of the '924 and '743 patents testified in another case that he did not invent

VoLTE. (Id. at 6-7)

In his report, Dr. Lomp explains that he utilized the Signals Ahead Report because it contains testing of the voice quality of a VoLTE call to a Skype call under various conditions. (Doc. No. 207, Ex. 2 Lomp Expert Report ¶ 319.) Dr. Lomp explains that the report's study is relevant to the present case because it is his opinion that VoLTE utilizes the infringing feature of the claimed invention (a special connection dedicated to voice service), and Skype represents a non-infringing alternative. (Id. ¶¶ 309, 311) Further, Dr. Lomp notes that the Signals Ahead Report itself contains statements linking the difference in voice quality between VoLTE and Skype to what Dr. Lomp opines is the infringing feature of the invention. (Id. ¶ 319.) In light of this, Dr. Lomp has provided a sufficient basis to support his reliance on the Signals Ahead Report. Further, the Federal Circuit has sanctioned the utilization of this type of comparative analysis to support a reasonable royalty estimate.[3] See Summit 6, 802 F.3d at 1296 (explaining that an expert may "value the infringed features by comparing the accused product to the non-infringing alternatives"). In addition, Federal Circuit precedent only requires an "approximate value of th[e] technological contribution," not absolute precision. Ericsson, Inc. v. D-Link Sys., Inc., 773 F.3d 1201, 1233 (Fed. Cir. 2014); see Virnetx, Inc. v. Cisco Sys., Inc., 767 F.3d 1308, 1328 (Fed. Cir. 2014) ("[W]e are cognizant of the difficulty that patentees may face in assigning value to a feature that may not have ever been individually sold. However, we note that we have never required absolute precision in this task; on the contrary, it is well-understood that this process may involve some degree of approximation and uncertainty.").

LG also argues that Dr. Lomp could not rely on the Signals Ahead Report's test results because those results are based on a non-accused product, specifically two Samsung Galaxy S4 mini phones. (Doc. No. 203 at 7.) LG argues that Dr. Lomp has not offered

---

[3] In light of this, the Court rejects LG's contention that no court has ever condoned Dr. Lomp's methodology.

9

18-cv-01577-H-BGS

any opinions on whether the Samsung Galaxy S4 mini infringes the '924 and '743 patents, such that he can rely on the Signals Ahead Report in his analysis. LG is wrong. In his expert report, Dr. Lomp opines that LTE-compliant products infringe the '924 and the '743 patents. (Doc. No. 207, Ex. 2 Lomp Expert Report ¶¶ 102-111, 114-255.) The Samsung phones utilized in the Signals Ahead Report were LTE-compliant phones powered by "a Qualcomm LTE modem" making VoLTE and Skype calls over a LTE network. (Doc. No. 184-2, Ex. 2 at 9-10, 18-23.) As such, the Court rejects LG's argument.

LG also argues that it was improper for Dr. Lomp to rely on the Signals Ahead Report test results because "those results constitute only a snapshot of voice call quality data corresponding to a single location, over a narrow time period, for a single cellular carrier, not during the infringement period." (Doc. No. 203 at 8.) But all of these specific challenges go to the weight of Dr. Lomp's analysis, not its admissibility. See i4i Ltd. P'ship v. Microsoft Corp., 598 F.3d 831, 852 (Fed. Cir. 2010) ("When the methodology is sound, and the evidence relied upon sufficiently related to the case at hand, disputes about the degree of relevance or accuracy (above this minimum threshold) may go to the testimony's weight, but not its admissibility."). LG's challenges to the Signals Ahead Report are more appropriately addressed through "cross examination, contrary evidence, and attention to the burden of proof, not exclusion." Primiano, 598 F.3d at 564; accord Summit 6, 802 F.3d at 1296. As such, the Court rejects LG's challenges to Dr. Lomp's benefits analysis at this time. See ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc., 694 F.3d 1312, 1333 (Fed. Cir. 2012) ("At their core, [defendant's] disagreements are with the conclusions reached by [plaintiff]'s expert and the factual assumptions and considerations underlying those conclusions, not his methodology. These disagreements go to the weight to be afforded the testimony and not its admissibility.").

Finally, LG notes that one of Wi-LAN's technical experts in a different case involving a different – but related – patent being asserted against LTE-compliant products conducted a similar benefits analysis based on the Signals Ahead Report's comparison of VoLTE and Skype to similarly conclude that the patent at issue in that case was responsible

for a 1.58 to 1.8 MOS improvement in voice quality.[4] (Doc. No. 274 at 2-3 (citing Doc. No. 274, Ex. A Madissetti Expert Report ¶ 43)).) See Apple Inc. v. Wi-LAN, Inc., No. 14CV2235 DMS (BLM), 2019 WL 4248899, at *3 (S.D. Cal. Jan. 3, 2019); Apple Inc. v. Wi-LAN, Inc., No. 14-cv-2235-DMS-BLM, Docket No. 714 at 6, 11-12 (S.D. Cal. Oct. 1, 2019). LG further notes that the expert's benefits analysis has twice been rejected by the district court in that case on the grounds that the analysis was based on improper assumptions that were not supported by the record. See Apple, 2019 WL 4248899, at *3–5 ("Absent a sufficient factual basis, Dr. Madisetti's opinion about the 'benefits' of claim 26 of the '145 Patent should not have been presented to the jury."); Apple, No. 14-cv-2235-DMS-BLM, Docket No. 714 at 10-13 ("Wi-LAN's benefits methodology is not reliable and was not reliably applied to the facts of this case. Accordingly, the Court grants Apple's motion to exclude this methodology.").

The Court acknowledges the district court holdings in the Apple case. But the record that was before the district court in the Apple case is not the record that is before the Court in this case. The cases involve different patent claims and different experts with different expert reports. Based on the record before the Court in this case, Dr. Lomp has provided an adequate basis for his reliance on the Signals Ahead Report to support the methodology employed in his benefits analysis.

In sum, the Court declines to exclude Dr. Lomp's benefits opinions at this time. Nevertheless, the Court reserves the right to reevaluate the admissibility of Dr. Lomp's benefits opinions at trial after the Court has had the opportunity to see the evidence in the record to support Dr. Lomp's opinions. Accordingly, the Court denies LG's motion to exclude Dr. Lomp's benefits opinions without prejudice to a contemporaneous objection at trial.

---

[4] The Court notes that U.S. Patent No. 8,457,145, the patent at issue in the Apple case, is related to the '924 patent and the '743 patent. Compare U.S. Patent No. 8,457,145, at (63) (filed Jun. 4, 2013) with '924 Patent at (63); '743 Patent at (63). Nevertheless, Wi-LAN notes that they are different patents with different sets of claims. (Doc. No. 253 at 12-13.)

## III. Dr. Wecker

LG argues that the Court should strike and exclude Dr. Wecker's survey opinions because they are based on Dr. Lomp's flawed benefits analysis. (Doc. No. 203 at 9-11.) LG explains that Dr. Wecker's survey questions relied on two audio files of differing voice quality that were selected by Dr. Lomp. (Id. at 9, 11.) LG further explains that Dr. Lomp selected these two audio files based on the results of his benefits analysis derived from the Signals Ahead Report. (Id.) LG argues, therefore, that the Court should exclude Dr. Wecker's opinions because they are based on Dr. Lomp's flawed opinions. (Id. at 10-11.)

The Court has declined to exclude Dr. Lomp's benefits analysis at this time. As such, the Court also declines to exclude Dr. Wecker's survey opinions at this time, and the Court denies LG's motion to exclude this portion of Mr. Weinstein's opinions without prejudice to a contemporaneous objection at trial.

## IV. Mr. Weinstein

### A. Reliance on Dr. Wecker's Survey Results

LG argues that the Court should strike and exclude Mr. Weinstein's reasonable royalty opinions that rely on Dr. Wecker's survey results. (Doc. No. 203 at 11-12.) LG argues that these specific opinions should be excluded because they rely on Dr. Wecker's flawed survey. (Id.)

The Court has declined to exclude Dr. Wecker's survey opinions at this time. As such, the Court also declines to exclude Dr. Weinstein's reasonable royalty opinions that rely on Dr. Wecker's survey results at this time, and the Court denies LG's motion to exclude this portion of Mr. Weinstein's opinions without prejudice to a contemporaneous objection at trial.

### B. Wi-LAN Rate Sheet

LG also argues that the Court should strike Mr. Weinstein's royalty opinions that rely on Wi-LAN's rate sheet. (Doc. No. 203 at 12-15.) LG argues that it was improper for Mr. Weinstein to use the rate sheet in his analysis because the rate sheet is irrelevant and highly prejudicial. (Id. at 13-15.) In response, Wi-LAN argues that that Mr. Weinstein's

reliance on the rate sheet is proper. (Doc. No. 253 at 15-18.)

The Federal Circuit has explained that a proposed, but unaccepted license, *i.e.*, an offered license, "may have some value for determining a reasonable royalty in certain situations." Whitserve, LLC v. Computer Packages, Inc., 694 F.3d 10, 29–30 (Fed. Cir. 2012). However, the Federal Circuit cautioned that its "evidentiary value is limited, however, by, *inter alia*, the fact that [a] patentee[] could artificially inflate the royalty rate by making outrageous offers." Id. at 30 (citing Deere & Co. v. Int'l Harvester Co., 710 F.2d 1551, 1557 (Fed. Cir. 1983) (upholding district court's decision to give little probative value to an offer to license)).

Wi-LAN has presented evidence from its Senior Vice President, Mr. Parolin, stating that the 2017 rate sheet memorializes its licensing practices and has been used by Wi-LAN in every wireless licensing negotiation as a starting point and as a guide. (Doc. No. 253-1, Ex. H Parolin Decl. ¶¶ 14-15.) Mr. Parolin further states that it has specifically engaged in many licensing negotiations where its opening licensing offer was a specific rate offered in the rate sheet and gives examples of such offers in his declaration. (Id. ¶¶ 16-22.) Because Wi-LAN has utilized the rate sheet in actual licensing negotiations and has made actual licensing offers based on its rates, under Whitserve, the rate sheet is relevant to a reasonably royalty determination. As such, the Court rejects LG's argument that the rate sheet is irrelevant.

Nevertheless, the Court agrees with LG that under these circumstances, the rate sheet is inadmissible under Federal Rule of Evidence 403. Under Rule 403, a "court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."

Although there is evidence in record that Wi-LAN used the rate sheet in actual licensing negotiations, there is no evidence in the record showing that anyone has ever agreed to one of the specific rates offered in Wi-LAN's rate sheet. Wi-LAN asserts that the rate sheet tracks actual royalty rates that Wi-LAN's licensees have agreed to pay. (Doc.

No. 253 at 15-16.) But in making this argument, Wi-LAN actually shows that the rates offered in the rate sheet were consistently rejected by Wi-LAN's licensees, and the licensees agreed to a lower rate in every license. Wi-LAN identifies six licenses that it represents were entered into following an opening licensing offer made pursuant to the rate sheet. (Id. at 16.) Wi-LAN then lists the ultimately agreed upon rate, showing that for every one of these licenses, the licensee agreed to a rate that was noticeably lower than the rate offered by Wi-LAN pursuant to the rate sheet/its licensing policy. (Compare id. at 15 with id. at 16; see also Doc. No. 253-1, Ex. H Parolin Decl. ¶¶ 17-21.) In the licenses listed by Wi-LAN, the actual rates to which the licensees agreed were between approximately 41% and 76% of the rate offered. (See id.)

Further, the record contains 21 actual licenses that Wi-LAN has entered into, including one prior license that was specifically between Wi-LAN and LG – the parties in this action – and covered the patents-in-suit. (Doc. No. 203, Ex. 8 Weinstein Expert Report ¶¶ 65-92.) Cf. LaserDynamics, Inc. v. Quanta Computer, Inc., 694 F.3d 51, 79 (Fed. Cir. 2012) ("Actual licenses to the patented technology are highly probative as to what constitutes a reasonable royalty for those patent rights because such actual licenses most clearly reflect the economic value of the patented technology in the marketplace."). In light of the above, the probative value of the rate sheet as to the reasonable royalty analysis in this case is severely diminished and insufficient to substantially outweigh the risk of unfair prejudice of skewing the damages horizon. See Fed. R. Evid. 403; Deere, 710 F.2d at 1557 (upholding the district court's decision finding "no significant persuasive value" in an offer to license under the circumstances); Apple Inc. v. Wi-LAN, Inc., No. 14CV2235 DMS (BLM), 2019 WL 4253832, at *2 (S.D. Cal. Mar. 26, 2019) (concluding that "[a]dmission of the [Wi-LAN] rate sheets was . . . prejudicial" and "'skew[ed] the damages horizon for the jury'"); Apple, No. 14-cv-2235-DMS-BLM, Docket No. 714 at 6 ("Wi-LAN's Rate Sheets should not have been admitted because they were more prejudicial than probative."). As a result, the Court grants this portion of LG's motion to exclude, and the Court excludes the 2017 Rate Sheet and Mr. Weinstein's opinions that rely on the rate

sheet.

## V. Drs. Huber and Marks

LG argues that the Court should preclude the expert testimony of Drs. Huber and Marks because their opinions constitute impermissible legal conclusions. (Doc. No. 203 at 18-21.) Drs Huber and Marks offer opinions about "standards development, standards development organizations, and IPR policies in the context of mobile telecommunication." (Doc. No. 254 at 19 (citing Doc. No. 184-8, Ex. 11 Huber Expert Report at 3 ¶ 12).) Wi-LAN explains that the expert opinions of Drs. Mark and Huber are relevant to LG's standards development organization defenses and counterclaims. (Id. at 20-21.)

On October 24, 2019, the Court granted summary judgment in favor of Wi-LAN on: (1) LG's defense and counterclaim of unenforceability for failure to disclose to standard setting organizations; (2) LG's defense and counterclaim that LG is entitled to license the patents-in-suit on FRAND/RAND terms and conditions; (3) LG's counterclaim for monopolization; (4) LG's counterclaim for attempted monopolization; and (5) LG's counterclaim for unfair business practices under California's UCL. (Doc. No. 278 at 79.) As a result, LG's motion to exclude portions of the opinions of Drs. Huber and Marks is denied as moot.

## Conclusion

For the reasons above, the Court grants in part and denies in part LG's Daubert motion to strike and exclude certain expert opinions. Specifically, the Court excludes the 2017 Rate Sheet and Mr. Weinstein's opinions that rely on the rate sheet. The Court denies the remainder of LG's motion without prejudice to a contemporaneous objection at trial.

**IT IS SO ORDERED.**

DATED: November 1, 2019

MARILYN L. HUFF, District Judge
UNITED STATES DISTRICT COURT